## DE LIMA *v.* BIDWELL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 456.   Argued January 8, 9, 10, 11, 1901.—Decided May 27, 1901.

By the Customs Administrative Act of 1890 an appeal is given from the decision of the collector "as to the rate and amount of the duties chargeable upon imported merchandise," to the Board of General Appraisers, who are authorized to decide "as to the construction of the law and the facts respecting the classification of such merchandise; and the rate of duties imposed thereon under such classification;" but where the merchandise is alleged not to have been imported at all, but to have been brought from one domestic port to another, the Board of General Appraisers has no jurisdiction of the case, and an action for money had and received will lie against the collector to recover back duties assessed by him upon such property, and paid under protest.

With the ratification of the treaty of peace between the United States and Spain, April 11, 1899, the island of Porto Rico ceased to be a "foreign country" within the meaning of the tariff laws.

Whatever effect be given to the act of March 24, 1900, applying for the benefit of Porto Rico the duties received on importations from that island after the evacuation by the Spanish forces, it has no application to an action brought before the act was passed.

THIS was an action originally instituted in the Supreme Court of the State of New York by the firm of D. A. De Lima & Co.

against the collector of the port of New York, to recover back duties alleged to have been illegally exacted and paid under protest, upon certain importations of sugar from San Juan in the island of Porto Rico, during the autumn of 1899, and subsequent to the cession of the island to the United States.

Upon the petition of the collector, and pursuant to Rev. Stat. sec. 643, the case was removed by certiorari to the Circuit Court of the United States, in which the defendant appeared and demurred to the complaint upon the ground that it did not state a cause of action, and also that the court had no jurisdiction of the case. The demurrer was sustained upon both grounds, and the action dismissed. Hence this writ of error.

In this and the following cases, which may be collectively designated as the " Insular Tariff Cases," the dates here given become material :

In July, 1898, Porto Rico was invaded by the military forces of the United States under General Miles.

On August 12, 1898, during the progress of the campaign, a protocol was entered into between the Secretary of State and the French Ambassador on the part of Spain, providing for a suspension of hostilities, the cession of the island and the conclusion of a treaty of peace. 30 Stat. 1742.

On October 18, Porto Rico was evacuated by the Spanish forces.

On December 10, 1898, such treaty was signed at Paris, (under which Spain ceded to the United States the island of Porto Rico,) was ratified by the President and Senate, February 6, 1899, and by the Queen Regent of Spain, March 19, 1899. 30 Stat. 1754.

On March 2, 1899, an act was passed making an appropriation to carry out the obligations of the treaty.

On April 11, 1899, the ratifications were exchanged, and the treaty proclaimed at Washington.

On April 12, 1900, an act was passed, commonly called the Foraker Act, to provide temporary revenues and a civil government for Porto Rico, which took effect May 1, 1900.

This case was argued with No. 507, *Downes* v. *Bidwell;* No. 501, *Dooley* v. *United States;* No. 502, *Dooley* v. *United*

*States;* No. 509, *Armstrong* v. *United States.* The briefs and the arguments were reported at length in a book entitled "The Insular Cases," compiled and published pursuant to a resolution of the House of Representatives passed in the Second Session of the 56th Congress, and containing both the briefs of counsel and their oral arguments. They amounted to 1075 pages. Of course it is impossible to reproduce all here, even if it were desirable.

*Mr. Frederick R. Coudert, Jr.,* for plaintiff in error. *Mr. Charles Frederick Adams* and *Mr. Paul Fuller* were on his brief.

The questions of law involved are: *First,* whether the said circuit court "*had jurisdiction* of the cause of action alleged in the complaint against the defendant." *Second,* whether "the complaint states facts sufficient to constitute a cause of action against the defendant."

1. The questions are raised under the following circumstances: "On or about the 6th day of November, 1899, the defendant" (being at the time "the duly appointed and commissioned collector of customs of the United States at the port of New York, in the actual and unrestricted exercise of his functions as such collector, and fully vested with all the powers and authority of his said office") "did under color of his said office and through the . . . exercise of the powers and authority in him vested for the purposes of the performance of his duties as such collector, . . . demand and by duress of goods collect from the plaintiffs' said firm of D. A. De Lima & Co., as alleged duties upon certain sugars, the product of the island of Puerto Rico, consigned to (said) plaintiffs at the port of New York, and brought thither from the port of San Juan in the said island during the month of July, 1899, by steamer *Salamanca* (the said sugars being those mentioned and described in warehouse entry No. 117,587, bond No. 1224, liquidated September 11, 1899), the sum of two thousand four hundred and fifty dollars and fifty-eight cents ($2450.58), which sum the plaintiffs were . . . against their will and in spite of their formal protest duly made, com-

pelled to pay, and did pay, in order to obtain possession of the said sugars, . . . . which the said defendant, enabled so to do by the power and authority of his said office, had detained, was detaining, and threatened to continue to detain from them, exacting as a condition to the delivery thereof such payment of said alleged duties. . . .

". . . On or about the 14th day of September, 1899, the defendant, being such collector as aforesaid, did, under color of his said office, and through the . . . exercise of the powers and authority in him vested for the purposes of the performance of his duties as such collector, . . . demand and by duress of goods collect from the plaintiffs' said firm of D. A. De Lima & Co., as alleged duties upon certain sugars, the product of the island of Puerto Rico, consigned to the plaintiffs at the port of New York, and brought thither from the port of San Juan in the said island during the month of June, 1899, by steamer *Evelyn* (the said sugars being those mentioned and described in consumption entry No. 95,684, liquidated Sept. 11, 1899), the sum of five thousand four hundred and fifty-two dollars and sixty-one cents ($5,452.61), which sum (the) plaintiffs were . . . against their will and in spite of their formal protest duly made, compelled to pay, and did pay, in order to obtain possession of said sugars, . . . which the said defendant, enabled so to do by the power and authority of his said office, had detained, was detaining, and threatened to continue to detain from them, exacting as a condition to the delivery thereof such payment of such alleged duties. . . .

". . . On or about the 1st day of September, 1899, the defendant being such collector as aforesaid, did, under color of his said office and through the . . . exercise of the powers and authority in him vested for the purpose of the performance of his duties as such collector . . . demand and by duress of goods collect from the plaintiffs' said firm of D. A. De Lima & Co., as alleged duties upon certain sugars, the product of the island of Puerto Rico, consigned to (the) plaintiffs at the port of New York, and brought thither from the port of San Juan, in the said island, during the month of ————, 1899, by steamer *Catania* (the said sugars being those mentioned and described

in consumption entry No. 89,319, liquidated September 1st, 1899), the sum of five thousand two hundred and forty-two dollars and seventeen cents ($5242.17), which sum (the) plaintiffs were . . . against their will and in spite of their formal protest duly made, compelled to pay, and did pay, in order to obtain possession of their said sugars, . . . which the said defendant, enabled so to do by the power and authority of his said office, had detained, was detaining, and threatened to continue to detain from them, exacting as a condition to the delivery thereof, such payment of such alleged duties. . . ." (Facts stated in the complaint and admitted by the demurrer, Record pp. 3, 4 and 5.)

Having thus, under protest, paid the said alleged duties exacted from them as a condition to the delivery to them of the sugars in question, the plaintiffs in error brought this suit to recover back the same, in the Supreme Court of the State of New York.

By writ of *certiorari*, dated March 22, 1900, and sued out by the defendant Bidwell, through Henry L. Burnett, Esq., United States attorney, acting as attorney for said defendant, the said suit was removed into the said Circuit Court of the United States for the Southern District of New York, in the Second Circuit.

Thereupon the said United States attorney, acting as attorney for said defendant, interposed a demurrer to the complaint upon the following grounds:

"*First.* Upon the ground that it does not state facts sufficient to constitute a cause of action against the defendant.

"*Second.* Upon the ground that this court has no jurisdiction of the cause of action alleged in said complaint against said defendant."

By its decree, filed October 17, 1900, the said Circuit Court "ordered, adjudged, and decreed that the said demurrer . . . be sustained, both on the ground that the complaint does not state facts sufficient to constitute a cause of action against the defendant, and on the further ground that this court has no jurisdiction of the cause of action alleged in the complaint against the defendant;" and on the same day judgment was

signed and filed, "that the complaint be dismissed" with costs.

To review the said judgment this writ of error has been brought.

I. It is not true "that (the) court has no jurisdiction of the cause of action alleged in said complaint against (the) defendant." The action being one against a Federal official for acts done by color of his office, and the remedy provided by the customs administrative act not being available (inasmuch as the plaintiff does not "concede that the [sugar] is imported merchandise"), the jurisdiction of the court to entertain this action is entirely beyond question.

II. It is not true that the complaint "does not state facts sufficient to constitute a cause of action:"

1. Puerto Rico was not, in June or September, 1899, a "foreign country" within the meaning of that term as used in the tariff act of 1897 (under authority of which, and of which alone, the defendant claimed the right to collect as duties the sums mentioned in the complaint).

2. Even if—in denial of the foregoing contention—the tariff act of 1897 had to be construed as in fact purporting to authorize the collection of duties on goods brought from Puerto Rico into New York in June or September, 1899, then, in that aspect of it, and to that extent, the act in question must be held unconstitutional and ineffectual to justify the exaction complained of in this case.

*a.* Congress cannot "lay and collect" any "duties" save such as are "uniform throughout the United States;"

*b.* "Duties" collectible "on goods brought from Puerto Rico into New York in June or September, 1899," would have been duties not "uniform throughout the United States," Puerto Rico having been, ever since the ratification of the treaty with Spain (antedating the period in question), a part of "the United States:"

(1) Treaties "ceding" territory to the United States make the territory so "ceded" a part of the United States within the meaning of the provision of the Constitution as to the uniformity of duties throughout the United States.

(2) The treaty with Spain "ceded" Puerto Rico to the United States as of the date when such treaty became effective (a date antedating the period here in question). There was nothing to postpone or suspend the operation of the treaty as a present cession of the island, in the circumstance—the only one which has been suggested to that effect—that it (the treaty) provides that the Congress shall determine the civil rights and political status of the native inhabitants of the ceded islands and that the Spanish-born inhabitants may have one year in which to choose whether to preserve or abandon their allegiance to Spain.

It is not true "that the court has no jurisdiction of the cause of action alleged in said complaint against (the) defendant." The action being one against a Federal official for acts done by color of his office, and the remedy provided by the customs administrative act not being available (inasmuch as plaintiff does not "concede that the sugar is imported merchandise"), the jurisdiction of the court to entertain this action is entirely beyond question.

The defendant's claim (in his "second ground" of demurrer) that the court has no jurisdiction of this action, is based, as appears by his brief in the court below, on the view "that the entire and only existing remedy for all claimants for duties alleged to be illegally exacted is to be found in the customs administrative act of June 10, 1890, which has provided for a new course of procedure on behalf of such claimants, repealed the preëxisting rights of action in such cases, and relieved the collector from liability for his decisions or actions as to customs duties."

In other words, the argument is that "the act of 1890" on the one hand provided a "remedy" (distinct from an action, such as the present one, against the collector), of which special remedy the plaintiffs here might have availed themselves to secure a decision of the issue they have sought to present in this suit; while on the other hand, the said act in effect prevented the valid bringing of such an action as the present by repealing (in sec. 29) "sections 2931 and 3011" of the Revised

Statutes ("providing for an exclusive statutory right of action."), and expressly (in sec. 25) "relieving the collector from liability," etc.

To the contrary of this, we respectfully submit:

*First.* That the "remedy" and the "procedure" provided by the customs administrative act of June 10, 1890, have no application whatever to, and are not available in, cases which (like the present one) are not "customs" cases at all (the merchandise not having been "imported"); and,

*Second.* That the act of 1890 has not prevented the valid bringing of such an action as the present, in a case such as that set up by the complaint herein, by its repeal of sections 2931 and 3011 of the Revised Statutes and its provision that collectors should not be liable for or on account of any of the matters mentioned in that connection in section 25 of the act.

I. That the "remedy" and the procedure provided by the customs administrative act of 1890 are not available in cases which (like the present one) are not "customs" cases at all, has been distinctly laid down by this court in its unanimous opinion in the *Fassett* case, as the following quotations show:

"It is contended on behalf of Fassett that when he, as collector, took possession of the yacht and decided that she was dutiable, the only remedy open to her owner was to pay under protest the duties assessed upon her, and in that way secure possession of her, with the right thereafter, as provided in sections 14 and 15 of the customs administrative act, of June 10th, 1890, 26 Stat. 131, 137, 138, to obtain a refund of those duties by taking an appeal from the decision of the collector to the Board of General Appraisers, and appealing, if necessary, from that board to the Circuit Court of the United States."

"The idea embodied in the libel is, that if the yacht was not an imported article, the act of the collector in forcibly taking possession of her was tortious, and, as that act was committed on the navigable waters of the United States, the District Court, as a court of admiralty, had jurisdiction, in a cause of possession, to compel the restitution of her. The libel presents for the determination of the District Court, as the subject-matter of the suit, the question whether the yacht is an imported article,

within the meaning of the customs revenue laws." p. 483. "The libellant had no other remedy than the filing of this libel. He has none under the customs administrative act, of June, 1890. By § 14 of that act, the decision of the collector as to 'the rate and amount' of duties chargeable upon imported merchandise is made final and conclusive, unless the owner, etc., . . . The appeal provided for in § 15 brings up for review in court only the decision of the Board of General Appraisers as to the construction of the law, and the facts respecting the classification of imported merchandise, and the rate of duty imposed thereon under such classification. It does not bring up for review the question of whether an article is imported merchandise or not; nor, under § 15, is the ascertainment of that fact such a 'decision' as is provided for. The decisions of the collector from which appeals are provided for by § 14 are only decisions as to 'the rate and amount' of duties charged upon imported merchandise, and decisions as to dutiable costs and charges, and decisions as to fees and exactions of whatever character. Nor can the court of review pass upon any question which the collector had not original authority to determine. The collector has no authority to make any determination regarding any article which is not imported merchandise; and if the vessel in question here is not imported merchandise the court of review would have no jurisdiction to determine any matter regarding that question, and could not determine the very fact which is in issue under the libel in the district court, on which the rights of the libellant depended (*i. e.*, the question whether the yacht was 'imported merchandise').

"Under the customs administrative act, the libellant, in order to have the benefit of proceedings thereunder, must concede that the vessel is imported merchandise, which is the very question put in contention under the libel, and must make entry of her as imported merchandise, with an invoice and a consular certificate to that effect, and thus estop himself from maintaining the fact which he alleges in his libel, that she is not imported merchandise." *In re Fassett*, 142 U. S. pp. 486-7.

The principle of the case has never been repudiated or qualified by this court, and the only supposed authority against it which the learned district attorney was able to cite in the Cir-

cuit Court is the decision in *Lascelles* v. *Bidwell*, 102 Fed. Rep. 1004, the entire report of which reads as follows: "*Lascelles* v. *Bidwell*, (Circuit Court, S. D., New York, March 19, 1900). Motion for preliminary injunction. Charles Henry Butler, for the motion. Henry L. Burnett, U. S. Atty., opposed. *Lacombe*, circuit judge. Motion denied on authority of *Cruikshank* v. *Bidwell*, 176 U. S. 73. Complainant has an adequate, summary, and expeditious remedy at law under the customs administrative act."

As the existence of "an adequate remedy at law," even though not "under the customs administrative act," afforded ample ground for the denial of the motion for an injunction, the specification of the customs act as affording the remedy at law, was clearly not of the essence of the ruling, but in the nature of a merely incidental *dictum*. It is hardly to be supposed that, had the learned Circuit Judge had distinctly in mind at the time of writing the reasoning and doctrine above quoted from the unanimous opinion of this court in the *Fassett* case, he would have announced his impression that Lascelles had a remedy "under the customs administrative act," without giving his reasons for thinking so, notwithstanding that the very essence of Lascelles' contention was that his Puerto Rico sugar " is not imported merchandise," and that this court has held in the *Fassett* case that that is a contention which is not raised, but surrendered, by proceedings under the act mentioned, since, " in order to have the benefit of proceedings thereunder, (one) must concede that the (article) is imported merchandise . . . and . . . estop himself from maintaining the fact which he alleges, that (it) is not imported merchandise."

As the memorandum itself shows, Judge Lacombe denied the Lascelles motion for an injunction " on authority of *Cruikshank* v. *Bidwell*, 176 U. S. 73." The report of that case shows that an injunction was there denied on the ground that the " remedy at law " was adequate; but so far from there being any intimation or implication that such remedy at law was to be had " under the customs administrative act," the opinion distinctly points to a suit against the collector as constituting the remedy referred to (the gravamen of the complaint there,

as here, being the absolute lack of authority on the part of the collector, instead of a merely erroneous exercise of authority vested in him):

"The sole ground of equity jurisdiction put forward," declares the opinion, "is the inadequacy of remedy at law in that the injury threatened is not susceptible of complete compensation in damages. The mere assertion that the apprehended acts will inflict irreparable injury is not enough. Facts must be alleged from which the court can reasonably infer that such would be the result, and in this particular we think the bill fatally defective. The matter in dispute was averred to be 'the value of the said teas and the right to import teas.' Confessedly the value of these teas was known, and their destruction capable of being compensated by recovery at law. The official character of the collector, the provisions of the act, and the regulations of the Secretary of the Treasury in execution thereof would not constitute a defense if the act were unconstitutional" (which was what was alleged). There was no intimation that the collector would be unable to respond in judgment, and, moreover, section 989 of the Revised Statutes provides that when a recovery is had in any suit or proceeding against a collector for any act done by him, probable cause being certified, 'the amount recovered shall, upon final judgment, be provided for and paid out of the proper appropriation from the Treasury.' *The Conqueror*, 166 U. S. 110, 124." *Cruikshank* v. *Bidwell*, 176 U. S. 81, 82.

There can be no question that action by an administrative officer, in a case other than that in which action by him is contemplated by the statutes conferring his official authority, is as completely unauthorized and unofficial as would be action under a statute which was itself void as unconstitutional. The statute would not protect him from personal liability any more in the one case than in the other. By analogy, therefore, the *Cruikshank* decision is an authority against instead of for the idea that the remedy provided by the customs administrative act is "the entire and only existing remedy" (or is one available at all) for those whose cause of action against the collector is not that he erred as to details of a customs case, but that as

a mere trespasser he assumed to act officially in a case in which, inasmuch as there has been no importation of merchandise, he has no authority whatsoever to act at all.

It being thus apparent that the remark in the *Lascelles* case was only *obiter dictum*, and, moreover, a *dictum* inconsistent with the principle of both the *Fassett* and the *Cruikshank* rulings of the Supreme Court (rulings which that court has never repudiated, doubted, or qualified) we beg leave to submit, with all respect to Judge Townsend, that he was mistaken in declaring in his opinion in *Goetze* v. *United States*, 103 Fed. Rep. 74, that the " preliminary question had been disposed of in the suit of *Lascelles* v. *Bidwell*," at least in the sense of establishing the availability of the remedy provided in the act of 1890 in cases in which, as in those of *Lascelles, Goetze,* and the present one, " the very question put in contention," namely, whether or not the merchandise had been " imported," would be " conceded " by proceedings under the act.

On the contrary the clear effect of the authorities cited, as well as of the principles of the subject, is undoubtedly that the " remedy " and the " procedure " provided by " the customs administrative act of June 10, 1890," have no application whatever to cases which (like the present one) are not " customs " cases at all (the merchandise not having been " imported "), and in which accordingly, the " illegality " complained of is not an erroneous exercise of the collector's authority in a case in which he was authorized to act as collector, but the radical " illegality " involved in his having, as a mere trespasser, assumed to act as collector in a case not one of the kind of case in which alone the statutes contemplated and authorized his acting officially.

2. Having thus seen that the defendant is in error in the first part of his theory as to our remedy—in his notion, namely, that the procedure provided by the act might have been available to us for securing a decision of the issue raised by the complaint—we beg now to submit that he is equally in error in the second part of that theory, since in point of fact (his argument to the contrary notwithstanding) the act of 1890 has not prevented the valid bringing of such an action as the present (in a case such as that set up by the complaint herein) by

its repeal of sections 2931 and 3011 of the Revised Statutes and its provision that collectors should not be liable for or on account of any of the matters mentioned in that connection in section 25 of the act.

The defendant's inference from the repeal of the sections named and the declaration of "exemption from liability" in § 25—the inference, namely, that the right to sue the collector in a case such as the present no longer exists—is based upon the assumption that "the right to sue the collector in a case such as the present" existed only by virtue of sections 2931 and 3011, and upon the further assumption that the matters in respect of which § 25 declares the collector to be exempt from liability, include a "matter" such as that which constitutes the gravamen of our complaint. Both assumptions ignore the essential distinction (recognized by this court in the *Fassett* and *Cruikshank* cases) between matters which are really "customs" matters and those which are not really such at all. Owing to their thus ignoring that distinction, both assumptions are erroneous, making fallacious the inference based upon them.

Consider, first, the repeal of sections 2931 and 3011. What does that "repeal" amount to? Simply the substitution of a new procedure in "customs" cases for the old procedure in "customs" cases. Those "sections" were portions of the old "customs administrative act" embodied in Title XXXIV of the Revised Statutes, the official heading of which is "collection of duties upon imports." The act of 1890 is simply a revision of that system. Both the original and the revision assume as a fact that merchandise is to have been "imported." Neither had any bearing upon or reference to the remedy available to one whose grievance is that the man who happens to be collector has assumed to act as such in a case in which, no "importation" having been made, he was not really authorized to act officially at all. The "repeal" of the sections regulating the old procedure in customs cases, to make way for the revised procedure in customs cases, did not destroy the right of action in non-customs cases, for the simple reason that such last-named right of action (against a mere trespasser) was not created by and did not depend upon or have any connection with the "sections" mentioned.

What now about the provision of § 25 of the act of 1890, "relieving the collector from liability for his decisions or actions as to customs duties?" In the light of the *Fassett* distinction, this difficulty proves as unsubstantial as that of the repeal of the two irrelevant sections. Obviously, the "relieving of the collector from liability for his decisions or actions as to customs duties" cannot mean the exemption of Mr. George R. Bidwell, the individual, from liability for "decisions or actions" having nothing to do with "customs duties" and made or performed in a case in which, inasmuch as there has been no "importation," he did not and could not decide or act as, or in any sense be, the "collector" at all.

Indeed, the text of § 25 on its face shows that the exemption from liability thereby secured to the "collector" is strictly restricted to customs matters, and by no means extends protection to the individual who, in customs cases, is collector, in respect of "any determination regarding any article which is not imported merchandise," which kind of "determination" this court in so many words declares that "the collector has no authority to make." 142 U. S. 487. The section reads as follows :

"SECTION 25. From and after the taking effect of this act no collector or other officer of the customs shall be in any way liable to any owner, importer, consignee, or agent of any merchandise, or any other person, for or on account of any rulings or decisions as to the classification of said merchandise, or of duties charged thereon, or the collection of any dues, charges, or duties on or on account of said merchandise, or any other matter or things as to which said importer, consignee, or agent of such merchandise might under this act be entitled to appeal from the decision of said collector or other officer, or from any board of appraisers provided for in this act." 26 Stat. 141.

This language clearly restricts the collector's exemption from liability to matters as to which an appeal can be had under the act from the decision of the collector. This court has held that, under the act—

"The court of review cannot pass upon any question which the collector had not original authority to determine. The collector had no authority to make any determination regarding

any article which is not imported merchandise." *In re Fassett,* 142 U. S. 479, 486.

In other words, no appeal can be had under the act from "any determination (by the collector) regarding any article which is not imported merchandise." Consequently in a case in which the decision complained of is one "regarding (an) article which is not imported merchandise" the collector is not "relieved from liability" by § 25.

It thus becomes plain that neither the repeal of sections 2931 and 3011, nor the exemption provision in § 25 of the act of 1890, really prevent the valid bringing of an action against the defendant Bidwell, notwithstanding his collectorship, in a case where the determination complained of was one which, because it regarded an article which was not imported merchandise, he "had no authority to make."

It is true, indeed, that in his brief in the Circuit Court the learned district attorney categorically imputes to this court a decision inconsistent with this conclusion; but we respectfully insist that in this he was demonstrably mistaken.

His citation reads: "In the case of *Schoenfeld* v. *Hendricks* (152 U. S. 691, affirming 57 Fed. Rep. 568, in this circuit), the Supreme Court also held that 'the right to maintain an action at law against the collector to recover duties paid, whether existing by virtue of the statutory or common law' (*sic*), 'was taken away by sections 25 and 29 of the customs administrative act of June 10, 1890.'"

As a matter of fact the Supreme Court "held" nothing of the sort. It certainly did not hold that the "common law" "right to maintain an action at law against the collector" "was taken away by section 25 and section 29 of the customs administrative act." Though appearing in the brief between quotation marks (precisely as it is above repeated), the language given as embodying the supposed "holding" nowhere appears in the report of the case in this court, either in the "headnotes" or in the opinion. On the contrary, the opinion affirmatively shows that what was "held" to have been "taken away" by the act of 1890 was simply the statutory right of action against a collector (in customs cases) until then existing under sec-

tions 3011 and 2931 of the Revised Statutes (152 U. S. 693);
while the reason for holding the " common law " right of action
unavailable in such a case as Schoenfeld's (which is of course all
that was " held " or even intimated, *obiter*, in the *Schoenfeld*
decision) is that indicated in the following statement in the
opinion (p. 695) : " We are of opinion that this action would not
lie at common law, the money being required by section 3010
to be paid into the Treasury." In the light of the reason thus
given, and on the principle *cessante ratione legis cessat ipsa lex*,
it is clear that the principle of the *Schoenfeld* decision holds
only in cases to which the requirement of " section 3010," that
" the money . . . be paid into the Treasury," can itself be
held to apply. Can that requirement be sanely held to apply
to any but " customs " cases ? Look at the text of the enact-
ment in question : " SECTION 3010. All money paid to any col-
lector of the customs, or to any person acting as such, for
unascertained duties or for duties paid under protest against the
rate or amount of duties charged, shall be placed to the credit
of the Treasury of the United States, and shall not be held by
the collector or person acting as such, to await any ascertain-
ment of duties, or the result of any litigation in relation to the
rate or amount of duty legally chargeable and collectible in any
case where money is so paid."

This section, being a part of Article XXXIV, on the " Col-
lection of duties upon imports," would be presumed to apply
only to cases in which merchandise had been in fact " imported."
Furthermore, the very wording of the provision affirmatively
shows that it is only money which the collector gets in " customs "
cases proper that he is directed to " place to the credit of the
Treasurer." The direction for immediate payment into the
Treasury is in so many words explained to be made in order to
prevent the money being " held by the collector to await "—
what ?—" any ascertainment of duties, or, the result of any
litigation in relation to the rate or amount of duty legally charge-
able," etc.

Now, in a case in which there has been, in fact, an " impor-
tation " of merchandise, the collector has statutory authority,
for the purposes of the performance of his functions, to decide

officially, in the first instance, all questions involved in the " ascertainment " of duties and the determination of their " rate and amount ; " and he is in such cases authorized to receive " duties " paid before definitive " ascertainment," or paid " under protest against the rate or amount of duties charged." Such " duties," and such duties only—" duties " the amount of which has either not been " ascertained " at all, or not conclusively ascertained as against the objection of the importer—are, under § 3010, to be at once on receipt " placed to the credit of the Treasurer." Where the essential " jurisdictional fact " exists, of an actual importation from a foreign country, the collector's errors as to details do not make his acts unauthorized or unofficial, and therefore his collections, though subject to revision, are deemed provisionally valid and as having been made by authority of the Government, and they may therefore well be the subject of such a provision as that of § 3010, as to the paying of the money into the Treasury. But in a case in which there has been in fact no importation at all the individual who holds the office of collector has simply " no authority " at all, and his erroneously holding that there has been an importation does not give him authority, or convert an exaction of money by him upon that theory into an official or authorized collection of " duties " such as can be deemed to be either the " unascertained " duties or the " duties paid under protest against the rate or amount of duties charged," which (and which alone) the statute directs the collector to deposit in the Treasury. As this court has said in the *Fassett* case, " The collector has no authority to make any determination regarding any article which is not imported merchandise." 142 U. S. 487. In such a case, therefore, he is a mere trespasser if he exacts money as if for " duties," and the law cannot be supposed to have contemplated any such trespass by him, nor, therefore, to have provided for the " paying into the Treasury " of the proceeds thereof.

The *Schoenfeld* case, 152 U. S. 691, was in fact a " customs " case, there having been an importation of merchandise. The money sued for there had been paid " for duties paid under protest as to rate or amount of duty charged," etc. To the money paid to the collector in that case, consequently, the provisions

of sec. 3010 literally applied.    It was entirely appropriate, therefore, for the court to say, as it did: " We are of opinion that this action would not lie at common law, the money being required by sec. 3010 to be paid into the Treasury."    To read this as intended to apply to a case materially different from the Schoenfeld case itself (as not being a " customs " case at all) would be to give it a sense in which it would be clearly obiter dictum.

Nor can it validly be urged against the maintenance of this action, that, whether compelled thereto by sec. 3010 or not, the defendant, supposing as he did that this was a customs case, did in fact deposit the money here in question, and his having done so should have the same effect toward exempting him from liability as it would have had in a case to which sec. 3010 applied.    In the first place, this supposed " actual," though voluntary, payment into the Treasury does not appear by the record, and is not to be presumed, it being, ex hypothesi, not required by law.    Secondly, the reason why a deposit of the moneys required by sec. 3010 to be deposited exempts the collector from personal liability is simply this, that by that very requirement the United States adopts the collection as its own act, and takes its agent's place in any litigation as to the propriety of such collection (as respects " rate and amount ") : This reason obviously does not hold where the collector's act is one which is wholly unofficial and unauthorized, as being one concerning " an article which is not imported merchandise."    That his having acted in good faith, and in fact deposited the money in the Treasury, is not in law a bar to a " judgment " against him (as distinguished from an execution) is made entirely clear by the explicit provisions of section 989 of the Revised Statutes, which was not " repealed " by the law of 1890, but, on the contrary, has been distinctly recognized by this court in cases much later than the Schoenfeld case, The Conqueror, 166 U. S. 124; Cruikshank v. Bidwell, 176 U. S. 81, as being in full force and operation.    It reads as follows : SEC. 989.  Whenever a recovery is had in any suit or proceeding against a collector or other officer of the revenue for any act done by him, or for the recovery of any money exacted by or paid to him and by him paid into the Treasury, in

the performance of his official duty, and the court certifies that there was probable cause for the act done by the collector or other officer, or that he acted under the directions of the Secretary, or other proper officer of the Government, no execution shall issue against such collector or other officer, but the amount so recovered shall, upon final judgment, be provided for and paid out of the proper appropriation for the Treasury."

It would seem to be beyond contradiction that this section—which is quite as clearly in force as "section 3010," or the "act of 1890"—distinctly proves the policy of the law to be to permit, in some cases, "a recovery" (i. e., a judgment) "against a collector . . . for the recovery of any money exacted by or paid to him and by him paid into the Treasury" (though execution is not to issue against the official, and the "final judgment" against him is to be paid out of the Treasury, if the court certifies to "probable cause, etc."). In what sort of a case could this provision find scope and application if not in a case such as the present, in which, the article not being imported merchandise, the intervention of the collector was wholly unauthorized and therefore unofficial, instead of being simply erroneous as to details? In the teeth of this statute, declared in the *Cruikshank* case to be in force, it seems impossible to insist that the collector's having paid the money into the Treasury is in any way incompatible with the "recovery" of a "final judgment" against him therefor.

II. It is not true that the complaint "does not state facts sufficient to constitute a cause of action":

*a.* Porto Rico was not, in June or September, 1899, a "foreign country" within the meaning of that term as used in the Tariff Act of 1897 (under authority of which, and of which alone, the defendant claimed the right to collect as duties the sums mentioned in the complaint).

*b.* Even if—in denial of the foregoing contention—the Tariff Act of 1897 had to be construed as in fact purporting to authorize the collection of duties on goods brought from Porto Rico into New York in June or September, 1899, then, in that aspect of it, and to that extent, the act in question must be held uncon-

stitutional and ineffectual to justify the exaction complained of
in this case.

c. Congress cannot "lay and collect" any "duties" save such
as are "uniform throughout the United States."

d. "Duties" collectible "on goods brought from Porto Rico
into New York in June or September, 1899," would have been
duties not "uniform throughout the United States"; Porto
Rico having been,.ever since the ratification of the treaty with
Spain (antedating the period in question), a part of the United
States."

Treaties "ceding" territory to the United States make the
territory so "ceded" a part of the United States within the
meaning of the provisions of the Constitution as to the uni-
formity of duties throughout the United States.

The treaty with Spain "ceded" Porto Rico to the United
States as of the date when such treaty became effective (a date
antedating the period here in question). There was nothing to
postpone or suspend the operation of the treaty as a present
cession of the island, in the circumstance—the only one which
has been suggested to that effect—that it (the treaty) provides
that the Congress shall determine the civil rights and political
status of the native inhabitants of the ceded islands and that
the Spanish-born inhabitants may have one year in which to
choose whether to preserve or abandon their allegiance to Spain.

These cases present the question whether under the Constitu-
tion the Government is authorized to impose a tax upon mer-
chandise brought into the port of New York from the island of
Puerto Rico after the cession of that island to the United States
by formal treaty, duly ratified and proclaimed.

Such a tax has been here imposed on the supposed authority
of the Customs Revenue Act of 1897 (Dingley Act).

The Dingley Act provides for the imposition of a customs
duty on sugars imported from foreign countries, and notwith-
standing the acquisition by the United States of the island of
Puerto Rico under the treaty with Spain of December 10, 1898,
ratifications of which were exchanged on the 11th day of April,
1899, the collector of the port of New York exacted the pay-

ment of customs duties on sugar brought into said port from Puerto Rico in the months of June and July, 1899, as though it had been imported from a foreign country.

As a basis for the examination of this question we submit the following propositions:

A. A treaty duly entered into is law, and has the force of a statute until superseded by subsequent enactment.

B. The treaty of Paris ceded Puerto Rico to the United States. Puerto Rico then came completely under the sovereignty and dominion of the United States. The political map of the world was changed and Puerto Rico became geographically a part of the United States, or of what Marshall called the "American Empire," under the statutory name of Porto Rico.

C. The clause of the treaty leaving the determination of the "civil rights and political status" of the native inhabitants to Congress was merely declaratory of the power given by the Constitution to withhold political rights and franchises and to establish civil government and enact municipal law in all places where no state government exists.

D. All territory lawfully acquired and taken under sovereign jurisdiction is a part of the United States.

E. The Constitution is a charter or grant of powers conferred upon the Federal Government by the people of the United States. The Federal Government has no existence outside of this Constitution. Hence it is a confusion of terms to speak of territory to which the United States has acquired title as not being within our "constitutional boundaries" or incorporated into the United States. It is a misapprehension of the nature of our institutions and of the function of the organic law of our national existence, known as the "Constitution," to speak of any part of the nation being beyond its boundaries, or to speak of its "extension" over portions or over all of the national territory. There is no boundary to the Constitution other than the whole sphere of the activity of the Federal Government. Outside of that sphere, beyond that boundary, the Federal Government can only act by usurpation—a government-of force—not of law, and officials assuming to act for the United States

outside of the prescriptions of the Constitution are, however well intentioned, outside of the law.

F. This is the elementary rule of constitutional functions. But it does not follow that, because all government finds its sole authority in the constitutional grant, every prescription of the Constitution, its delegations, limitations, and prohibitions can always and at all places be made applicable to all governmental action in all circumstances. These are applicable according to varying place and circumstance.

The unquestioned proposition that the government is powerless to act outside of the charter of its existence does not of necessity imply that the Bill of Rights—the prohibition against cruel and unusual punishments—operates at once throughout any territory over which the Government of the United States exercises jurisdiction—military, transitory, or permanent.

G. Territory held by military occupation during hostilities or as an incident thereto is subject to the rule of the President as Commander in Chief under the Constitution. No limitations are placed upon his power as Commander in Chief, save such as must be implied—*i. e.*, to wage only civilized warfare. But the freedom from limitation does not arise from the inapplicability of the restraints of the Constitution; on the contrary, it is a freedom granted by the Constitution, which gives him, in case of war, the usual powers of military commanders recognized by international law.

H. Territory acquired by the law or treaty-making power, and hence coming under the sovereign jurisdiction of the United States, may be governed by the Executive until Congress undertakes to govern it.

As long as war lasts the Executive continues his military rule as Commander in Chief. Upon ratification of the treaty of peace he continues his rule under his general duty and power to execute the laws, but as a *de facto* civil government, pending any action of Congress for the government of the new territory. This doctrine was followed by the political authorities in the case of California and was defined and upheld in *Cross* v. *Harrison* (*vide* the opinion of Judge Magoon, legal adviser to the War Dept., Sen. Doc. No. 594, 56th Cong., 1st Sess.).

But in any event the new territory is part of the United States pending its definite organization under the powers given to Congress.

I. As soon as the military status ceases and a *de facto* civil government is carried on, even by army officers, the civil rule being reëstablished, it is subject to the constitutional requirements. These territories are but " political subdivisions of the outlying dominion of the United States." Congress is supreme in legislating for them ; it has all the powers of the people of the United States, except such as have been expressly or by implication denied and prohibited by the terms of the Constitution.

J. Within those prohibitions or limits Congress has supreme power. These limitations and prohibitions, however, are its " constitutional boundaries," outside of which it may not go.

The only question, therefore, is :

Has Congress ignored these prohibitions and gone beyond these limits in its government of Porto Rico ; in other words, violated the constitutional restrictions which lie at the center and foundation of the Federal powers ?

K. The Dingley Act in terms imposed a duty on goods imported from foreign countries. It could have no application to goods from Porto Rico, which ceased to be a foreign country upon the ratification of the treaty ceding it to the United States. To apply it to Porto Rico would make it obnoxious to the constitutional prohibition (Art. I, Section VIII) which prescribes that " all duties, taxes, and imposts shall be uniform throughout the United States."

The tax was levied at the port of New York on sugar from Porto Rico. No tax was leviable upon like merchandise from any other part of the United States. This is not the uniform taxation required by the Constitution.

This legislation was enacted by Congress as the lawmaking body for the whole United States and affected every port in the United States. It was not a local tax or excise for the benefit of a particular locality.

L. The precedents adduced from our former acquisitions of territory do not militate against this view.

M. The inhabitants of the ceded territories are citizens of the United States in the sense in which all persons owing immediate and complete allegiance to the United States and inhabiting its territory are citizens.    In that sense the word citizen is the equivalent of "national" or subject.    See Senator Foraker's report on Porto Rico, No. 249, Feb. 5, 1900, p. 12.

N. While the argument from the consequences is not always the best argument, it is perhaps in this case, owing to its importance, relevant.

The only consequence of the construction contended for to which the Government objects is the uniformity of duties clause. All the other rights secured to citizens and others within the United States by the prohibitions granted by the Constitution are admittedly applicable.    The danger feared is the possibility of the American markets being thrown open to the products of the ceded territories.    It is not an objection which the court can take into consideration in deciding this case.

### I. UNDER THE CONSTITUTION OF THE UNITED STATES A TREATY IS THE SUPREME LAW OF THE LAND.

That this proposition has never been dissented from or doubted in this court is well known.    It would not be necessary to discuss it now were it not for the fact that it has recently been challenged and a novel doctrine has been broadly asserted.    It has been claimed that a treaty is a mere contract between two nations of no effect as law within the United States until given such effect by act of Congress; in other words, the treaty is of no legal force save as an international obligation.

This suggestion cannot appeal to this court.    The question was settled positively, clearly, and without possibility of equivocation by the "Great Chief Justice:"

"A treaty is in its nature a contract between two nations, not a legislative act.    .    .    .    In the United States a different principle is established.    Our Constitution declares a treaty to be the law of the land.    It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature wherever it appears, of itself, without the aid of any legislative provisions."    Marshall, C. J., *Foster* v. *Neilson*, 2 Peters, 253.

" . . . A treaty, it is true, is in its nature a contract between two nations, and is often merely promissory in its character, requiring legislation to carry its stipulations into effect.
. . . If the treaty operates of its own force and relates to a subject within the power of Congress, it can be deemed in that particular only the equivalent of a legislative act to be repealed or modified at the. pleasure of Congress. In either case, the last expression of the sovereign will must control." *Chinese Exclusion Case,* 130 U. S. 600.

" A treaty is primarily a compact between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it.
. . . But a treaty may also contain other provisions which confer certain rights upon the citizens or subjects of the nations residing in the territorial limits of the other which partake of the nature of the municipal law."

" . . . The Constitution gives it (the treaty) no superiority over an act of Congress in this respect, which may be repealed or modified by an act of a later date." *Head Money Cases,* 112 U. S. 597. See also *Geoffrey* v. *Riggs,* 133 U. S. 258–271.

## II. BY THE TREATY OF CESSION PORTO RICO BECAME A PART OF THE UNITED STATES.

By the treaty of Paris Spain ceded Porto Rico to the United States, and by such cession, we submit, Porto Rico became a part of the political entity known as the United States.

It is now claimed, and as we believe for the first time by a court of the United States, that territory may come under the complete and absolute sovereignty and dominion of the United States and yet remain foreign.

Judge Townsend has held in the case of *Goetze* v. *The United States* that although the title to the soil of Porto Rico is in the United States and no other country has any rights there of any character, yet Porto Rico was, subsequent to the treaty, a foreign country within the meaning of the statutes of the United States, imposing duties upon goods coming from foreign countries. The reasoning by which this conclusion is reached

is so novel and important that it will justify a close examination.

He says: "By cession the title to the soil became *de jure*, but in the status of the islanders as foreigners, and so in the status of Porto Rico as a foreign country no change was to be made until Congress should determine its character." 103 Fed. Rep. 17. "Thus we see that in all previous cessions of territory there has been a special provision in the treaty for incorporating the inhabitants within the United States. Whether a treaty stipulation would be sufficient to incorporate the territory into the Union is not clearly established. . . . There is (in the treaty of 1898) no provision for the incorporation of the inhabitants within the Union as there has always been in prior treaties." 103 Fed. Rep. 76. "There has been found, then, no reason either on principle or authority why the United States should not accept sovereignty over territory without admitting it as an integral part of the Union or making it bear the burden of the taxation uniform throughout our nation. To deny this power is to deny to the nation an important attribute of sovereignty," etc. 103 Fed. Rep. 86.

The sentences quoted contain the reasoning of the Government, and, as we believe, the fallacy upon which their position is based. These fallacies are endorsed by the Attorney General, who says in his *Goetze* brief, p. 4:

"That the treaty-making power—the President and the Senate—as evidenced by the language of the treaty of Paris, did not intend to make Porto Rico and the Philippine Islands integral parts of the United States, but intended in several particulars to reserve their final status for adjustment by Congress." And at page 8: "There is no doubt that it was the intention of the treaty of Paris not to make the ceded islands a part of the United States."

The Government of the United States may sustain as to any given territory three relations: (1) Sovereign jurisdiction. (2) Temporary occupation of foreign soil. (3) Foreign territory over which it has no jurisdiction.

In the last case it has no relations with the inhabitants; in the second it is merely the *de facto* sovereign over certain ter-

ritory; this sovereignty cannot under the Constitution affect the political status of the inhabitants since the allegiance which they owe to the United States is but temporary and only as an incident of war, their former allegiance reverting with the return of the former sovereign. *The Castine Case, United States v. Rice,* 4 Wheat. 246, and *Fleming v. Page,* 9 How. 615.

In the first case, and that is the position of Porto Rico, the power of Congress over the political status is plenary. Political rights are franchises which may be given or taken away by Congress in the territories, *i. e.,* the places over which it has exclusive local jurisdiction. *Murphy v. Ramsey,* 114 U. S. 15.

The treaties to which Judge Townsend referred endeavored to settle the political status of the countries ceded by provisions that they should be admitted into the Union as soon as possible, and the Attorney General (*Goetze* brief, p. 66) emphasizes this position.

Granting that by the treaty the inhabitants of Porto Rico acquired neither civil nor political rights, yet that did not make Porto Rico a foreign country.

A foreign country is a country under a sovereignty other than that of the United States. "By a foreign port may be understood a port within the dominions of a foreign sovereign and without the dominions of the United States." Mr. Justice Story in *United States v. Heyward,* 2 Gall. 501. See also Chief Justice Spencer in *King v. Parks,* 19 Johns. 375. Also Treasury Regulation 835, approved in *Stairs v. Paislee,* 18 How. 526. This Porto Rico admittedly was not.

What Judge Townsend meant, then, was simply that until Congress had legislated, the inhabitants had no political rights, and their private or civil rights remained unchanged.

Incorporation of the inhabitants within the United States means, if anything, that the inhabitants shall be made part of the body politic, *i. e.,* enter the union as a State, as was intended in the case of Louisiana, which we shall hereafter examine.

This is very different from making territory a part of the United States, which is all the present case contends for.

The fact that the inhabitants of a country ceded by treaty to

the United States are still under the military authority of the
Government awaiting the action of Congress organizing a local
government is entirely apart from the question as to whether
the territory, regardless of the status, race, or color of its in-
habitants, is a part of the United States.

Let us assume that Porto Rico was inhabited by roving In-
dian tribes and had no other inhabitants, could it be contended
that although we had acquired title to the soil, the Indians be-
ing tribes which were not, while maintaining their tribal rela-
tions, citizens of the United States, therefore the territory in
question was a foreign country? Certainly not.

As the Attorney General says, *Goetze* brief, p. 6 : " The basis
of the custom laws is not ownership, but (1) the geographical
origin of the shipment, and (2) the nature of the goods."

The learned judge and the Attorney General confuse the idea
of acquiring territory, and thus enlarging the boundaries of the
United States, with the withholding of political rights. They
make the one depend upon the other. This is clear from the
expression (in the *Goetze* case) that the United States " may
accept sovereignty without admitting it (the territory) as an
integral part of the Union." If by an integral part of the
Union he means a political part, *i. e.*, a State, we assent to the
proposition.

The political power of the Union is in the inhabitants of the
States—those of the Territories have none.

The incorporation of new territory into our body politic
would and must mean the incorporation of the inhabitants into
our political people *i. e.*, into people of the States.

This we do not contend for.

Had nothing been said in the treaty as to the inhabitants,
their political status and within certain limitations their civil
rights would have been entirely within the power of Congress.
In previous treaties acquiring territory the United States had
usually promised the ceding country that its inhabitants should
have admission to statehood.

This had been the usual course.

In the present instance the American Government, desiring
that the disposition of the question should be left entirely to

the Congress, was not satisfied to negatively refrain from promises to Spain, but, in order that no misunderstanding should occur in the future, expressly stipulated with Spain that Congress should determine these questions. It would have been proper for Spain to have asked that her subjects in Porto Rico should be admitted to and incorporated in the Union of States. She did not do so, but left the matter absolutely to the United States.

This clause in the treaty then left the United States free to deal with the inhabitants as she chose—subject always to the prohibitions of the Constitution.

Its sovereignty over the territory is thus emphasized, not diminished.

III. EFFECTS OF ANNEXATION. The fallacy underlying all the reasoning of the learned court below, and of the counsel for the Government, seems to be based upon the following reasoning:

"We have the authority of *Fleming* v. *Page*, that acquiring title to the soil of the territory making it part of the United States as regards other nations does not bring it within the sphere of the Constitution. If, then, it is not acquisition of soil which extends our constitutional boundaries, what does accomplish this result? In order to extend the boundaries recognized by other nations, the extension of dominion by acquisition is sufficient."

To speak of soil coming within the sphere of the Constitution seems to us to be a misuse of language. It was held, and rightly held, in *Fleming* v. *Page*, that where the armies of the United States had overrun, conquered, and held an extent of territory, other nations would recognize that the United States was a *de facto* Government in and over such territory.

This is an elementary rule of international law which we do not question.

This was occupation, not acquisition.

How the country over which the authorities of the United States had established a *de facto* government was to be organized and governed, is a question with which international law has no concern. Under the Constitution of the United States

the Government has power to wage war and to carry out all the duties necessary and incident to the waging of such war. When it occupies foreign territory it is doing so in pursuance of a power delegated to it by the Constitution, and while the Constitution as such does not affect the territory or soil over which the United States troops exercise jurisdiction, it is by reason of the grant of power contained in the Constitution that the United States troops are there carrying on legitimate warfare, and are not mere adventurers or revolutionists.

What the learned judge means by bringing the territory within the sphere of the Constitution we do not exactly understand.

If he means that our jurisdiction there is not exercised in pursuance of the Constitution, we claim that he is incorrect in his postulate of constitutional law. If, however, he means that the jurisdiction is only temporary military jurisdiction, and that the clauses of the Constitution in regard to the bill of rights and uniformity of taxation do not and cannot apply, we accede to his view entirely.

The confusion in his reasoning seems to arise from want of appreciation of the fact that the Constitution applies both to peace and to war. That there is, so to speak, a Constitution for peace and one for war.

This is no new theory, but was clearly and ably expressed by John Quincy Adams in the House of Representatives in 1836. He said:

" There are, then, in the authority of Congress and in the Executive, two classes of powers altogether different in their nature and often incompatible with each other—war power and peace power. The peace power is limited by regulations and restricted by provisions in the Constitution itself. The war power is only limited by the usage of nations. This power is tremendous. It is strictly constitutional, but it breaks down every barrier so anxiously erected for the protection of liberty and of life."

This war power is, then, unlimited, except by the limitation which may fairly be implied from the Constitution that the war allowed to be waged shall be civilized warfare; that is to say, warfare according to the rules and regulations recognized

by civilized nations, not warfare as known to and practiced by the Apaches and Zulus. That in carrying on such warfare in accordance with the public law of the world the Government of the United States has the right to exercise a temporary jurisdiction over territory belonging to another nation is unquestioned. That jurisdiction, however, is and must remain temporary, until either the treaty-making or law-making power of the Government has acted.

The President, as Judge Taney said, cannot enlarge the territorial boundaries of the United States. The nation whose soil we are occupying and whose jurisdiction we have temporarily ousted has what might be termed in private law a right of reverter, and when the United States withdraws its troops the world recognizes that the sovereignty belongs to the nation temporarily dispossessed. The boundaries could not " be enlarged or diminished as the armies on either side advanced or retreated." *Fleming* v. *Page*, 9 How. 615.

But, and here we think the learned court in the *Goetze* case failed to appreciate the distinction, if the law or treaty-making power enacts that the territory over which the military arm of the Government has extended shall come under the permanent absolute sovereign jurisdiction of the United States, then, and then only, a new and different status arises. " The United States, it is true, may extend its boundaries by conquest or treaty . . . but that can be done only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the President by the declaration of war." *Fleming* v. *Page*, 9 How. 614. The former sovereign then loses all right of reverter and the territorial limits of the United States are in so far enlarged. See *Cross* v. *Harrison*, 19 How. It is, therefore, erroneous to say that " it is not acquisition of soil which extends our constitutional boundaries." What was meant is probably that occupation of soil did not extend our boundaries.

" Constitutional boundaries," we submit, is a misleading if not meaningless term. The Constitution is the life of the Government of the United States. Wherever that Government goes it goes by virtue of that Constitution or grant from the

sovereign people which made the Government and which gave it as a government certain powers and withheld from it others. When, therefore, the Government of the United States was in Porto Rico, in Cuba,. and in the Philippines during the war with Spain, it was because the Constitution gave it the right to wage war. The constitutional boundaries, therefore, if the phrase be claimed to have any meaning, we must again insist can only mean the entire sphere of activity within which the Government moves.

We repeat here the contention of the Government:

"In order to extend boundaries recognized by other nations the extension of dominion by conquest is sufficient. To extend constitutional boundaries there must be some extension of organic law to the inhabitants or of institutions over the territory. The sphere of application of the Constitution is determined not by considerations of title to land, but by recognition of the political status of its inhabitants" (opinion in the *Goetze* case); or, as the Attorney General phrases the same contention, "acquired territory as [is] neither bound nor privileged by that instrument until brought within its operation either by express compact in the treaty or by act of Congress." p. 10, Brief.

The difference between our position and the reasoning of the learned judge and the Attorney General is fundamental and admits of no compromise.

If they be correct, we were in Porto Rico from the treaty of peace down to the recent act for the government of that island without any constitutional authority.

If this be so, our Government and officers had no warrant for their acts in the Constitution, and, however well-meaning they might have been, they were in law mere usurpers; they were acting without the law and without the authority of the sovereign creating the law.

Granting that the title to the soil came rightfully to the United States; that the island was completely under its dominion and jurisdiction, all its agencies in that island and all its actions there were in pursuance of the Constitution.

By this we mean—and we desire to make this point very clear, as it seems to us that misconception of its force has led to

the fallacy underlying the decision under consideration—that the agencies of the Government acting in Porto Rico had the powers and only the powers conferred by the Constitution, and that in their actions there they were subjected to all its applicable limitations, restrictions, prohibitions, or delegations.

IV. THE EXTENSION THEORY. The clear effect of annexation as shown in the point above is sought to be avoided by a theory that the Constitution extends to certain places and not to others.

The so-called extension of the Constitution has been a premise upon which much reasoning has been based. This reasoning we believe to be fallacious, because the premise is a misleading one.

Our claim is that the Constitution as such cannot be extended by the legislature. This use of the term "extension" is a misnomer.

The cases relating to the application of the constitutional provision in regard to jury trials in the District of Columbia and in Utah have been fully discussed in the other cases now pending before this court, and to do so here would thus involve endless repetition. The cases to which we refer are the following: *Reynolds* v. *United States*, 98 U. S. 145; *Callan* v. *Wilson*, 127 U. S. 540; *Springville* v. *Thomas*, 166 U. S. 707; *Bauman* v. *Ross*, 167 U. S. 548; *Thompson* v. *Utah*, 170 U. S. 343; *Capital Traction Co.* v. *Hoff*, 174 U. S. 1; *American Publishing Co.* v. *Fischer*, 166 U. S. 464; *Black* v. *Jackson*, 177 U. S. 363. These cases decide that the Congress cannot make any law in violation of the prohibitions of the Constitution.

In order, however, to avoid the conclusion that these cases authoritatively settle the proposition that Congress in legislating for the Territories is bound by the limitations expressly contained in the Constitution, the learned counsel for the Government claim that in all the cases cited Congress had legislated that Constitution into the Territories, *i. e.*, extended the Constitution. Hence it was there in force by Congressional action, and the cases referred to were properly decided.

It is true that with one possible exception this theory is no-

where foreshadowed in these decisions.   They are all based on the Constitution itself, not the Constitution by act of Congress.

Passing this objection, however, the position criticised is unsound for the following reasons:

(1) If the Constitution is in the Territories as an act of Congress, it is a mere law, and can be recalled in whole or in part by the same power that projected it.

(2) The Constitution is a constitution or creation of a government, not a system of laws applicable to any particular territory. The Government created thereby has jurisdiction over certain territory, but the Constitution only affects the territory indirectly because of its operation upon the Government.   To extend the Constitution to a territory does not establish a government for the territory.   It can be changed, modified, abrogated —it cannot be extended.   The Government which it has ordained may, in the march of time, rule all the peoples of the earth, but the Constitution would not be thereby extended—the same Government would have extended its dominions, but the Constitution would be the same instrument operating in the same way, viz., upon the Government.

(3) The organic acts for the Territories and the Revised Statutes enact that no law shall be passed for the Territories "inconsistent with the Constitution."   Assuming for the argument that the contentions of counsel for the Government are correct, to the effect that the Constitution was only made for and can only apply to the States of the United States, we must then read into all the general prohibitory clauses of the Constitution the word States, e. g., Congress shall make no law respecting an establishment of a religion within the States.

No person shall be held to answer for a capital or otherwise infamous crime " within the States " unless on a presentment, etc.

Thus read there would have been nothing inconsistent with the Constitution in the laws held unconstitutional in *Callan* v. *Wilson*, or *Springville* v. *Thomas*.   If the Congress was allowed by the Constitution to enact laws for the trial of capital cases without jury in the Territories, then such laws are not inconsistent with the Constitution.   The truth is that the legislation of Congress on this point was merely declaratory of its

own powers. It knew that laws violating the prohibitions were " inconsistent with the Constitution " wherever civil government prevailed. If the views of the learned Attorney General are correct, the legislation of Congress was the merest nullity because none of the laws declared unconstitutional are inconsistent with the Constitution read in the light of his novel theory.

It is respectfully submitted that Congress in establishing a government in the Territories and enacting an organic act defining the powers of the local legislature used out of abundant caution the language cited as part of one complete scheme, a portion of which was merely declaratory.

The Constitution is not a physical substance. It is in the nature of a grant or power, or what would be termed, in private law, a power of attorney. A real Constitution is a grant of rights or powers by a sovereign. The sovereign cannot be limited, for he is the source of all law. Judge Matthews in *Yick Wo* v. *Hopkins*, 118 U. S. 370.

If the sovereign, so called, is limited by some external power, then he is not the real sovereign ; it is the power imposing the limitation that possesses sovereignty. This is so because sovereignty is something which cannot be limited. It is the ultimate power. The sovereignty in the United States is in the people of the States.

It was contended during a long period of our history, and the contention finds adherents in our day, that the sovereignty of the United States was in the States of the Union, and that they, as States, and not the people, created the Constitution.

In the great case of *McCulloch* v. *Maryland*, 4 Wheat. 416, it was argued by one of the ablest advocates of that theory that the Constitution was created by the acts of the sovereign and independent States. Chief Justice Marshall met the proposition and answered it.

He said : " To the formation of a league such as was the Confederation the state sovereignties were certainly competent. But when, 'in order to form a more perfect union,' it was deemed necessary to change this alliance into an effective government, possessing great and sovereign powers, and acting directly on the people, the necessity of referring to the people,

and of deriving its powers directly from them, was felt and acknowledged by all.

"The Government of the Union, then (whatever might be the influence of this fact on the case), is emphatically and truly a government of the people. In form and in substance it emanates from them. Its powers are granted by them and are to be exercised directly on them and for their benefit.

"This Government is acknowledged by all to be one of enumerated powers."

The limitations of the Constitution upon the Federal Government are not limitations upon the American nation.

The American nation is sovereign.

It can go where it wishes, can act where it wishes, acquire territory where it wishes, treat the inhabitants as it wishes, and its powers are only limited by the physical force which may be brought to bear against it by other sovereigns.

But the Government is not sovereign.

Again we desire to respectfully submit that a great deal of the reasoning upon which our opponents rely is based upon the inability to distinguish this salient fact: That the people of the United States are sovereign, and that the Government is not, is the great fact which distinguishes our constitutional law from that of most of the civilized nations of Europe.

It was a great departure from and a great improvement upon the political science and upon the law and institutions which had preceded it. It did not make us a crippled nation, as the Attorney General suggests, but a nation that has permanently protected itself against usurpations by its own agents.

The court below said: "If the United States is to be denied this common attribute of sovereignty, it must be admitted that the treaty of Paris is so far unconstitutional; but if our nation has this power in common with other nations, then the treaty · is valid."

Here, again, we find this precise fallacy, the confounding of the nation with the Government. If the Government possesses all the powers of the nation, then there is no question before the court for decision.

To state that because other nations or states possess certain

powers the Government of the United States must possess them, or the nation be a crippled one, is an absurdity.

The difference between the other nations referred to and the United States is that in those nations the body of officials con-. stituting the government are endowed by the people with all the powers of the state or of the sovereignty. They can take property without due process of law; they can try in any mode which they may desire; they can abridge the freedom of the press; they can violate all those rights which we are accustomed to call sacred and inalienable.

The United States as a sovereign people can do all these things, but they were unwilling to allow their officials to do them, and until their ideas shall have changed, so that they no longer believe certain rights important or fundamental, these limitations placed upon the Government will doubtless remain there.

But to argue from this that the sovereign nation called the United States is any less powerful than other nations, or cannot pursue any course or policy which it may desire, is, we submit, due to a failure to appreciate the basic elements of our constitutional law.

" The *de jure* title to the soil," says the learned judge, " was in the United States, but its inhabitants were foreigners to the Union, and the provision for the uniformity of duties had no application there."

If by foreigners to the Union he means persons without political rights, then we acquiesce in the proposition. Citizens of the United States residing in the District of Columbia or in the Territory of Oklahoma, or residing abroad and having lost their residence within the States of the Union, are then foreigners to the Union.

Many, if not most, of the provisions of the Constitution may be inapplicable to the inhabitants of Porto Rico, but this is true of many inhabitants of the United States. Aliens of all races, whether Aryan or Mongolian, inhabiting the United States, may in this sense be foreigners to the Union, yet they possess certain rights which the Government cannot infringe (*Yick Wo* v. *Hopkins*, 118 U. S. 370), " not because those provisions were enacted for them, but because they are essential limitations inherent in

the very existence of the American Government." Secretary Root's report of 1899.

The Constitution does not act directly upon the people of Porto Rico or the United States.

It is upon the Government that the Constitution acts directly.

The officers of the Government cannot take property within the District of Columbia without due process of law. They cannot try a man in the Territory of Oklahoma without indictment by a grand jury and trial before a petit jury and with the other safeguards known to the common law, and yet the individual whose property is so protected in the District of Columbia, or whose life is so safeguarded in the Territory of Oklahoma, may not be, and often is not, a citizen either in the general or political sense and has no direct relations to the Constitution; he is an inhabitant of the United States, and as such (temporarily subject to its jurisdiction) he is entitled to certain rights because the people of the United States have chosen to place certain limitations on the Government.

The people may take his property without due process of law and they may try him without a jury, if they so desire. They have elected to do otherwise, and until they terminate that election he possesses immunities against the action of the Government.

In other words, there are certain spheres within which the Government, at least under normal circumstances—that is to say, peace—cannot tread, by reason of those inhibitions in the Constitution. The inhabitant has rights, or what may be better called, viewed at least from the Government standpoint, immunities.

While the military status lasted the prohibitions and limitations of the Constitution did not apply.

Martial law is the will of the commander—that is to say, it is no law—and, therefore, while martial law existed by virtue of the Constitution, the Porto Ricans had no rights thereunder because the Constitution granted them none.

It is this absence of immunities on the part of the inhabitants of territory under the sovereign dominion of the United States during the existence of military government which the learned

judge apparently had in mind when he speaks of the Porto Ricans being foreigners to the Constitution. The Constitution did not spread about them its protecting ægis; because during the military period the usual limitations did not apply.

The Constitution does not apply as a whole to every action of the Government in every particular locality. Wherever and however acting, it is acting under some clauses or provisions of organic law and may not be affected by others.

There are, in other words, in our system, broadly speaking, two kinds of government permitted by the Constitution. (1) Military government, which means the suspension of all immunities, and (2) the normal or peace Constitution. This may in turn be properly divided into two portions, viz.: (I) The Federal, in which the powers of government are divided between the local or state governments and the General Government (and the greater portion of the Constitution applies to the Government in this Federal capacity); (II) the local, or that government in Territories or places in which no state government exists.

As a territorial government Congress has all the powers which it possesses as a Federal Government, and together therewith all the powers which the state governments possess, save such powers as may be expressly inhibited to both governments by the Constitution and reserved to the people. *Nat. Bank* v. *Yankton*, 101 U. S. 129.

But a curious sophism has recently been advanced. It is contended that land may be within the sovereign jurisdiction of the United States, the Government may exercise unlimited jurisdiction over it, and yet that such land or territory is not territory of the United States. It is difficult to combat this assertion, because it is a mere assertion, resting upon no logical basis whatever. " All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States." *Nat. Bank* v. *Yankton, supra.*

The Territories are nothing more than outlying dominion of the United States.

The learned court below in the *Goetze* case says:

" New territory is not brought under the Constitution by acquisition of the soil, otherwise *Fleming* v. *Page* could not have been decided as it was. This is done either by an incorporation of the inhabitants into the Union, or by an extension of our laws and institutions throughout the territory. This cannot be done by conquest, but only by legislation or treaty. *Fleming* v. *Page.* Here the treaty recognizes and makes complete the *de facto* title gained by conquest. The island is not thus brought under the Constitution unless the treaty supplements the confirmation of title by an incorporation of the inhabitants into the Union under the Constitution or by the extension of our institutions. . . ."

That the incorporation of the inhabitants into the political body constituting the sovereign people of the United States has nothing to do with the immunities of persons within the territory seems thus abundantly established.

V. The Question of the Status of Porto Rico under the Presidential Government cannot affect this case.

Again it has been urged that the imposition of duties here complained of is made valid by reason of the President's prerogatives over conquered territory held under military sway.

But the tax having been imposed at New York upon goods of a New York merchant under the general tariff law, it is immaterial that Porto Rico may have been under a military form of government.

The Executive claimed that war existed, and the military status continued, and we believe the courts cannot view the matter in any other light, but must follow the coördinate branch of the Government.

Assuming, however, the truth of this, it does not follow therefrom that territory ceded to the United States is not a part thereof. The fact that the Executive still continues a *de facto* government originated under the law of belligerent rights does not affect the question. It has never been judicially determined, however, that when war has notoriously ceased and peace reigns triumphant the Executive in such a *de facto* government can

still exercise full war rights without the restraints and restrictions imposed upon government by the Constitution.

The Government and the courts have established a contrary doctrine in the case of California *Cross* v. *Harrison* and *Leitendorfer* v. *Webb, supra,* where it was held that the presidential government originated in belligerent rights and remained the *de facto* government until Congress chose to legislate otherwise.

It is respectfully submitted that while war actually continues the executive power is there as Commander in Chief, and that when war has ceased, and it is so recognized by the Executive, the Executive · remains as the government in a civil capacity for the purpose of executing the laws of the United States.

International law, or that great body of usage prevailing among nations, is, of course, only a part of our law and binding upon our Government, as far as it has been recognized, acted upon, and adopted by our tribunals. But even viewed from this precise standpoint, our courts have recognized and adopted the rule of international law, that when territory is ceded the law of the old government remains in force. The sanction, of course, is in the acquiring government, and the old laws are laws because sanctioned by the new sovereign of the ceded territory. As the laws of the former sovereign, they are without force; as the usages of the inhabitants sanctioned by the new sovereign, they obtain the dignity of law, and this law remains unchanged until Congress chooses to act. And as the laws of such new sovereign they cannot prevail if they are in conflict with the fundamental principles of the new sovereign's constitution.

"Every nation acquiring territory by treaty or otherwise must hold it subject to the constitution and laws of its own government." *Pollard's Lessee* v. *Hagan,* 3 How. 212–225.

"Every nation which acquires territory by treaty or conquest holds it according to its own institutions and laws." *Fleming* v. *Page,* 9 How. 615.

"By this substitution of the new supremacy, although the former political relations of the inhabitants were dissolved, their private relations, their rights vested under the government of their former allegiance or those arising from contract or usage

remained in full force and unchanged, except in so far as they were in their nature and character found to be in conflict with the Constitution and laws of the United States." *Leitendorfer* v. *Webb,* 20 How. 177.

It is therefore clear that such law is only good when not in contravention of the Constitution or laws of the United States, which might possibly apply to new territories.

In enforcing such law the Executive is merely enforcing the law of the United States, and, we respectfully submit, is acting in a civil capacity.

In such capacity he has not the rights which he would have as Commander in Chief during hostilities, and, therefore, the immunities of the Constitution for the protection of life, liberty and property operate in favor of the individual in the ceded territory; that is to say, they operate as restraints upon the Government there because it has ceased to be military and become civil.

This theory was the one adopted by the court in *Cross* v. *Harrison,* and was tersely summed up as follows: " This government *de facto* will, of course, exercise no power inconsistent with the powers of the Constitution of the United States, which is the supreme law of the land."

We submit, however, that the determination of this question is not necessary to the decision of this case.

The duties were levied upon a merchant at the port of New York, a place within the Southern District of New York, a portion of the territory constituting the United States under the civil government of a State.

The form of government in territory belonging to the United States may be military or civil, but the territory is for that reason none the less a part of the United States and, therefore, according to the Constitution, duties must be uniform throughout.

To claim that because a part of the United States may temporarily be under military government goods coming therefrom must be taxed as goods coming from foreign countries seems to us the result of great confusion of thought.

Judge Taney's illustration in *Fleming* v. *Page,* to the effect

that ports remained foreign to the revenue laws until these laws had erected the machinery of custom-houses, collection districts, inspectors, and collectors, was clearly not necessary to the decision, and as a *dictum* was in itself incorrect as the historical precedents invoked were mistakenly stated and have been ignored by this court in the later case of *Cross* v. *Harrison*, 16 How. 164.

Duties must be uniform throughout the United States, and it is a matter of indifference under what particular form of government any portion of the United States be.

Were the State of New York declared to be under the military government of the United States, we respectfully submit that during the time of such military occupation goods coming from New York into New Jersey or into the District of Columbia belonging to merchants there could not be taxed on the theory that New York was not a part of the United States.

VI. *The meaning of the United States.* This brings us to a consideration of the Government plea that in the uniformity clause the term " United States " does not mean what it plainly implies.

It may be admitted, as Judge Townsend says, that other nations may take territory under their sovereignty, which they do not annex and make part of themselves.

That the people of the United States could do this and could declare that the inhabitants of territory annexed in future should have no rights recognized by the Constitution is clearly demonstrated.

That the present officials of the United States can do this we deny.

The analogy to other countries is misleading. The Constitution of the United States is a peculiar one. In the European states the government is also the state or nation. The same power which legislates also makes the constitution. Many of the European nations have a so-called constitution, but that instrument is not a constitution strictly, but merely a *charte constitutionelle* or charter, an instrument by which the government gives to the people certain rights. The government possessing all the rights of the sovereign nation and being itself sovereign

can, when acting in territory not covered by this *charte*, govern as it wishes.

This is the absolute reverse of the United States. In the United States the people endow the Government. And the people of the United States, in addition to other inhibitions which they have placed upon their Government, have declared that duties must be uniform throughout the United States.

References, therefore, to the constitutional history of other nations can have no bearing whatever.

The one question, and the sole question, for decision is, whether Porto Rico, within the meaning of this clause, is a part of the United States.

While in one sense this is a political fact, it is also a fact affecting a property right protected by the Constitution, and as such a fact the court will, of course, feel bound to decide it.

The advocates of the position taken by the collector must claim broadly and without reservation, in order to maintain their contention, that the clause of the Constitution requiring uniformity of duties throughout the United States refers only to the thirteen original States and the States to be formed in the future, " because the term United States as there used (in the uniformity clause) means only territory comprised within the several States of the Union." Brief of Attorney-General in *Goetze* case, p. 5.

The claim in substance is that the term United States as used in the Constitution can have only two meanings: (1) The collective name of the States which were united together under the Constitution and mentioned in the Declaration of Independence and in the Articles of Confederation; this is the original and literal meaning of the word. (2) The corporate name of the nation.

That as used in the United States Constitution the term " United States " frequently refers to the States united does not admit of question. It is, however, admitted that it is used with great frequency in another sense as the political entity exercising governmental power.

In the Pinckney draft of the Constitution, evidently with a view to make clear one of the meanings of the term " United

States" as used in the Constitution, appears the following: " The United States shall be forever considered as one body corporate in law, and entitled to all the rights and privileges which to bodies corporate do, or ought to, appertain."

That it has, however, a third meaning, is also evident. It means not only the States united and the body corporate or governmental power which represents them, but it means— and this is its ordinary meaning in the language of the day— that whole portion of the earth's surface over which the flag of the United States flies in sovereign dominion.

It is clear, therefore, that we are not restricted to the meaning of the term as it appears in the Articles of Confederation. It is argued with more emphasis than plausibility, that because it meant in that instrument the States united, it can mean nothing more in the Constitution of the United States, and that the phrase " United States " in the tax clause of the Constitution is equivalent to " The United States in Congress assembled."

We submit that this is a misinterpretation of history.

During the confederate period the thirteen States were thirteen distinct political sovereignties united together by a compact which was strictly an agreement in the nature of a treaty. They were not a nation.

The creation of the Constitution, however, wrought a fundamental change; a pouring of new wine into old bottles. Some of the form remained, but the spirit was gone.

A people practically homogeneous in law and language had chosen to organize itself into a political governmental unity ; an idea which had existed only when the consciousness of the people had become by the organization of the Constitution an objective reality.

A nation did not spring into being as the poets have it, because the nation existed. But the nation established for itself a government and by the Constitution gave it the necessary organization. This change was so radical that it is absurd to say that the term " United States" as used in the Constitution was used in the same sense as it had been used in the old Confederation.

The United States, indeed, sometimes might mean the States of the United States. But it meant something more besides.

Since the treaty with England of September 3, 1783, a vast tract of unorganized land had come into the possession of the people inhabiting the thirteen States, formerly the British colonies of North America. Whether this tract of land belonged to the individual States or to the people was long a mooted question, and the dispute arising therefrom was the main cause leading to the formation of a more perfect union and the adoption of the Constitution. But, from the time that this vast tract of territory came within the sovereign dominion and jurisdiction of the United States, that term ceased to mean only the States united.

As was said by Madison in the Federalist (No. 38): "We may conclude that the Northwest Territory will soon become a national tract, and Congress having assumed the government of this Territory, has attempted to do more. They have appointed officers and have prescribed the conditions upon which States may be admitted into the Union. All this has been done, and done without the least color of constitutional authority."

It was clear that the Government of the Confederation had never had any constitutional right to govern this Territory. The people of the United States, even under that imperfect organization, took upon themselves the task which resulted in the celebrated ordinance of 1787, by which the inhabitants of this Territory were accorded not only the ordinary civil rights, which in that primitive age were considered so important as to be inalienable, but also certain political rights.

Of course until the cession of these lands to the General Government by the people of the United States, the latter term could have but one meaning. It would have been perfectly possible, and even proper, for the people to have used another word to designate the entire domain made up of the original States and the new land, and which John Marshall called the American Empire.

But the draughtsman of the Constitution chose to use the same word to designate three things: The States, the corporate name of the nation, and the whole territory over which the

people of the United States through either their general or state governments had jurisdiction.

It is admitted by an able advocate of the view under criticism that, as far as the United States has been concerned, " At all events no such new term has been adopted and hence United States is the only term which we have had to designate either individually or collectively the States and Territories, and accordingly, while it has always been used for the former of these purposes, it has sometimes been used for the latter." Professor Langdell, Harvard Law Review, Feb. 1900.

Or, as the learned Attorney General says, the word has the third meaning in " an international sense designating the extent of our dominion as a sovereign nation," and explains the admission by stating that the term in this sense is one of common usage—that is to say, conventional, and that it has no constitutional or legal meaning, and that, therefore, the Constitution cannot be supposed to have intended it for that purpose.

So far from its being probable that the framers did not mean to use the word in its so-called international sense, the history of that time demonstrates quite conclusively that the exact opposite was their intention.

The great ordinance for the government of the Northwest Territory, drawn originally by Jefferson, and somewhat modified before it passed through Congress, was in some respects a prototype of the Constitution itself. It embodied the ideas which led up to the foundation of the Constitution, based upon the political philosophy adhered to by most of the framers of the Constitution. It gave to the hardy and self-reliant pioneers in that Territory political rights of self-government and secured to them the guarantees of personal freedom in accordance with the most enlightened rules of the common law. That this ordinance was regarded as sacred and as unchangeable as the law of the Medes and Persians, appears from its language, which declares it to be a compact between the people of the Territories and the people of the States, unchangeable except by consent. Almost the first act of the first Congress, in which many of the framers of the Constitution sat, was to reënact the Northwest ordinance in its entirety. It is idle to say that their doing this

involved the notion that the people therein were not sufficiently protected by the Constitution, as the learned Attorney-General assumes. The Constitution gave them no right of local self-government. It was necessary to enact some law conferring upon them political rights, and therefore the ordinance was re-enacted by Congress, the original ordinance having been adopted prior to the adoption of the Constitution.

The fact that the ordinance contained many of the provisions of the subsequent Constitution in no manner supports the theory of the learned Attorney General that "the accepted doctrine was that such guarantees and rights must be conferred by Congress." p. 102 of *Goetze* brief.

Unnecessary provisions are sometimes inserted in statutes out of abundant caution. *McAllister* v. *U. S.*, 141 U. S. 174, 187.

VII. THE UNIFORMITY CLAUSE IS NOT IN THE NATURE OF A LAW ITSELF, BUT PROHIBITS THE CONGRESS FROM PASSING CERTAIN LAWS.

In further considering the reach of this uniformity clause or the consequent breadth to be assigned to the term "United States," it is proper to recall the difference between the rule of interpretation to be given to a statute, and that to be given to an organic act whose object was to restrict the statute-making power, and prohibit the enactment of a certain class of obnoxious legislation.

As the ordinance was framed before the Constitution it seems strange to claim that "the history of the ordinance for the government of the Northwest Territory also proves that the statesmen of that day did not accept the doctrine that the guarantees enjoyed by the inhabitants of the States were possessed by the inhabitants of the Northwest Territory neither by virtue of the Articles of Confederation nor the fact that they had theretofore been within the jurisdiction of one of the States." Atty. Gen. *Goetze* brief, p. 102.

The provisions of the Constitution relating to the States have often been put in the statutes creating the machinery necessary to carry them out. Without this machinery many of these enactments are lifeless.

This is true of the original judiciary act drawn by Mr. Ellsworth and of many of the early statutes.

The prohibitions in the Constitution against direct taxation, unless in proportion to representation, uniformity in duties, and the bill of rights, are, however, all of a negative nature.

They forbid the Government to do certain things and it does not require legislation to carry out the prohibition. In other words, the Government cannot legislate in contravention of them.

The Constitution intended that all the inhabitants of the States and Territories under the sovereign dominion of the United States should have the equal protection of the laws and the Constitution.

As was said by Judge Bradley in *Boyd* v. *United States,* 116 U. S. 616, regarding the Fourth Amendment: "As every American statesman during our revolutionary and formative period as a nation was familiar with this monument of English freedom (referring to Lord Camden's decision in *Entic* v. *Carrington* and three other king's messengers, which was the *Wilkes* case) and considered it as the true and ultimate expression of constitutional law, it may be confidently asserted that its propositions were in the minds of those who framed the Fourth Amendment to the Constitution," etc. In was therefore true, historically and legally, "That the District of Columbia or the territory west of the Missouri is not less within the United States than Maryland or Pennsylvania; and it is not less necessary on the principles of our Constitution that uniformity in the imposition of imposts, duties, and excises should be observed in the one than in the other. Since then the power to lay and collect taxes, which includes direct taxation, is obviously coextensive with the power to lay and collect duties, imposts, and excises, and since the latter extends throughout the United States, it follows that the power to impose direct taxes also extends throughout the United States." *Loughborough* v. *Blake.*

Admitting that the Constitution uses the term "United States" in several senses, it would then follow that we must seek for the meaning of the term in the context.

It is not reasonable to suppose, however, that different senses

would be given to the word in the same clause. "That Congress shall have power to lay and collect taxes . . . to provide for the common and general welfare of the United States," etc., but all duties must be uniform throughout the "United States."

The United States for whose debts and general welfare the proceeds of the taxes are to be devoted must mean the same United States throughout which they are to be uniform.

It is respectfully submitted that it can hardly be seriously contended that Congress cannot apply the proceeds of the general taxation to the general defence and welfare of the Territories as parts of the United States.

If our opponents are logical they must deny this and Congress would, therefore, not have the power to apply the proceeds of general taxation to the welfare of the people of Oklahoma or New Mexico, or to defend them in case of invasion.

The Constitution also provides that Congress shall have power to pass a uniform rule of naturalization. It has been recognized by the Supreme Court that the early laws passed by the Congress in which sat many of the members of the convention are contemporaneous interpretations of the highest value.

An examination of the naturalization law will show that that statute was intended to include the Territories as well as the States.

The act of January 29, 1795, c. 20, 1 U. S. 414, which was an act to provide a uniform rule of naturalization, includes the Territories of the United States within the term "United States." It declares that any alien may become a citizen of the United States upon complying with certain requisites.

He shall declare before one of the courts that he has resided in one of the States aforesaid or within the Territory within which such court is held at least one year. His time of residence within the Territory is evidently included within the five years within which he shall reside within the United States, and it is evident that the statute uses the term "United States" in the same sense that Chief Justice Marshall used it as the Great American Empire. That it also used it in the sense of States united is evident from the first article, "That any alien

being a free white person may be admitted to become a citizen of the United States or any of them." Certainly in the naturalization law the word was used in both senses.

*Elk* v. *Wilkins*, 112 U. S. 102, virtually takes the same view.

It is unsound to argue that because in some contexts the word is used meaning individual States it may not in others mean to apply to all the dominions over which the Government exercises jurisdiction.

The flexibility with which the word "State" may be used, and the underlying principle that when used in some legal enactment or document the context must be considered and the word may be understood in its conventional and ordinary meaning as well as in the legal or historical meaning, is well illustrated in the case of *Geofroy* v. *Riggs*, 133 U. S. 258.

It is there held that the word "States" or "Union" may include the District of Columbia, although strictly speaking the District of Columbia is not a State. It is a political entity possessing the right to local self-government and may properly fall within the designation of State as understood generally in the language of diplomacy and international law. "To insure reciprocity in the meaning of the treaty it would be necessary to hold that by the term United States or Union is meant all the political States in the country. . . . It is not only those political communities called the States, but also those which constitute the political bodies called the Territories and the District of Columbia." *Geofroy* v. *Riggs, supra.*

The question of the meaning of this term arises very clearly under the Fourteenth Amendment in the phrase, "All persons born or naturalized in the United States." This phrase has been interpreted by the Supreme Court in the famous case of *Wong Kim Ark* v. *United States*, 169 U. S. 649, as follows: "These provisions are useful in their application to all persons within the territorial jurisdiction. It is accordingly enacted by section 1997 of the statutes that all persons within the jurisdiction of the United States shall have the same rights in every State or Territory."

As was said in the *Slaughter House Cases*, 16 Wall. 36, 74: "Not only may a man be a citizen of the United States without

being a citizen of a State, but an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union."

Which is the "United States" as here distinguished from the several "States?"

It has been demonstrated —

That the term "United States" was meant by the framers of the Constitution to include States and Territories or the outlying dominion under the jurisdiction of the United States;

That the Constitution itself shows that it was used in this sense in the uniformity taxation clause;

That the early laws of the United States carrying out the Constitution so interpreted it and that the meaning given to it by Chief Justice Marshall as the equivalent of the Great American Empire was the meaning intended by the Fourteenth Amendment.

This meaning is the ordinary general meaning in which it is understood, not only by American citizens, but by people throughout the world. The historical, legal, and constitutional uses of the term are therefore in accord.

The fact that it sometimes means the States of the United States and at other times the Government is immaterial, as each time that it occurs in the Constitution its meaning must be determined by the context.

It is true that an eminent statesman, Mr. Webster, at times contended, both before the Supreme Court and in Congress, that the Constitution did not apply to the Government of the United States when it was acting in the Territories, and that it had there no limitation.

"Congress," he says, "has full legislative powers in the Territories without any grants from the State. What is Florida? It is no part of the United States."

In the great debate with Calhoun, however, Mr. Webster admitted that the laws of Congress governing Territories were based upon the power granted in the Constitution to make all necessary rules and regulations for the Territories of the United

States, thereby admitting that a portion of the Constitution, at least, applied to the Territories. He was also forced to admit that the constitutional inhibitions on the General Government were everywhere in force. 20 Cong. Globe, 252, Feb. 1849.

An examination of the position taken by Mr. Webster shows that he had in mind political rights, and that when he asked about Florida and said it was no part of the United States because not represented in Congress, he had in mind the political rights of the people of the States recognized by the Constitution, which extend as well to the inhabitants of Territories.

The position, however, which he was forced to take resolves itself simply into the assumption that under the rules and regulations clause Congress can do what it wishes in the Territories. This position has been so frequently overruled by the courts that it is scarcely necessary now to argue it.

It is certainly inapplicable to the uniformity clause, because even if the Bill of Rights by any strained construction of the Constitution be held not to go with Congress into the Territories, certainly the uniformity clause, as has been shown, applies to the whole United States, and therefore limits Congress when legislating for the Territories.

The learned counsel for the Government has set forth the debate in the Senate on the Walker amendment proposing the extension of the Constitution to California. He considers Calhoun the father of the theory that the Constitution can have effect in the Territories, and believes the doctrine to have had its origin in the desire of the advocates of slavery to carry that institution into the Territories.

If Webster adopted a position which even his ability and ingenuity failed to sustain, this position is fairly attributable to his fear that the doctrine that the Constitution extended to the States would involve the proposition (not as we believe a necessary consequence) that slavery should also be allowed to exist in the Territories free from the power of Congress to interfere with it.

He was, therefore, looking at the question from a partisan standpoint, and his opinion on the question as a legal proposition was as much influenced thereby as that of Calhoun.

The debate referred to has been well described by Von Holst, a historian whose hostility to slavery and its advocates is a most marked characteristic of his able and exhaustive work.

He says: " The amendment in this modified form gave rise to an interesting and important constitutional debate. Webster objected to it on the ground that it gave the President unlimited authority over the district, but he also maintained that it was impossible to extend the Constitution in so general a way to a Territory. It was indeed the moral duty of Congress in its legislation for the Territory to preserve the principles of the Constitution, but it was not absolutely necessary. The Territories were not a part, but a possession of the United States.

" Calhoun, on the contrary, maintained that the Constitution, which was of itself the supreme law of the land, extended *proprio vigore* and *eo ipso* also to the Territories, even though its provisions were not all applicable there. If the Constitution does not extend to the Territories, whence did Congress get the authority, which existed only by virtue of the Constitution, to exercise any government over the Territories?

" Calhoun was evidently right, although Webster had good grounds for astonishment that the radical upholder of State rights should support this view. The courts of the United States have decided that the Constitution has a legal existence. The relation of the Union to the Territories is, therefore, a legal relation in and under the Constitution which is wholly independent of the legislation of Congress, of which it is in fact the basis. The fact that the legislative action of Congress is required in order to make this legal relation effective is by no means, as Webster seemed to think, in contradiction of this relation, for, as Calhoun rightly said, the legislative action of Congress is equally necessary in order to put into operation the provision of the Constitution relating to the States. Unquestionably there is an essential difference between the nature of the legal relations of the States to the Union and that of the Territory. The distinction following Webster's line of thought is closely followed by Cooley's saying, ' the Constitution is made for States, not for Territories.' . . .

\*      \*      \*      \*      \*      \*      \*      \*

"And equally incontestable is its (the Supreme Court's) further declaration that the powers of the Federal Government in regard to the persons and property in Territories cannot be greater than those guaranteed to the citizens of the State. Calhoun had asked whether Congress could create a nobility and an established church in the Territories." Von Holst's Constitutional History, vol. 3, p. 444.

Exemption from the uniformity clause has been sought in the fact that Congress, acting as the local legislature, may impose special taxes for the use of a special locality, as the States may do in the territory over which they have legislative power.

When Congress is acting as the local legislature in the Territories, and taxing there, it is contended that it is not bound by the uniformity clause.

Such taxes are not for the common welfare of the United States, but are to defray the expense of the government of the locality, and in the dual position which Congress occupies in our system, as Federal Government and as local government for the territory of the United States not erected into States, it has the power to tax for local purposes.

Taxes, therefore, levied in Porto Rico, the proceeds of which are applied for the benefit or maintenance of the government of the island, may, perhaps, be defended upon the ground that they are imposed in the exercise of the right which Congress has in the Territories.

But no question of this kind can arise in this case. The tax was imposed under the Dingley Act, a law for the taxation of all goods coming into the United States of America and for the benefit of the Treasury of the United States. Congress in passing this law was acting as the General Government, and no question of its power as the local legislature can possibly be raised. The tax was levied on the goods of a New York merchant at the port of New York and is unaffected by the status of Porto Rico, it being once admitted that Porto Rico was a part of the United States.

VIII. Precedents Drawn from Our History do not Sustain the Position of the Government.

The precedents attempted to be drawn by the learned coun-

sel for the Government from the history of the Louisiana and Mexican annexations under the treaties with France and Mexico, respectively, are not in point.

The learned Attorney General states (page 31 of his *Goetze* brief):

" It is a common error, long disseminated and many times repeated, to assert that Jefferson was under the belief that the United States had no constitutional power to acquire foreign territory. . . .

" An examination, however, of his writings and of his whole course of action with reference to the Louisiana purchase, especially with reference to the constitutional question, shows conclusively that Mr. Jefferson's doubt was not with reference to the power of the United States to acquire foreign territory, but rather as to the right to annex it to and make it a part of the United States."

The learned counsel thinks this point of very great importance.

As a matter of history his view is perhaps correct, although even as to this there is considerable doubt.

What Jefferson did certainly doubt, and the history of the time and the debates in Congress tend to show it, was the power of Congress to admit new States to the Union from the ceded territory without even a Constitutional Amendment or the consent of all the States.

Mr. Jefferson had instructed Mr. Livingston, then American minister in Paris, that in no event should a provision be inserted in the treaty with the French Government providing that States should be erected in the new territory, as he evidently did not believe that this could be legally done, and was therefore unwilling that the Government should take upon itself an obligation which it could not carry out.

Mr. Jefferson knew the jealousy which the States felt of each other and the sectional feeling which prevailed. He felt that an attempt to form States out of this vast territory would give rise to controversy, and with this in view he so instructed Mr. Livingston. Mr. Livingston, however, for reasons which doubtless justified the wisdom of his act, disobeyed the instructions of Mr. Jefferson.

The First Consul desired to insert a provision in the Louisiana treaty to the effect " that the inhabitants be incorporated into the Union of the United States," etc. It was necessary to conclude the treaty with great rapidity, as France was verging upon a war with England, and the opportunity presented by the proposition of the First Consul to cede the whole Louisiana territory seemed so favorable to Mr. Livingston that he thought no obstacles should be interposed to its immediate execution. It was for this reason that the clause was inserted in the treaty, contrary to the express instructions of the President. This clause, as appears from its wording, can mean only one thing. The new territory was to be admitted among the States of the Union, and its inhabitants to be citizens of such States as soon as possible.

The history of the time, as outlined in the foregoing, proves this beyond question. Adams' History of United States, vol. II, chap. II to V.

As was said by Mr. Jefferson and quoted by the Attorney General: It is most necessary [to convene Congress] because they will be obliged to ask from the people an amendment of the Constitution authorizing their receiving the province into the Union."

" The Constitution has made no provision. for our holding foreign territory, still less for incorporating foreign nations into our Union."

" I think it would be safer not to permit the enlargement of the Union but by amendment of the Constitution."

" I am aware of the force of the observations you make on the power given by the Constitution to Congress to admit new States into the Union without restraining the subject to the territory then constituting the United States. But when I consider that the limits of the United States are precisely fixed by the Treaty of 1783, that the Constitution expressly declares itself to be made for the United States, I cannot help believing that the intention was to permit Congress to admit into the Union new States which should be formed out of the territory for which and under whose authority alone they were then acting. I do not believe it was meant that they might receive

England, Ireland, Holland, etc., into it, which would be the case under your construction." pp. 33 to 36, Attorney General's brief.

The learned Attorney General, however, seems to assume that the expression of the treaty that the territory shall be admitted into the Union, etc., means something different from the union of the States. He says: "This correspondence demonstrates conclusively that whatever doubt Jefferson had as to the constitutional authority for the Louisiana Treaty related, not to acquiring territory, but to the right either of the treaty-making power or of Congress to annex it to or incorporate it into the Union."

If by this the Attorney General means to incorporate it into the Union *as a State*, we agree with his assertion. We cannot see what other meaning it can possibly have, and yet the Attorney General finds in this history of the Louisiana acquisition precedent for the proposition that territory may be acquired and held by our Government as a colony or province, not a part of the United States.

The meaning which the learned Attorney General seems to have in mind is that the Union included not only the actual States, but that portion of the States which had been ceded to the General Government and which was usually known as the Northwest Territory. He seems to think, further, that as the framers had intended that that territory should be erected into States, it stood upon a different basis from territory thereafter acquired, and that incorporation into the Union did not necessarily mean as a State, but meant to place the new territory in the same position as that formerly held by the Northwest Territory.

We fail utterly to appreciate the force of this argument.

Even assuming it to be true that Jefferson and his advisers, as well as the framers of the Constitution, contemplated that this territory was held in trust for the purpose of erecting States out of it, nevertheless there was nothing in the Constitution to show that this territory should be held differently and governed differently from territory thereafter acquired.

Admitting, as it is claimed, that Jefferson did assume that

the United States Government had the power of acquiring territory, it would then, according to the contention of the learned counsel for the Government, come under the rules and regulations clause.

This is the clause, however, of the Constitution in which he finds warrant for the government of the Northwest Territory.

Therefore, the Northwest Territory and the new acquisitions must have stood on a precisely similar footing. As is said by the learned Attorney General (page 102 of his brief): "The history of the ordinance for the government of the Northwest Territory also proves that the statesmen of that period did not accept the doctrine that the guarantees enjoyed by the inhabitants of the States were possessed by the inhabitants of the Northwest Territory, neither by virtue of the Article of Confederation nor by the fact that they had theretofore been within the jurisdiction of one of the States."

The phrase "union" therefore meant the union of States, and when Mr. Jefferson and his advisors doubted the propriety of admitting the territory into the Union, they did not mean the union of States and Territories, but the union of the States. Besides, it is respectfully submitted that that is the undoubted meaning of the word "union."

The debates cited at so much length clearly show that the only question was as to the constitutionality and propriety of the stipulation of the treaty admitting the new territory into the Union.

Many in Congress shared Mr. Jefferson's doubts, at least as far as the question of admitting the new territory to statehood was concerned.

It did not seem to be clearly understood at that time whether the treaty was of itself operative so to admit the inhabitants, or whether an act of Congress was necessary, or whether both together without an amendment of the Constitution or the consent of all the States could accomplish the object.

That Art. III of the Treaty of 1803 was considered by Congress and by the Louisiana inhabitants as intending to provide for an admission of their territory as a State is evidenced by the remonstrance and the Congressional reply, which we ex-

cerpt: " Your honorable body seems to have adopted a construction of this article which would suspend its performance until some period fixed by the principles of the Constitution and to have read the article thus: 'The inhabitants shall be incorporated into the Union and admitted to the enjoyment of all the rights, etc., as soon as the principles of the Federal Constitution will permit.' We, on the contrary, contend that the words 'according to the principles of the Federal Constitution,' as they are placed in the sentence form no limitation, that they were intended as a description of the kind of rights we were to enjoy, or, at most, relate to the mode in which they were to be conferred, and that the article contemplates no other delay to our reception than will be required to pass the necessary laws and ascertain the representation to which we are entitled." To this remonstrance the Committee of Congress replied: " We consider, in the first place, that the clause, which is the ground of our claim, is a stipulation made expressly in favor of the inhabitants of Louisiana then existing, because the French Government had no right to stipulate the incorporation of the future citizens of Louisiana. We think that the words ' as soon as possible, according to the principles of the Constitution,' evidently express that this incorporation is to be executed without any unnecessary delay, and that it is to take place on the same principles by which the Constitution has regulated the rights of the individual States, and of the citizens of the United States, in relation to the Federal compact. We humbly think that any interpretation tending to procrastinate the incorporation of the present inhabitants of Louisiana into the Union is directly opposite to the spirit of the third article of cession of our country, the object of which is unquestionably to secure that advantage to the inhabitants who are annexed to the United States by that treaty; that, consequently, any condition depending on future circumstances ought to be inadmissible, because it would expose the inhabitants who existed in Louisiana when the treaty was made to be kept out of the enjoyment of rights which have been stipulated for them."

The only difference of opinion was as to the time when such statehood should be conferred.

These doubts and difficulties were evidently borne in mind by the Government when it concluded the treaty with Mexico, and they were avoided, as appears from the clause of that treaty.

### MEXICO TREATY.

Should be incorporated into the Union and be admitted at the proper time (not immediately *proprio vigore* of the treaty), but by act of the Congress of the United States to the enjoyment of all rights of citizens of the United States. p. 66, Attorney General's brief in *Goetze* case.

### LOUISIANA TREATY.

The inhabitants of the ceded territory shall be incorporated into the Union of the United States and admitted as soon as possible according to the principles of the Federal Constitution to the enjoyment of all rights, advantages, and immunities of citizens of the United States.

We respectfully submit that Jefferson believed the Government could annex territory, though he doubted whether such territory could be admitted into the Union, the question in this case is not affected.

The contention of the Government is, that this territory and all territories, save the original States and the States subsequently admitted, are not affected by the inhibitions placed by the Constitution on the action of the Government.

This they claim to be true of all territory owned by the United States from the earliest time to the present; that is, their argument applies equally to the Northwest Territory and to the island of Porto Rico.

There is here failure to distinguish between political rights on the one hand and the immunities against the actions of the Government which the people of the United States have created by the Constitution on the other hand.

The statesmen of Jefferson's day were, many of them, unwilling that Louisiana should be admitted into the Union, have two Senators and Representatives in Congress, and disturb what they believed to be a very nice adjustment of interests.

What they doubtless feared was political power.   They had no desire to oppress Louisiana, establish an order of nobility or a religion, to take property without due process of law, or to tax the inhabitants for their own benefit.   That none of these things were in their minds was evident from the course pursued. She was given all the guarantees of liberty and the machinery to carry them out.   Our customs laws and tariff were extended to her and her inhabitants were not cut off from our markets. No debates, no struggles, no doubts can be found in the history of the time as to the right of her people to have all these things. It is, therefore, manifest that the statesmen who opposed the treaty opposed it, not because they feared to grant those things which were given so freely and so unanimously, but because they feared the subsequent admission of States from Louisiana and the injection of new political forces and interests into the Union of the United States.   The act of March 26, 1804, for the government of Louisiana enacted a full bill of rights in entire accord with the Constitution.

It is true that in October, 1803, the House hurriedly enacted a bill providing for immediate temporary government, by the President, transferring to him all the powers held by the former Spanish officials.   That this was a temporary measure appears upon its face and the bill above referred to for the government of the territory was passed within a year, yet even in this haste the safeguard was inserted that these powers should be exercised for maintaining and protecting the inhabitants of Louisiana in the full enjoyment of their liberty, property, and religion.

While this latter bill was under consideration, Dr. Eustace, of Massachusetts, made a speech largely relied upon by the learned Attorney General in support of his point that the Constitution had no effect in Louisiana.   Dr. Eustace said: "The people, in my opinion, are at present unprepared for and undesirous of exercising the elective franchise.   The first object of the Government is to hold the country.   How?   By protecting the people in all their rights and by administering the government in such a manner as to prevent any disagreement among them—to use no other term.   .   .   .   When they should be better acquainted with the principles of our Government, and

shall have become desirous of participating in our privileges, it will be full time to extend to them the elective franchise. Have not the House been informed from an authentic source since the cession that the provisions of our institutions are inapplicable to them?"

And yet this speech was made in support of a bill which guaranteed full civil rights.

The view was then held by Congress, and probably rightly held, that the people should remain under what we term territorial government for some time before they should be admitted as States.

In this connection the learned Attorney General seems to believe that Gouverneur Morris's statement as to what he intended by the rules and regulations clause of the Constitution should have some weight. While we scarcely believe that a communication contained in a private letter as to what one member of a convention desired that the law should mean, can be considered as a factor by this tribunal, nevertheless we respectfully submit that if the letter is to be given any weight at all it goes to show that the convention took a view opposite from that advocated by the Government.

Gouverneur Morris says: "I always thought that when we should acquire Canada and Louisiana, it would be proper to govern them as provinces and allow them no voice in our councils. In wording the third section of the fourth article, I went as far as circumstances would permit to establish the exclusion. Candor obliges me to add my belief, that had it been more pointedly expressed, a strong opposition would have been made."

Mr. Morris's idea seems to have been that newly acquired territory should not, under the Constitution, be admitted to statehood. If he meant that it should be denied the ordinary common-law rights guaranteed by the Constitution, he did not say so. However, even assuming, as the Government seems to do, that this was his intention, he apparently shrank from announcing it to the convention. He, as a member of that convention, and a prominent participant in its debates, doubtless understood the views of all those present, and so sure was he that no scheme of colonial government, such as he apparently had in mind;

could be engrafted upon the Constitution, that he endeavored by means of a subterfuge to inject into the Constitution something which might be twisted into granting a power which the other members of the convention did not wish to confer upon the Government.

The rules and regulations clause, viewed in the light of history, referred to granting titles to land in the Northwest Territory and otherwise disposing of and regulating it. It was a substitute for the Pinckney draft " to appropriate the unappropriated lands of the United States."

Gouverneur Morris's redraft of this clause was passed without opposition, and it was evident that the framers of the Constitution saw no other meaning in it than that in the Pinckney draft. That so able a man as Morris should have been compelled to attempt to confer upon the Government by the Constitution such a power in such a way is very clear evidence of the intentions of the majority who framed the Constitution. As he himself admits, had his intention been expressed, a strong opposition would have been made. That this opposition would have been strong enough to override his views would seem not improbable from his fear and failure openly to express them.

The cases relating to the territorial courts have been so fully discussed in the briefs already presented to the learned court, that further comment is not required. We may only say that they do not affect the question as to whether territory newly acquired by treaty, and as yet unorganized, is within the limits of the United States and subject to the uniformity clause of the Constitution.

The regular judicial courts of the United States were clearly established by the Constitution for the purpose of exercising jurisdiction in reference to certain specified matters and within the States of the United States. The language of the Constitution makes this clear in itself. They were adapted to carry out the Federal system of government.

They are, this court has said, " parts of the Federal system, invested with the judicial power of the United States, expressly conferred by the Constitution and to be exercised in correlation with the presence and jurisdiction of the several state courts

and governments." *Hornbuckle* v. *Toombs*, 18 Wall. 648, 655. Cited with approval in *McAllister* v. *U. S.*, 141 U. S. 174, 183.

On the other hand, the courts established by the Congress within the Territories have jurisdiction not only over matters which the Constitution specially reserves to the Government as a Federal Government, but general jurisdiction over all cases arising between man and man, and which in the States are within the jurisdiction of the state courts.

In other words, they are not Federal courts, but municipal courts.

The most, then, that these cases decide is that the territorial courts are not the courts mentioned in the Constitution. The ultimate ground upon which these decisions do and must rest, is the fact that the Territories are not States, and therefore the constitutional courts would be inapplicable to them. "The distinctions between the Federal and state jurisdictions, under the Constitution of the United States, has no foundation in these territorial governments, and consequently no such distinction exists either in respect to the jurisdiction of their courts or the subjects submitted to their cognizance. They are legislative governments, and their courts legislative courts, Congress in the exercise of its powers in the organization and government of the Territories combining the powers of both the state and Federal authorities. There is but one system of government or of laws operating within their limits, as neither is subject to the constitutional provisions in respect to state and Federal jurisdiction." *Benner* v. *Porter*, 9 How. 235.

This question is entirely different from the question at bar. The inhibitions placed upon the central Government are general in their language and are applicable to the Government and not to any particular territory or any particular circumstances. That Chief Justice Marshall so understood it is very clear from the expressions used by him in the *Canter* case. He admitted that by the treaty at least the citizens of Florida were citizens of the United States. If that was so, it is very clear that Mr. Webster's contention that Florida was not part of the United States was considered unsound. But having held Florida to be a part of the United States, the court then proceeds to show

territorial courts to be local courts under the act of Congress, and not courts of the United States. It is little less than absurd to say that Chief Justice Marshall, though considering citizens of Florida to be citizens of the United States, considered Florida to be a foreign country.

Some concern has been expressed with reference to the effect of the nationalization of the uncivilized tribes that may inhabit the invaluable possessions acquired under the Treaty of Paris—a dread of the suffrage wielded by hordes of untamed Malays.

The Attorney General has, we believe, dissipated this fear by the position which he assumes for the Government at page 60 of the *Goetze* brief: " The political status of the native Indian tribes within territory acquired by the United States by treaty has been uniformly regarded as unaffected by the cession. A long line of special treaties with such tribes and numerous acts of legislation by Congress on the subject of Indians and Indian rights show that these people have always been regarded as *quasi* foreign."

This position is sustained by precedent at once abundant and illustrious, from *Worcester v. Georgia*, 5 Pet. 1, 17 (1826), down to the most recent date, through *Kagama* v. *United States*, 118 U. S. 375 ; *Talton* v. *Mayes*, 163 U. S. 376 ; *Elk* v. *Wilkins*, etc.

The Indians have from the beginning been considered and held as distinct political communities, owing a primary allegiance to their tribal authorities, and not subject to the complete jurisdiction of the United States.

For this reason their birth within the United States does not confer upon them the citizenship which the Constitution attaches to such birth in one subject to the jurisdiction.

While the Indians, however, have occupied under the law the anomalous position of independent though subservient nationality, the territory they occupy has never ceased to be territory of the United States, within the geographical boundaries of and subject to the sovereignty and dominion of the nation ; in every sense a part of the United States, to the extent that birth within such territory was enough to endow the person so

born with citizenship—unless he owed immediate allegiance to some tribe.

The only question that remains is : Whether uncivilized tribes in our new Asiatic or Caribbean possessions may be assimilated to these Indian tribes, if the Government or Congress should choose so to treat them.

That the existence of tribal relations and the savage state should have a like effect in either case goes without saying, unless there is some constitutional inhibition ; unless, in other words, the relation of Indian tribes, which has prevailed since the Constitution was adopted, can be shown to have been limited by such Constitution to North American Indians.

We submit with confidence that no such limitation can be found.

This court in *United States* v. *Kagama*, 118 U. S. 374, says:

" The Constitution of the United States is almost silent in regard to the relations of the Government which was established by it to the numerous tribes of Indians within its borders." p. 278.

The court then proceeds to point out that the only clauses relevant are the power to regulate commerce with the Indian tribes, and the apportionment of direct taxation excluding Indians not taxed.

It was the ownership of the territory, and the right of exclusive sovereignty over the same, which was lodged in the Federal Government that gave that Government the right of controlling the actions of the Indians, excluding from any such privilege even the state government within whose borders an Indian reservation was located.

In *Elk* v. *Wilkins*, the relation of the Indian born within the United States and subject to tribal government was determined not under any specific Indian clause in the Constitution, but by the clause relating to citizenship by birth, and under the XIVth amendment.

In other words, there are virtually no Indian clauses in the Constitution, certainly nothing to confine the regulation of our intercourse with uncivilized tribes within our borders to North American Indians.

In the acquisition of Mexican territory, additional uncivilized tribes were brought in and dealt with.

On the acquisition of Alaska, the uncivilized tribes in that Territory, whose racial characteristics are as distinct from the North American Indian as both are from the Malay and the Tagal, were dealt with on the same basis.    The treaty provides:

"The inhabitants  .  .  .  with the exception of uncivilized native tribes shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizenship, etc."   Art. III, March 30, 1867.

"The uncivilized tribes will be subject to such laws and regulations as the United States from time to time adopt in regard to aboriginal tribes."

On the acquisition of the Philippines, the general commanding entered into a treaty with the head of the Sulu tribes, who there enjoys the title and certain attributes of a sultan.

We can see no difficulty, as indeed we see little relevancy, in the relation of the Indian question to the sovereignty of the United States over all territory within its borders, and the obligation which the Constitution establishes of uniform imposts throughout those borders.

IX. The Effects of Cession upon the Question of Citizenship.

It is contended by the Government that: "The conceded power to acquire territory by treaty or by conquest includes the right to prescribe what terms the United States will agree to as fixing the status of its inhabitants."

We have elsewhere shown that the status of the inhabitants is a matter apart from and outside the principles governing this case.

The question of customs duties has nothing to do with citizenship or nationality.

The brief of the learned Attorney General expresses our views admirably.

"The right to bring merchandise into the United States is a right entirely within the regulation of Congress; such a right in no wise differs as to either citizens or aliens.    Citizenship

carries with it no special or peculiar privileges at the custom-house. The American, the Spaniard, the Porto Rican are treated alike. The basis of the customs laws is not ownership, but (1) the geographical origin of the shipment, and (2) the nature of the goods." Brief Atty. Gen. in *Goetze* case, p. 6.

Under these circumstances, and with this concession, it might seem superfluous to discuss the vexed question of citizenship had not the learned Attorney General deemed it important, if not relevant, and discussed the question at some length in his brief.

In support of his proposition he cites two precedents.

(1) The status of the free negro prior to the civil war, and the amendments to the Constitution.

(2) The history of our relations with the Indians.

It may be a cause for surprise that he should have adduced in support of such an important proposition the two least cred-itable instances in our history.

His argument seems to sum itself up as follows:

The inhabitants of Porto Rico are not citizens of the United States because (1) the power to confer citizenship is one which the Government has not in this instance chosen to exercise; (2) such citizenship is not expressly conferred either by the Constitution, the laws, or the treaty; this appears from the fact (as shown by the *Dred Scott* case) that free negroes were not citizens and that the members of the Indian tribes have always been held to be not citizens but *quasi* foreigners who could only acquire citizenship by naturalization.

These questions seem so important as to require somewhat full examination.

"The law knows nations only as political communities and as sovereign States. The nationality, therefore, as a legal attri-bute of persons, is connection with a certain body politic, mem-bership in a particular State. The members of a State are called its subjects or citizens. The former term if properly construed is applicable to the people of any nation without re-gard to the form of government, for every State is based upon the relation of its members to its sovereign." Encyclopædia

Political Science and United States History, article Nationality, by Munroe Smith.

The question of citizenship in the United States has always been confused because of the use of that word in a dual sense. The word "citizen" has two meanings.

It means in the first sense, primarily and properly, the persons exercising political rights and members of the ruling body politic.

In the second sense, it is applicable to the whole people of any nation without regard to the form of government. Citizenship in the latter sense means simply subject to the allegiance of a particular State or nation. In this sense it has precisely the same meaning as the term "subject." Story on the Constitution, Cooley's edition and notes, §§ 1932–33–34, cited at length by Sen. Foraker, p. 12, Rep. No. 249, 5th Feb. 1900, 56th Cong. 1st Sess.

All the members of a nation, subject to its jurisdiction, or, as the common law has it, "born under the actual obedience" are subjects or citizens in this sense. The word "subject" has been somewhat discredited by reason of its usual reference to feudal or absolute monarchies where none or few of the subjects are citizens in the sense of possessing political rights. The learned Attorney General is in error in supposing that "the term does not imply anything as to the nature or form of the government of which one is a subject." p. 72, *Goetze* brief. By reason of the disfavor that this term has thus fallen into, it is now found in no constitutionally governed nation save England.

The rule of the common law upon this subject is plain and well settled both in England and America. Except in the case of children of ambassadors, who are in theory born upon the soil of the sovereign whom the parent represents, a child born in the allegiance of the king is born his subject without reference to the political *status* or condition of its parents. Birth and allegiance go together. 1 Blackstone, 366; 2 Kent's Com. 39, 43; *Ingles* v. *The Sailor's Snug Harbor*, 3 Pet. 120; *U. S.* v. *Rhodes*, 1 Abb. U. S. Rep. 40; *Lynch* v. *Clarke*, and authorities there cited; 1 Sandf. Ch. 630.

This is nothing more than declaratory of the rule of the com-

mon law as above stated. To be a citizen of the United States by reason of his birth, a person must not only be born within its territorial limits, but he must also be born subject to its jurisdiction—that is, in its power and obedience. *McKay* v. *Campbell*, 3 U. S. Courts Rep. Ninth Circuit, 118, p. 129. See also *Elk* v. *Wilkins*, 112 U. S. 99.

In order, however, to avoid the ambiguity due to this dual sense, the Germans and the French make use of the word "nationals" to denote all persons subject to the allegiance of the state, *i. e.*, forming a part of the nationality, including both holders and nonholders of political rights. Generally speaking, therefore, nationals and aliens would include every person within a given territory and would indicate the legal relations which they hold to the public authority of such territory.

Nationals are again divided into two classes, those possessing political rights and those who do not possess them. The latter class would include women, minors, and persons who, for a variety of reasons other than alienage, do not possess the political franchise. *Minor* v. *Happersett*, 21 Wall. 162.

The Fourteenth Amendment, declaring that all persons born or naturalized in the United States and subject to their allegiance are citizens, uses the word in the sense of national or subject.

Before the Fourteenth Amendment the only apparent exception was due to the peculiar incidents of our history which made the negro something different from the ordinary human being—half man, half beast—something partly within the domain of natural history and partly within that of politics.

"The citizenship of the negro had been denied in the *Dred Scott* case on the assumption that citizenship and subjection were not indentical ideas; that a person might be a subject without being a citizen. In declaring that citizenship is acquired in the same manner in which subjection is established at common law, the Fourteenth Amendment has placed the equivalency of these terms and established the citizenship of a negro beyond the possibility of a doubt." Encyclopædia Pol. Sc. Article Nationality.

In the recent leading case on the question of nationality and

citizenship (*Wong Kim Ark*, 169 U. S.) Justice Gray, writing for the court, says: "In *Dred Scott* v. *Sandford* (1857), 19 How. 393, Mr. Justice Curtis said:

"'The first section of the second article of the Constitution uses the language—a natural-born citizen. It thus assumes that citizenship may be acquired by birth. Undoubtedly this language of the Constitution was used in reference to that principle of public law well understood in this country at the time of the adoption of the Constitution, which referred citizenship to the place of birth. 19 How. 576.

"'Allegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign. Two things usually concur to create citizenship; first, birth locally within the dominions of the sovereign; and secondly, birth within the protection and obedience, or in other words, within the ligeance of the sovereign—that is, the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from and consequently owe obedience or allegiance to the sovereign as such *de facto*. . . .

"'Subject and citizen are in a degree convertible terms as applied to natives; and though the term citizen seems to be appropriate to republican freemen, yet we are equally with the inhabitants of all other countries subjects, or we are equally bound by allegiance and subjection to the Government and law of the land.' 2 Kent. Com. 258, note.

"Passing by questions once earnestly controverted, but finally put at rest by the Fourteenth Amendment of the Constitution, it is beyond doubt that, before the enactment of the civil rights act of 1866, or the adoption of the constitutional amendment, all white persons at least and born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States.

"The fundamental principle of the common law with regard

to English nationality was birth within the allegiance, also called 'ligealty,' 'obedience,' 'faith,' or 'power,' of the King. The principle embraced all persons born within the King's allegiance and subject to his protection. Such allegiance and protection were mutual—as expressed in the maxim, *protectio trahit subjectionem, et subjectio protectionem*—and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the Kingdom. Children born in England of such aliens were, therefore, natural-born subjects. But the children born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the King's dominions, were not natural-born subjects, because not born within the allegiance, obedience, or the power, or, as would be said at this day, within the jurisdiction of the King."

Proceeding from these unquestioned principles, it naturally follows that the natives of Porto Rico and the other ceded islands are United States nationals, or, as the learned Attorney General prefers to term them, American subjects.

They are subjects or nationals in the same sense that women, minors, inhabitants of Oklahoma and Arizona are subjects or nationals.

Persons in States requiring an educational qualification for voting, who cannot attain to this qualification, are also in this position.

And, certainly, if the learned counsel means no more than this, he is right when he says that, "To be called an American subject is no disgrace."

That the treaty carries out this idea is very clear, for it declares that natives of the peninsula of Spain who have not elected to remain Spanish subjects shall be deemed to possess the *nationality* of the territory in which they reside. Of course, the nationality of the territories depends upon the nation under whose jurisdiction the territories are, and as this jurisdiction is the United States, the phrase is equivalent to saying that citizens of the territory who do not elect to remain Spanish citizens

become American nationals, or, again, as the learned Attorney General prefers to style them, American subjects.

It is very clear that Porto Rico and the Island of Guam have no nationality of their own, nor can any territory which does not possess sovereignty or autonomy be said to have any nationality. The inhabitants of these possessions of the United States are subject to its obedience and are, therefore, its nationals or subjects.

The negotiators of the treaty with Spain undoubtedly understood the treaty—as making all the inhabitants who did not elect to remain Spaniards, American citizens or nationals.

The Spanish commissioners claimed that—

" The American commission refuses to acknowledge the right of the inhabitants of the countries ceded or relinquished by Spain to choose the citizenship with which, up to the present, they have been clothed. And, nevertheless, this right of choosing, which is one of the most sacred rights of human beings, has been constantly sacred since the day when man was emancipated from serfdom. This sacred right has been respected in treaties of territorial cession concluded in modern times." Annex to Protocol No. 21, treaty of peace between United States and Spain of Dec. 10, 1898.

To this the following reply was made:

" The American commissioners do not so understand the article upon the subject of citizenship submitted by them as a substitute for the article proposed by the Spanish commissioners. An analysis of the article will show that *Spanish subjects, natives of Spain* are allowed a year's time in which, by the simple process of stating in a court of record their intention so to do, they may preserve their allegiance to Spain.

" Such persons have the fullest right to dispose of their property and remove from the territory, or, remaining, to continue to be Spanish subjects or elect the nationality of the new territory.

" As to natives, their status and civil rights are left to Congress, which will enact laws to govern the ceded territory. This is no more than the assertion of the right of the governing power to control these important relations to the new govern-

ment. The Congress of a country which never has enacted laws to oppress or abridge the rights of residents within its domain, and whose laws permit the largest liberty consistent with the preservation of order and the protection of property, may safely be trusted not to depart from its well-settled practice in dealing with the inhabitants of these islands." Annex 1 to Protocol No. 22, treaty of peace between United States and Spain of Dec. 10, 1898.

In view of these assertions of the treaty makers, is it reasonable to claim that this treaty was intended to empower Congress for the first time in its history to govern " dependencies" without regard to Constitutional immunities?

But the learned counsel for the Government, if we understand him correctly, claims that annexation of territory by mere treaty cession which makes no provision for conferring citizenship upon the inhabitants leaves them aliens until Congress chooses to enact otherwise.

The Louisiana, Florida, Mexican, and Alaskan treaties provided that the inhabitants shall be admitted to the enjoyment of the rights and privileges of citizens of the United States, and from this he infers that without such stipulation they would not have been citizens.

As to Louisiana, Florida, and Alaska, the stipulation evidently refers to the full citizenship incident to statehood ; not to " naked citizenship," to borrow Justice Curtis's phrase, or, as we have termed it, " nationals."

The Alaskan treaty is peculiar in that it excepts uncivilized tribes.

" The inhabitants of the ceded territories, according to their choice, reserving their natural allegiance, may return to Russia within three years ; but if they prefer remaining in the ceded territory they, with the exception of uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States."

In that treaty remaining three years was considered equivalent to renouncing the Russian allegiance.

The Attorney General considers this privilege of election a suspension of citizenship by the United States, and finds in

this proof that the Constitution did not affect the question. Brief, p. 58. It is respectfully submitted that the inhabitants of Alaska had been Russian citizens or subjects; that it is usual under the general postulates of international law to allow persons to retain the allegiance to their former masters, if they so desire. The provision in the Alaskan treaty simply gave the inhabitants three years to decide whether they would retain their former allegiance. Their citizenship was not suspended; they were Russian citizens until they chose to become American citizens.

This treaty is analogous to the treaty with Spain. The Spanish-born inhabitants of the ceded islands are allowed one year in which to decide whether they wish to retain their former citizenship. In case they should retain it, their allegiance was due to Spain and their reliance for protection was upon her. Should they not retain it, they then became United States nationals. Treaty of Paris, Art. IX.

The other inhabitants of the islands have not been accorded this privilege for reasons fully set out in the documents of the Peace Commission. Senate Doc. 64, 1898.

As far as the United States was concerned, the latter people could not remain like natives of the peninsula, Spanish subjects, but became at once United States nationals. That the United States might have given them power to remain Spanish subjects is doubtless true, but it did not choose to do so.

Pothier thus lays down the principle, says Mr. Lawrence, in reference to the acquisitions which had been made by France before the French Revolution: "When a province is united to the Crown, its inhabitants must be regarded as Frenchmen whether they were born before or after the union."

Pothier carries the principle so far as to say: "There is every reason to think that the foreigners who are established in these provinces, and who have there obtained, according to the laws in force, the rights of citizenship, must, after the annexation, be considered citizens equally with the native inhabitants of those provinces, or, at least, with foreigners naturalized in France."

And applying the same principle in the cases of loss and

restoration of territory, he says: "When a province is dismembered from the Crown, when a conquered country is restored by the treaty of peace, the sovereignty over the inhabitants is changed. Citizens at the time of the conquest or since the conquest, or if born since the union, citizens by their birth till the dismemberment of the province, become foreigners." Traité des Personnes, Part I, tit. 2, sec. 1, cited by Lawrence, Appendix to Wheaton, 897.

The treaty of April 26, 1798, for the incorporation of the Republic of Geneva with the French Republic, declared that the Genevese who inhabited the city and territory of Geneva, as well as those who were in France or elsewhere, became and were native-born Frenchmen (français nés), and the treaty for the annexation of Mulhausen also declared that the citizens and inhabitants of Mulhausen and its dependencies became and were native-born citizens (français nés). Referring to these treaties, Mr. Lawrence says: "It is not, however, understood that these special declarations varied the conditions of the inhabitants of these small republics from that of the numerous countries and provinces which were incorporated with France between 1789 and 1814.

"These relations established as to Geneva and Mulhausen were applicable to all the annexations.

"They were the 'immediate consequences,' says Fœlix (Revue de Droit Français et Etranger, Tom. II, page 328, Naturalization Collective), 'of every union of territory, according to the existing law of nations, and since it is no longer the custom, even after the conquest of a country, to reduce its inhabitants to a condition inferior to that of the conquering country.'"

This custom which, as Fœlix says, has fallen into honorable disuse, is apparently what the Attorney General desires to revive by placing Porto Ricans on the footing of the "1135 free people of color in New Orleans in 1803," that is, at the time of its cession to the United States.

The dismemberment of populated territory from a State on the one hand, and its incorporation into a new nationality on the other, operate as a collective naturalization ipso facto. "Annexation of territory, either by peaceful cession or as a re-

sult of war, invariably carries with it a change of nationality. This is what is called collective naturalization." Pradier Fœdéré, Droit International Public, ed. 1885, vol. III, p. 721.

"Treaties of annexation generally give an option to individuals owing allegiance to the State whose territory is annexed. This option may be manifested either by emigration simply, or by a declaration of intention accompanied by emigration; sometimes a simple declaration is made without resorting to emigration. In any case inaction or silence imports adhesion to the new order of things—tacit acceptance of the nationality newly imposed." *Ibid.* 1, p. 723. "It is a doctrine of natural law that conquest or peaceful cession relieves the inhabitants from all bonds of allegiance towards the sovereign of the passing territory and enjoins fidelity on their part to the new régime. In fact, the inhabitants having had the choice of leaving the country or continuing their residence therein, it is but just that their permanent sojourn in the annexed territory should be construed as a tacit declaration of their fidelity to the conqueror." Calvo, Droit International Theorique et Pratique, ed. 1896, vol. IV, p. 394.

Fœlix, cited by Lawrence, *supra*, says that "change of nationality results either by mere operation of law or from the act of the individual." Of the former he says, "cession of territory furnishes another example." "There can be little or no doubt," says Halleck, "that the inhabitants of Florida, as intimated by Chief Justice Marshall, were entitled *without* the treaty stipulation, to the 'privileges, rights, and immunities' of citizens in this more extended sense of the term; but their right to be incorporated in the Union, and participate in political power, was derived from the treaty and not a necessary consequence, under the law of nations, of the transfer of their country and allegiance." Halleck's Int. Law, § 13, p. 824.

"A collective naturalization of all the inhabitants is effected when a country or province becomes incorporated in another country by conquest, cession, or free gift." Phillimore, vol. I, p. 449, ed. 1879.

The treaty thus confers upon the inhabitants the "nationality of the territory to which they belong."

As to Porto Rico, that nationality is of course the United States. *Boyd* v. *Thayer*, 143 U. S. 162.

Porto Rico is not a country in the political sense, and hence can have no independent nationality of its own.

International law knows no State or nation of Porto Rico. It is not a member of the family of nations. Its inhabitants can only be either aliens, *i. e.*, persons owing allegiance to a sovereignty other than the United States, or nationals, *i. e.*, (passive) citizens of the United States.

Congress may of course naturalize, by annexing territory, the inhabitants, and, as we have demonstrated, mere cession and transfer of territory has this effect without special stipulation in the treaty.

A treaty provision to that effect is therefore merely declaratory of the rule of international law. As was said by the present learned Chief Justice: "Persons not thus subject to the jurisdiction of the United States at the time of birth cannot become so afterward except by being naturalized either individually as by proceedings under the naturalization acts, or collectively, as by the force of a treaty by which foreign territory is acquired." *Wong Kim Ark*, 169 U. S.

"A person born out of the jurisdiction of the United States can only become a citizen by being naturalized either by treaty, as in the case of the annexation of foreign territory, or by authority of Congress, exercised either by declaring certain classes of persons to be citizens, as in the enactments conferring citizenship upon foreign-born children of citizens, or by enabling foreigners individually to become citizens by proceedings in the judicial tribunals as in the ordinary provisions of the naturalization acts." *Wong Kim Ark*, 169 U. S. 649, 702.

As to persons born subsequent to the acquisition, the question is even clearer. The Fourteenth Amendment has enacted a rule of law into the Constitution which overrules treaties and legislation.

Prior to such amendment had the Government desired to violate the common-law rule adopted by the United States, it could have declared in a case like that of Porto Rico that all of the inhabitants should remain citizens of Spain. The territory

would none the less have been a part of the United States, but its inhabitants would have been aliens and subjects to a foreign jurisdiction. Such an incongruous result would, in the absence of Constitutional restriction, have been possible. The inhabitants of such territory would then have owed temporary allegiance to the United States such as aliens within its jurisdiction now owe it; but because a part of the territory is populated by aliens that territory is none the less within the geographical boundaries of the United States. The question could only arise as to inhabitants born before the cession, but as this treaty has provided otherwise, the question is academic.

The Fourteenth Amendment enacting the common-law rule of citizenship into the dignity of constitutional provision, settles the status of persons born since the cession. "The Fourteenth Amendment of the Constitution, in the declaration that 'all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the States wherein they reside,' contemplates two sources of citizenship, and two only—birth and naturalization. Citizenship by naturalization can only be acquired by naturalization under the authority and in the forms of law. But citizenship by birth is established by the mere fact of birth under the circumstances defined in the Constitution. Every person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States and needs no naturalization." *Wong Kim Ark*, 169 U. S. 649.

The main precedent, however, upon which the learned Attorney General seems to rely is that of the position of the free negroes before the civil war; because he says:

"Suppose a cession of a small island with half a dozen inhabitants—must the United States agree to permit them to remain and accept them as citizens? It might be the purpose of the Government to use the island solely as a fort or military reservation. . . . And if such restriction on its right to acquire exists, how does it resist the rights of uncivilized tribes in Alaska and in the Mississippi and New Mexican regions to be counted also as citizens? Or the 1135 'free people of color' in New Orleans in 1803, to say nothing of the slaves."

The learned Attorney General then proceeds to show from the *Dred Scott* decision that free negroes were not citizens. We may admit that the free negroes before the war and during the civil war occupied an anomalous position.

The case of *Dred Scott* simply held that the negro was so low in the scale of humanity that the States could not, by conferring freedom upon him, make him capable of becoming a citizen of the United States in the broad or passive sense. He was, therefore, neither citizen nor subject, but a being who, under the Constitution, was something different and apart from the rest of humanity.

His anomalous position was thus described by Chief Justice Taney: "In the opinion of the court the legislation and the histories of the times and the language used in the Declaration of Independence show that neither the class of persons who had been imported as slaves, nor their descendants, whether they had become free or not, were then acknowledged as a part of the people, nor intended to be included in the general words used in that memorable instrument.

"It is difficult at this day to realize the state of public opinion in relation to that unfortunate race which prevailed in the civilized and enlightened portion of the world at the time of the Declaration of Independence, and when the Constitution of the United States was framed and adopted. But the public history of every European nation displays it in a manner too plain to be mistaken.

"They had for more than a century been regarded as beings of an inferior order and altogether unfit to associate with the white race either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the negro might lawfully and justly be reduced to slavery for his benefit. He was bought and sold, as an ordinary article of merchandise and traffic, whenever a profit could be made by it. This opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as in politics, which no one thought of disputing or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted

upon it in their private pursuits as well as in matters of public concern, without doubting for a moment the correctness of this opinion.

" And in no nation was this opinion more firmly fixed or more uniformly acted upon than by the English Government and the English people. They not only seized them on the coast of Africa and sold them or held them in slavery for their own use, but they took them as ordinary articles of merchandise to every country where they could make a profit upon them and were far more extensively engaged in this commerce than any other nation in the world.

" The opinion thus entertained and acted upon in England was naturally impressed upon the colonies they founded on this side of the Atlantic. And, accordingly, a negro of the African race was regarded by them as an article of property and held, and bought and sold as such, in every one of the thirteen colonies which united in the Declaration of Independence and afterwards formed the Constitution of the United States. The slaves were more or less numerous in the different colonies, as slave labor was found more or less profitable. But no one seems to have doubted the correctness of the prevailing opinion of the time." pp. 407–408, 19 How.

\* \* \* \* \* \* \* \*

" The question with which we are now dealing is, whether a person of the African race can be a citizen of the United States and become thereby entitled to a special privilege by virtue of his title to that character and which, under the Constitution, no one but a citizen can claim.

\* \* \* \* \* \* \* \*

" The only two provisions which point to them and include them treat them as property, and make it the duty of the Government to protect it; no other power in relation to this race is to be found in the Constitution, and as it is a Government of special delegated powers, no authority beyond these two provisions can be constitutionally exercised."

Mr. Justice Curtis in his dissenting opinion uses the following apposite language (p. 583) : " And my opinion is that, under the Constitution of the United States, every free person born on

the soil of a State, who is a citizen of that State by force of its constitution or laws, is also a citizen of the United States.

" I will proceed to state the grounds of that opinion.

" The first section of the second article of the Constitution uses the language ' a natural born citizen.' It thus assumes that citizenship may be· acquired by birth. Undoubtedly this language of the Constitution was used in reference to that principle of public law well understood in this country at the time of the adoption of the Constitution which referred citizenship to the place of birth. At the Declaration·of Independence and ever since the received general doctrine has been, in conformity with the common law, that free persons born within either of. the colonies were subjects of the King; that by the Declaration of Independence and the consequent acquisition of sovereignty by the several States all such persons ceased to be subjects and became citizens of the several States, except so far as some of them were disfranchised by the legislative power of the States, or availed themselves seasonably of the right to adhere.to the British Crown in the civil contest and thus to continue British subjects. *McIlvaine* v. *Coxe's Lessee,* 4 Cranch, 209; *Inglas* v. *Sailors' Snug Harbor,* 3 Pet. 90; *Shanks* v. *Dupont,* 3 Pet. 42."

\* \* \* \* \* ·\* \* \*

" A naturalized citizen cannot be President of the United States, nor a Senator till after the lapse of nine years, nor a Representative until after the lapse of seven from his naturalization. Yet, as soon as he is naturalized, he is certainly a citizen of the United States. Nor is any inhabitant of the District of Columbia or of either of the Territories eligible to the office of · Senator or Representative in Congress though they may be citizens of the United States. So in all the States numerous persons, though citizens, cannot vote or cannot hold office either on account of their age or sex, or the want of necessary legal qualifications. The truth is, that citizenship under the Constitution of the United States is not dependent on the possession of any particular political or even of all civil rights; and any attempt so to define it must lead to error. To what citizens the elective franchise shall be confided is a question to be deter-

mined by each State, in accordance with its own views of the necessities or expediencies of its condition. What civil rights shall be enjoyed by its citizens, and whether all shall enjoy the same, or how they may be gained or lost, are to be determined in the same way." ·

\*     \*     \*     \*     \*     \*     \*     \*

" It rests with the States themselves so to frame their constitutions and laws as not to attach a particular privilege or immunity to mere naked citizenship."

It thus appears the condition of the negro was such that he was not in the legal sense a person. Whether free or slave, he was something capable of being reduced to property, and, therefore, he did not fall within any category which would fit the genus man.

But assuming that it is necessary to classify him at all, it may be said that he belongs to the class of " nationals," and further was placed in a subclass by himself (under the Constitution of the United States as interpreted by the court in the *Dred Scott* case), and that as member of that subclass he owed allegiance to the United States, but was incapable of possessing constitutional rights such as the right to sue in the Federal courts, which was expressly guaranteed to the citizens of the United States.

Thus political rights were accorded to some citizens and civil rights to all save the negro.

It was for the purpose of removing from our Constitution this disability that the Fourteenth Amendment was enacted. By it the negro stepped from the domain of zoölogy into that of history.

What rights human beings owing direct and immediate obedience to the sovereign in whose jurisdiction they may reside are to possess is a question for that sovereign to determine in a constitution or by legislation, but subjection or nationality merely express a relation of fact, to wit, allegiance and protection.

The inhabitants of Porto Rico who were born subsequent to the cession and who do not owe any direct, immediate allegiance to any foreign nation are citizens or subjects of the United States.

As such citizens or subjects they possess whatever rights are generally conferred upon that class by law.

Neither by the laws of the United States nor the Constitution does any subdivision of that class exist incapable by nature of possessing any rights of any character. This anomalous position was confined to the free negro before the Fourteenth Amendment.

If the learned Attorney General dissents from this proposition, as to the inhabitants of the ceded territory, he can only do so upon the ground upon which Judge Taney held negroes not citizens, namely, that they were persons capable of being considered as property, and therefore too degraded to come within that category. If the learned counsel means anything else than this his argument is irrelevant.

If he means this, we can only say that his views have been repudiated by the American people in the civil war, by three amendments to the Constitution of the United States by this court, and by forty years of advancing civilization.

X. It is erroneous to assume that the decision in this case can or will involve the right of the United States to own, possess, or govern colonies.

The only question involved is as to how the United States shall govern its colonies. From the beginning it has possessed colonies or dependencies.

Morris, in his work on colonization, volume II, at page 292, speaking of Russia, says:

"These recent efforts of Russia recall, if the digression be here permitted, that in this sense the United States have likewise, throughout their actual career, been engaged in the real work of colonization, although the extension of the Republic may not generally be recognized as such a manifestation. The casual observer is prone to attach to this idea the idea of distance, to believe that for the application of the term colony to a dependency, the latter must necessarily be remote from the metropolis. The fact is, that the relation is based on certain peculiar mutuality of rights. What difference can it possibly make that the possession be isolated by the depths of the sea, by a voyage over the seas occupying a month, or by a journey

on the land of a similar interval. If the thought of separation by water be disassociated, cannot the settlement of Louisiana, California, and the Northwest Territory well be claimed as some of the greatest episodes of history? In Alaska the inhabitants are still occupied in the work of colonization."

That those territories have not usually been thought of as colonies, because they were not separated from the United States by large bodies of water, does not make them any less colonies. They are colonies just as much as Canada, New Zealand, or Australia are colonies of Great Britain. They had, however, been governed better and more liberally than the colonies of any power in the world, and the history of colonization shows that the methods of the Government of the United States are being imitated by the other nations of the world.

Therefore in acquiring and governing new territories, dependencies, or colonies, we have continuous precedents extending back to the formation of the Constitution, but in governing these territories without according them as of right certain immunities which have always been deemed by the American people fundamental rights, we should be equally reversing the precedents of one hundred years.

It is idle to say that Congress will give them these rights independent of the Constitution. The question is not what Congress will do, but what it can do. Congress has heretofore passed laws which were unwise, and has passed laws which have been declared by this court to be unconstitutional. There is no guaranty that they will not pass such laws again.

The government of Great Britain not many years ago passed a law (Ashburton Act) practically confiscating property in England and Ireland, and allowing the courts to fix the rents which the tenants should pay the landlords. Such an act would be utterly impossible under our system of government, as long as our present Constitution endures.

The learned Attorney General in his brief, page 12, says: "No one pretends that Congress, irrespective of any limitation of the Constitution, could properly make and enforce a law to

take without cause property of one person and vest it in another."

We ask why Congress cannot do this. If there is no legal limitation upon Congress, what limitation is there? If it be said a moral obligation, the answer is that it is no limitation whatever. Is there any reason to suppose that the Congress of the United States might not be willing to do as was done by the Parliament of England, which did the thing the Attorney General claims that Congress could not do irrespective of the limitations of the Constitution, namely, to take property of one individual and vest it in another?

But the Attorney General adds: "These are all despotic powers which no Congress would claim, much less attempt to exercise." History scarcely teaches the lesson that a body of men will not exercise all the power which they possess. Rather the contrary is true, and the instances which we have in our own history in the attempt to make laws inconsistent with the Constitution would hardly lead us to assent to the proposition of the learned Attorney General, that while Congress had the power to ignore these rights, it is certain that they would not do so. Colonies frequently, if not usually, suffer from too much government, rarely, if ever, from too little.

XI. We have now considered every one of the strictly legal arguments advanced in support of the Government's position. But arguments of another class have been presented, and a word must be said in reference to them.

It has been said that the due regard for constitutional limitations would make us a "crippled nation," and that, like "humpbacked Richard," we would be the laughing stock of nations as we "halt by them."

The argument from the consequences which may attend upon the interpretation of a constitutional provision is not always the best argument, but is one which may sometimes be considered. As was said by this court in *Maxwell* v. *Dow*, 176 U. S. 590: "The argument, we admit, is not always the most conclusive which is drawn from the consequences urged against the adoption of a particular construction of an instrument. But when, as in the case before us, these consequences are so

serious, so far reaching and pervading, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the state governments by subjecting them to the control of Congress in the exercise of powers heretofore universally conceded to them of the most ordinary and fundamental character; when, in fact, it radically changes the whole theory of the relations of the state and Federal governments to each other and of both these governments to the people, the argument has a force that is irresistible in the absence of language which expresses such a purpose too clearly to admit of doubt. We are convinced that no such results were intended by the Congress which proposed these amendments, nor by the legislatures of the States which ratified them."

We assert that the only consequence which the Government of the United States fears from an adverse decision is the necessity for free trade between the new possessions, or colonies, and the States of the United States.

It has been assumed that the guarantees of certain civil rights conferred by the Constitution might be incompatible with the government of newly acquired possessions. This assumption, however, is entirely negatived: 1. By the history of our past acquisitions, and 2. By the attitude already assumed by the Government in regard to our new territories.

In all our past acquisitions, not only those of the Northwest Territory, inhabited by English speaking people, but in territory acquired from Mexico, Spain, and France, inhabited by people different in language, law, and religion, we have not feared, but, on the contrary, we have hastened to confer on the inhabitants all the rights and liberties which centuries of conflict led our ancestors to believe essential, if not sacred.

That these concessions have not retarded the development of our former colonies or territories is matter of public history.

The first act for the government of Louisiana conceded trial by jury and provided for the other guaranties of the bill of rights.

The military governments in the territories wrested from

Mexico by conquest and confirmed by treaty gave the inhabitants these rights.

Not only have they been accorded to the civilized inhabitants of former acquisitions, but by recent legislation provision is made for the trial of Indians by the United States courts, and they are tried by the methods known to the common law and sanctioned by the amendments to the Constitution.

There is nothing in the Constitution incompatible with the proper administration of such territory. It is not probable that we will find it necessary to establish an order of nobility or to prohibit the free exercise of religion or of the right of the people peaceably to assemble.

We will scarcely find it useful to quarter soldiers in the houses of the inhabitants in time of peace or to establish torture in order to compel witnesses to tell the truth, or burning at the stake as a means of capital punishment.

And why, if we can try Indians by the ordinary methods of petit and grand jury, should we deny this right to the people of Porto Rico and the Philippines, who have been accustomed to Spanish criminal and civil law, which, whatever may be its deficiencies, is certainly preferable to the Indian tribal customs? Why should we desire to require excessive bail or prescribe cruel punishment?

The Government evidently desires to do none of these things. As the Secretary of War has said, they do not mean to interfere with what he terms: " The underlying principles of justice and freedom which we have declared into our Constitution, and which are the essential safeguards of every individual against the powers of government, not because these provisions were enacted for them, but because they are essential limitations inherent in the very existence of the American Government. To illustrate: The people of Porto Rico have not the right to demand that duties should be uniform as between Porto Rico and the United States because the provision of the Constitution was not made for them."

We quote this to show exactly the effects which the Government fears from a decision that Porto Rico is within the United

States; not the granting of common-law rights to the people, but the opening of our markets to the colonial products.

In the *Goetze* case involving this question, " certain industries " have filed a brief in which they state that their interests are equally important with those of the Government of the United States. Those interests are commercial interests, whose desires, according to their brief, is that the American Government shall have the power to impose a tariff upon the products of these islands, which would shut them out from competition.

It is therefore evident,

(1) From the nature of the rights guaranteed by the Constitution.

(2) From the views of our Government as outlined by the Secretary of War.

(3) From the attitude of the industrial interests here represented, and

(4) From the history of the Government of our former acquisitions, that the only effect of a decision by this court in favor of the Government would be to allow the shutting out of the products of these places from our markets, or, in other words, the taxation of the inhabitants of the new possessions for the benefit of some inhabitants of the States of the United States.

That any danger so great in its extent and dire in its nature would follow from the impossibility of imposing such commercial restrictions is hardly so evident or certain a factor as to influence the decision in this case.

But, even assuming that the people of the United States are unwilling to consume tobacco from Porto Rico and the Philippine Islands, or to allow it to be sold in their markets, they can prevent this by constitutional amendment.

The learned Attorney General stated in his argument in the *Goetze* case that England taxed the products of her colonies at her custom-house. While the fact that the English Government follows a certain policy may not prove absolutely that such policy is a wise and beneficent one, yet we admit that the acts of the British Government, as the acts of a wise and prudent Government in matters of finance, are entitled to respect.

We would, however, call attention to the fact that the

English colonies also exclude English goods from their markets, and as they possess a local self-government, with which the English Government interferes in no respect, can care for their own interests as well as the mother country, and, therefore, the case is scarcely analogous to that at bar.

There is probably no provision in the Constitution which demonstrates more conclusively the wisdom of the framers of that instrument than the uniformity clause.

It is argued that the insertion of this clause was due to the desire on the part of some States that a majority of the House of Representatives should not build up industries in some States to the loss of others, or, in other words, that the industries of the smaller States should not be at the mercy of the larger ones. While this reason may have been applicable to the States, it is inapplicable to the Territories according to the contention of the learned Attorney General.

But we submit that it is more applicable to the Territories because, as they possess no representation, they are defenceless, and should the States impose burdens upon them by taxing their products they would thus have complete and absolute power to do so. Having no representation, the Territories could not defend themselves as might even a minority of the States from this form of oppression. It is true that taxation without representation is only a political right.

We have no right to assume that the framers of the Constitution, realizing this, were willing that their "posterity" should have no protection against this taxation. As the people of the Territories could not, under the Constitution, have representation, there was only one principle that could protect them, and that was uniformity. It is good for the governed and the governing, the rulers and the ruled, to feel the pressure of the same law. "If it be said that the principle of uniformity established in the Constitution secures the district from oppression in the imposition of indirect taxes, it is not less true that the principle of apportionment, also established in the Constitution, secures the district from any oppressive exercise of the power to lay and collect any direct taxes." C. J. Marshall in *Loughborough* v. *Blake*, 5 Wheat. 324.

Is it not possible that the framers of the Constitution may have foreseen the possibility that interested persons in the thirteen States might desire to build themselves up at the expense of or free from competition of the Northwest Territory? Certainly no provision more admirably adapted to prevent this could be framed than that requiring that all duties should be uniform throughout the United States.

We contend, therefore, that far from the effects which would follow from the adoption of our interpretation of this clause being incompatible with good government of the newly acquired Territories the direct opposite would be the result. They would have the inherent rights which the Government does not wish to deny them. They would possess, besides, freedom from that danger which English-speaking men have always held most important—unjust taxation. They cannot be represented in fixing their taxes; their only safeguard, therefore, is that their rulers cannot tax them without equally taxing themselves, and upon the best known principles of human nature it would be difficult to find an incident so calculated to guarantee the inhabitants of the newly acquired Territories from being unequally taxed in the disposition of their products and properties for the benefit of certain industrial interests.

XII. It is inevitable that upon questions of the breadth and far-reaching importance of those here presented all concerned in their settlement should look with anxiety on the result of their deliberations and seek to avoid in reaching a conclusion any disastrous effect upon the nation.

The Attorney General has told us that the maintenance of the limitations invoked by the plaintiffs in error would make us a crippled nation, incapable of meeting the requirements which duty and destiny impose upon this Republic.

That we have a government of limited powers he has frankly conceded. We desire to impress upon him that the dangers of such limitation and their possible inadaptability to circumstances that might arise in a distant future were quite present to the master minds from whose contact sprang the instrument which has held together this mighty nation through nullification, secession, and civil war for more than a hundred years.

They provided for the emergency.

Article V of the Constitution prescribes a method for its amendment, which may be readily applied whenever the people agree with the contentions of the Government in the present case, and determine that the limitations imposed upon their agents have ceased to be a benefit or have become an obstacle to the good government for which they sought.

We will not enlarge upon this theme, but will leave the case in the hands of the court with citations from two of its justices, and from one whom it is not yet considered sentimental to call the Father of his Country.

Mr. Chief Justice Fuller says: "Differences have often occurred in this court—differences exist now—but there has never been a time in its history when there has been a difference of opinion as to its duty to announce its deliberate conclusions unaffected by considerations not pertaining to the case in hand." *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 634, 635. "Still less can we recognize the doctrine that because the Constitution has been found in the march of time sufficiently comprehensive to be applicable to conditions not within the minds of its framers, and not arising in their time, it may therefore be wrenched from the subjects expressly embraced within it, and amended by judicial decision without action by the designated organs in the mode by which alone amendments can be made." *McPherson* v. *Blackie*, 146 U. S. 36. Mr. Justice Harlan says:

"If some of the guarantees of life, liberty, and property which at the time of the adoption of the national Constitution were regarded as fundamental and as absolutely essential to the enjoyment of freedom, have, in the judgment of some, ceased to be of practical value, it is for the people of the United States so to declare by the amendment of that instrument." *Maxwell* v. *Dow*, 176 U. S. 617.

Washington, in his farewell words to his fellow-countrymen, says:

"If in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way in which the

Constitution designates.    But let there be no change by usurpation; for though this in one instance may be the instrument of good, it is the customary weapon by which free governments are destroyed.    The precedent must always greatly overbalance in permanent evil any partial or transient benefit which the use can at any time yield."

We confidently submit that no authority has been shown to justify the exaction of duties complained of by the plaintiff in error, and that the judgment of the court below should be set aside and the case remanded with instructions to give judgment for the plaintiff.

New York, January 2, 1901.

*Mr. Attorney General.* for the United States.

### I. INDIRECT TAXES NEED NOT BE UNIFORM THROUGHOUT " THE TERRITORY " OF THE UNITED STATES.

The Constitution has not provided for absolute uniformity of duties under all circumstances.

States may still impose imposts and duties on imports and exports and duty of tonnage, provided Congress consent thereto. Constitution, Art. I, sec. 10, pars. 2 and 3.

The uniformity clause of the Constitution refers to the States and not to Territories.

(*a*) The historical reasons for its insertion into the Constitution prove this.

(*b*) The phrase "throughout the United States" elsewhere used in the Constitution refers only to the States.

Article I, section 8, paragraph 4; Article II, section 1, paragraph 3.    See *Sturges* v. *Crowninshield*, 4 Wheat. 122.

Similar meanings should be attached to the same phrase wherever it occurs unless some different meaning is clearly indicated by the context.

(*c*) The power to tax within the limits of territory is not derived from article 1, section 8, paragraph 1, but from the general power to make all needful rules and regulations respecting the territory belonging to the United States.

(*d*) The States, by the compact of submission to the Govern-

ment organized under the Constitution, were to stand on a perfect equality with each other. The Congress was forbidden to exercise any discrimination between the States or their several ports.

As to the Territories no such compact was made. The full power of taxation was conferred on Congress along with the power to govern them; and in the exercise of the power Congress possesses unrestricted discretion both as to the subjects of taxation and the places where it shall be levied and those where it shall not be levied.

As between the different Territories there is no compact in favor of uniformity. Such uniformity is not essential for the protection of the States as between each other, because the Territories are the common property of all of the States, and whatever is done as to territorial taxation is done by the authority of the States and for their equal benefit.

(e) There are obvious reasons of prudence and policy for not requiring the revenue laws, which must be uniform throughout the States, to be uniform also throughout the Territories.

This is expressly decided to be so as to direct taxes. *Loughborough* v. *Blake.* For the same reasons, and for other reasons as well, the same is true as to indirect taxes.

The internal revenue, or tariff, or license laws, made for the States, may be inconvenient, oppressive, unprofitable, impolitic, for the Territories. Those laws may be wise and politic for some and very unwise and impracticable for other Territories.

Congress ought to possess, and we contend does possess, the power to vary its system of taxation according to the location, conditions, and circumstances of the different Territories.

Otherwise not only will the Government be embarrassed and hampered, but actual injustice will be done to some sections of our possessions.

(f) It is conceded that Congress has such power to vary the system of taxation for local purposes.

But in principle and in reality there is no difference between local taxation and general taxation upon territorial property.

There were reasons why the limits of taxation upon the States should be fixed by the Constitution.

Equality between the States was the prime and most evident object to be attained. To that end were established the rule of apportionment as to direct taxes and the rule of conformity throughout all the States as to duties, imposts, and excises.

Story, answering the question why "duties, imposts, and excises" are required to be uniform throughout the United States, says:

"The answer to the latter may be given in a few words. It was to cut off all undue preferences of one State over another in the regulation of subjects affecting their common interests. Unless duties, imposts, and excises were uniform, the grossest and most oppressive inequalities, vitally affecting the pursuits and employments of the people of different States, might exist. The agriculture, commerce, or manufactures of one State might be built up on the ruins of those of another; and a combination of a few States in Congress might secure a monopoly of certain branches of trade and business to themselves, to the injury, if not to the destruction, of their less-favored neighbors. The Constitution, throughout all its provisions, is an instrument of checks and restraints, as well as of powers. It does not rely on confidence in the General Government to preserve the interests of all the States. It is founded in a wholesome and strenuous jealousy, which, foreseeing the possibility of mischief, guards with solicitude against any exercise of power which may endanger the States, as far as it is practicable. If this provision as to uniformity of duties had been omitted, although the power might never have been abused to the injury of the feebler States of the Union (a presumption which history does not justify us in deeming quite safe or certain), yet it would, of itself, have been sufficient to demolish, in a practical sense, the value of most of the other restrictive clauses in the Constitution. New York and Pennsylvania might, by an easy combination with the Southern States, have destroyed the whole navigation of New England. A combination of a different character, between the New England and the Western States, might have borne down the agriculture of the South; and a combination of a yet different character might have struck at the vital interests of manufacturers." 2 Story on Constitution, sec. 957.

He discusses the cognate clauses of the Constitution relating to taxation by the States, showing that all of those clauses are a part of one and the same system and have the same object, viz., the regulation of taxes within the States and by the States. "No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports and exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of Congress. No State shall, without the consent of Congress, lay any tonnage duty." In the first draft of the Constitution the clause stood: "No State, without the consent," etc., "shall lay imposts or duties on imports." The clause was then amended by adding "or exports," not, however, without opposition, six States voting in the affirmative and five in the negative; and again, by adding "nor with such consent, but for the use of the Treasury of the United States," by a vote of nine States against two. In the revised draft the clause was reported as thus amended. The clause was then altered to its present shape by a vote of ten States against one; and the clause which respects the duty on tonnage was then added by a vote of six States against four, one being divided. So that it seems that a struggle for state powers was constantly maintained with zeal and pertinacity throughout the whole discussion. If there is wisdom and sound policy in restraining the United States from exercising the power of taxation unequally in the States, there is, at least, equal wisdom and policy in restraining the States themselves from the exercise of the same power injuriously to the interests of each other. A petty warfare of regulation is thus prevented, which would rouse resentments and create dissensions, to the ruin of the harmony and amity of the States. The power to enforce their inspection laws is still retained, subject to the revision and control of Congress; so that sufficient provision is made for the convenient arrangement of their domestic and internal trade, whenever it is not injurious to the general interests. Idem, sec. 1016.

"No tax or duty shall be laid on articles exported from any

State. (*a*) No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; (*b*) Nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another."

The obvious object of these provisions is to prevent any possibility of applying the power to lay taxes or regulate commerce injuriously to the interests of any one State so as to favor or aid another. If Congress were allowed to lay a duty on exports from any one State, it might unreasonably injure, or even destroy the staple productions or common articles of that State. The inequality of such a tax would be extreme. In some of the States the whole of their means result from agricultural exports. In others a great portion is derived from other sources; from external fisheries, from freights, and from the profits of commerce in its largest extent. The burden of such a tax would, of course, be very unequally distributed. The power is, therefore, wholly taken away to intermeddle with the subject of exports. On the other hand, preferences might be given to the ports of one State, by regulations either of commerce or revenue, which might confer on them local facilities or privileges in regard to commerce or revenue. And such preferences might be equally fatal, if indirectly given under the milder form of requiring an entry, clearance, or payment of duties, in the ports of any State other than the ports of the State to or from which the vessel was bound. Idem, sec. 1013, 1014.

It is not necessary to rely upon "inherent powers" in order to sustain the authority of Congress to govern territory. The power to govern territory is expressly conferred.

It is given without limitation. Subject it may be to general restrictions contained in the Constitution, but these restrictions are not strictly upon the power to govern territory; they are not local in any sense.

Such is the prohibition against creating titles of nobility or the passage of bills of attainder.

There is no reservation of power in the people of the Territories. This reservation is to the people of the States.

The States granted to the Federal Government some powers; others they reserved to themselves or to their people.

On the subject of the government of the territory of the United States the States reserved nothing; they granted the power to make all needful rules and regulations respecting it.

The power of Congress over the States is the exact converse of its power over territory.

. In legislating for the States, Congress has only the powers expressly or impliedly granted. The States have reserved all other powers.

But in legislating for .territory the States have no power. Congress has it all. There is no residuary power left anywhere.

There can be no government in a Territory, except by the will of Congress. But States are organized governments which Congress cannot destroy, or even interfere with, except in special matters where the States have delegated the power by means of the Constitution.

Congress alone is the judge of what laws for territory are needful. There are no residuary powers.

## II. POWER OF TAXATION.

This power to govern territory, which is so absolutely conferred on Congress, includes the power to tax, either by direct or indirect methods.

Taxation is necessary for the purpose of government.

. Revenue must be provided, either by appropriation out of the general treasury or by local assessments, in order to govern any territory.

Therefore tax laws are "needful" as to Porto Rico and the Hawaiian Islands.

The subject we are now inquiring about is taxation. Congress has the power of taxation. That is conceded. Is the power of taxation absolute or limited?

It is absolute in some respects; limited in others.

What are the limitations?

Direct taxes must be apportioned among the several States which compose this Union.

Duties, imposts, and excises must be uniform throughout the United States.

Perhaps the objects for which taxes, etc., may be levied are

also limited to the payment of the debts, the common defence, and the general welfare.

Are there any other limitations?

I know of none. In all other respects, then, the power of taxation is unrestricted. We might properly say absolute, unlimited, arbitrary.

It would be highly inaccurate, however, to say that it is despotic.

Congress can fix absolutely the subjects of taxation, the rates, the methods of assessment and collection. Its power in these respects is absolute—or equivalent to what counsel for appellants improperly call "despotic;" but it is not unconstitutional.

The question here is whether duties on merchandise, imported into the United States from the insular possessions, or into the islands from the United States, may be constitutionally laid. That they may be so laid is undoubted, unless such a system violates the clause of the Constitution which requires duties to be uniform throughout the United States.

There is no principle of inherent justice or personal rights at stake. It is a pure matter of geographical equality. There is no question of arbitrary or despotic power such as counsel have imagined.

We concede the power must be one exercised under the Constitution. We find the power in the Constitution, not outside it, nor beyond it, nor contrary to it.

It is not, in any correct way of speaking, a question of whether the Constitution "extends," or "follows," or "goes;" it is a question of the extent of the power conferred on Congress by the Constitution and how far it is limited by that instrument.

Federal taxation is either general or local.

Local taxes are levied under Article I, section 8, paragraph I.

Local taxes are for the support of territorial or non-state governments.

The Porto Rican tariff is of the local kind.

General taxes are of two kinds, direct; and what, for brevity, may be called indirect, meaning thereby duties, imposts, and excises.

Direct taxes must be laid on all the States alike; none may

be exempted. They may be, but they need not be, laid on the territorial possessions.

In the same way we contend that indirect taxes must be uniformly imposed throughout the States which compose the Union; that they may be extended, but do not need to be extended, to the territorial possessions.

The power of Congress to tax the Territories for local purposes is not limited or restricted. Counsel for appellants would, probably, though improperly, call that a claim of despotic power.

The taxes (using the term in its general significance) authorized to be imposed within the States are Federal taxes. They are imposed within the jurisdiction of the States, which themselves constitute separate and, in some senses, independent and sovereign governments, possessing and required to exercise, for their own internal needs to carry on their own administration, the power of taxation. The power of the States to raise money by taxation for domestic uses does not depend in any way upon the Federal Government. The right of the United States to tax for national purposes property within the limits of the States is a concession made by the States to the General Government.

The concession thus given was guarded by some limitations, and those limitations naturally were only such as the States demanded for their own protection to prevent inequality.

No such condition exists as to territory. The government of territory, whether denominated local or general, is all Federal. All the officers of a Territory are but agents of the General Government. The legislatures of the Territories exercise only delegated powers—are nothing but legislative agents.

In *Gibbons* v. *District of Columbia*, 116 U. S. 404, it was declared that the power of Congress, legislating as a local legislature for the District, to levy taxes for District purposes only, in like manner as the legislature of a State may tax the people of a State for state purposes, was expressly admitted in *Loughborough* v. *Blake*, and has never since been doubted.

" In the exercise of this power Congress, like any state legislature unrestricted by constitutional provisions, may at its dis-

cretion wholly exempt certain classes of property from taxation, or may tax them at a lower rate than other property." Per Gray, J.

If the unrestricted right of local taxation for the support of territorial governments be, as we submit it is, conceded, then it may be useful to follow the subject further, in order to show how useless such a distinction would be as a corollary to the doctrine which denies the right to lay special taxes for general purposes on territorial property by means of port duties when carried back and forth between the ports of the United States and the islands.

The laws, the administration, and the revenues of the Territories are subject to the absolute control of Congress.

Congress may repeal the whole form of government existing in a Territory; may destroy the legislature, vacate all the offices, and take over all the public funds and absorb them into the common Treasury. It may appropriate out of the Federal Treasury all the money necessary to carry on a territorial government, omitting all local taxation. We must not forget that "territory belonging to the United States" is the common property of the United States and is to be administered at the common expense and for the common benefit of the States united, who jointly, as a governing entity, own it.

Porto Rico and the Philippines were not won by arms and taken over by treaty through the efforts or influence or at the expense of the inhabitants, but through the might of the United States, upon their demand and upon their contribution of $20,000,000 to Spain, and upon the assumption by treaty of solemn national obligations which the United States, not the islands or their inhabitants, are bound to observe and keep.

The inhabitants of the islands are not joint partners with the States in their transaction.

The islands are "territory belonging to the United States," not a part of the United States. The islands were the things acquired by the treaty; the United States were the party who acquired them, and to whom they belong. The owner and the thing owned are not the same.

It is not a very sensible construction of the Constitution which

will forbid Congress to do directly what it will permit it to do indirectly, and yet, if the contention of the appellants is correct, it follows that Congress cannot levy import duties on goods taken from the United States into Porto Rico, or *vice versa*, provided those duties are levied for general purposes, although Congress may levy any kind of a tax it chooses on the merchandise after it has been admitted into Porto Rico, provided it be for local purposes, and may then by legislative act take over such taxes into the General Treasury, to be paid out at the pleasure of Congress for general purposes.

Taking into consideration the relation of the Federal Government to territory, the fact that it is the common property of all the States; that the General Government through Congress must support and administer the government of the territory, if it is to have any government; that Congress alone has the power, and the discretion as well, to say whether there shall be any organized government in any particular territory, and what such government, if allowed, shall be, it is necessary to concede the broadest discretion to Congress in determining the means by which and the sources from which the revenue to carry on the government of such territory shall be raised.

In so far as the question of taxation for local territorial purposes is concerned, therefore, it is clear that the express tax clauses of the Constitution are not applicable, and neither the law of apportionment nor of uniformity exists.

The right to tax merchandise in Porto Rico for local purposes existing in Congress, it is immaterial what the merchandise consists of, or where it originated, or who is its owner.

So also it is not perceived that to withhold the levy of the tax until the merchandise is brought into a port of the United States modifies or destroys the power to tax for such local purposes. The tax may be imposed in Porto Rico or held in abeyance until the merchandise reaches a port in the United States when, as a preliminary to its admission (not after its admission), it may be taxed for the support of the government of the islands.

One Territory may be taxed for the support of its local government, while another may be supported wholly from the Gen-

eral Treasury of the United States.    In this there would be a technical inequality, but the practical wisdom and justice of it might be universally conceded.

The question would be one of governmental discretion vested in Congress, which neither the States nor the courts of justice are entitled to review.

The legality of the collection of duties on imports from Porto Rico between the date of the evacuation and the date on which the Porto Rico act took effect has been expressly recognized and confirmed by Congress in the act entitled " An act appropriating, for the benefit and government of Porto Rico, revenues collected on importations therefrom since its evacuation by Spain and revenues hereafter collected on such importations under existing law," approved March 24, 1900.    Acts of Fifty-sixth Congress, first session, page 51.

This act directs that the amount of customs revenue received on importations by the United States from Porto Rico since the evacuation of Porto Rico by the Spanish forces on the 18th of October, 1898, to the 1st of January, 1900, together with any further customs revenue collected on importations from Porto Rico since the 1st of January, 1900, or that shall hereafter be collected under existing law, shall be placed at the disposal of the President, to be used for the government now existing and which may hereafter be established in Porto Rico, and for the aid and relief of the people thereof, and for public education, public works, and other governmental and public purposes therein until otherwise provided by law.

Every provision of the Porto Rico act is for the peculiar and local benefit of the insular government.    The revenue is all paid into the insular treasury to be used to support the local establishment created by the act.

A special protective duty on coffee, a product of Porto Rico, is laid for the benefit and encouragement of the coffee growers of the Territory.

Upon the point that laws of Congress do not extend in operation to territory unless such extension be expressed in the statute, I desire, in addition to what was said in my brief in the *Goetze* case, to add the following additional remarks:

Many instances of legislation show that Congress has always considered something more than the term " United States " to be necessary when it designed a statute to extend to territory.

The internal revenue laws are one instance.

See especially the act of 1868, 15 Stat. 125, where the word " State " is specifically defined to include a Territory.  Sec. 104.

Also section 107, where the phrase " the exterior boundaries of the United States " is used in order to include all territory within the geographical limits of this country.

See also section 1891, Revised Statutes.  It is to be remarked that this section refers only to organized Territories, and not to one organized territory.

Section 2145, Revised Statutes, extends criminal statutes to the Indian country, which would not be necessary if criminal statutes extended there of their own force.

Thomas H. Benton, for thirty years a senator from Missouri, was as able and distinguished a statesman as the territory included in the Louisiana purchase has ever produced.  His views on the general question under discussion were strong and positive; his long service in the National Legislature, his familiarity with the course of public events, increased to an unusual degree by his practice of recording for publication the incidents of political and legislative discussion, his great ability as a constitutional lawyer, and his patriotic devotion to the best interests of our country, render his opinions and statements of superlative value.  Some of his expressions concerning the subject of the extension of the Constitution to the Territories were quoted in the brief of the United States in the *Goetze* and *Pepke* cases.  Still more remarkable passages, evincing the same views which the Government's counsel have maintained in these arguments, are found in a little book put forth by Mr. Benton in 1857, entitled " Historical and Legal Examination of the Dred Scott Case."

Referring to the history of the formation of the Constitution, he says :

" Who were the parties to it ?  The States alone.  Their delegates framed it in the Federal convention ; their citizens adopted it in the state conventions.  The Northwest Territory was then

in existence, and had been for three years ; yet it had no voice, either in the framing or adopting of the instrument—no delegate at Philadelphia, no submission of it to their will for adoption. The preamble shows it was made by States and for States. Territories are not alluded to in it. The body of the instrument shows the same thing, every clause, except one, being for States ; and Territories, as political entities, never mentioned once ; and the word 'territory,' occurring but once, and that as property, assimilated to other property—as land, in fact, and as a thing to be disposed of—to be sold. Now, you never sell a territorial government, but you sell property ; and in that sense alone does the word 'territory' occur, and that but once in the whole instrument. Tried by the practice under it, and the Territory is a subject, without a political right—no right to vote for President or Vice-President, or Senator, or Representative in Congress ; nor even to vote through their Delegate on any question in Congress—all their officers appointable and removable by the Federal authority, even their judges—their territory to be cut up as Congress pleases ; even parts of it to be given to Indians ; no political rights under it, except as specially granted by Congress ; no benefit from any act of Congress, except specially named in it, or the act specially extended to them, like the subject colonies and dependencies of Great Britain. How can the Constitution go to them of itself, when no act of Congress under it can go to them unless specially extended ? Far from embracing these Territories, the Constitution ignores them, and even refuses to recognize their existence where it would seem to be necessary—as in the case of fugitive from service and from labor. Look at the clause. It only applies to States—Fugitives from States to States.[1] Why ? Because the ordinance of 1787, the organic law of the Territories, made that provision for the Territories, and about in the same

---

[1] "No person held to service or labor in one *State*, under the laws thereof, and escaping into *another*, shall, in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on the claim of the party to whom such service or labor may be due." Article 4, sec. 2.

words, and before it was put in the Constitution.[1] In both places it is an organic provision, barren of execution until a law should be passed under it to give it effect—which was done in the fugitive-slave and criminal act of 1793, that act applying to Territories as well as to States, and so carrying both the Constitution and the ordinance into effect (p. 26).

"The whole Constitution was carried out upon the principle of ignoring the existence of Territories. I speak of Territories, implying political existence and organization, in contradistinction to territory signifying land, and repeat that, as political entities, the Constitution ignores them. This may be seen in every clause—strongly in the two instances just given and in those previously given, and still more strongly in the article which relates to the establishment of courts. If there is one branch of the Government which, above all others and more than all others, concerns the whole body of the community, it is the judicial department. The administration of justice, civilly and criminally, may reach every individual of a country. No age or sex, no rank, no condition of rich or poor, no conduct—not even that of virtue and merit itself—is secure from litigious involvement. The first care of the organic legislating power is to give a judiciary to the people; and this is what our Constitution has carefully done, as far as our system of government required its action. It has provided for the trial of all cases which could invoke the Federal authority—all between citizens of different States, and between citizens and foreigners, and for all cases arising under the Federal laws—all cases, in short, which were not left to the state courts—so that between the two systems the citizens should have a remedy for every wrong. Did this extend to the Territories? Not at all! The Federal judiciary system does not reach them, nor the state systems either. What then? Are they without courts? By no means. Congress supplies them, and in a way to show that they do not

---

[1] "Provided, always, that any person escaping into the same (the Northwest Territory) from whom labor or service is lawfully claimed in any one of the original *States*, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service, as aforesaid." Ordinance of 1787, art. 6.

do it under the Federal Constitution, or in conformity to any state constitution known in our America. They made judges to hold office for a term of years, subject to be removed by the President, like any common officeholder, and several have been so removed; and they gave codes of law, both civil and criminal, not only over the organized Territories reduced to our possession, but over the wild territory still in the hands of the Indians. By the decision of the Supreme Court this would seem to be unconstitutional and void, a consequence which seemed to set hard on one of the brother justices who had acted under these laws, and who, while agreeing in the decision upon the Missouri compromise act, did it for a different reason from that which would have condemned his own action.[1] Certainly all this legislation was incompatible with the Constitution, but no violation of it, because the Constitution did not reach these territories, either civilized or savage."

Referring to the act for the government of the Louisiana territory, Mr. Benton declared: "The bill thus passed received the approbation of the President the same day it was laid before him; and to those who are acquainted with the working of the legislative machinery, it may well be believed that the whole proceeding was in concert with the Administration; that Mr. Jefferson picked out Mr. Breckenridge to bring in the bill; that its principles were settled in Cabinet meeting; that Mr. Madison drew it, and that every question in relation to it was duly considered before it was submitted to final action. And thus, this first instance of Congress legislation upon newly acquired territory was as high an instance of disregard of the Constitution as the imagination could conceive, being nothing less than the continuation of the Spanish regal despotism; the President taking the place of the King of Spain; Governor

---

[1] "It is due to myself to say that it is asking much of a judge, who has for nearly twenty years been exercising jurisdiction, from the western Missouri line to the Rocky Mountains, and, on this understanding of the Constitution, inflicting the extreme penalty of death for crimes committed where the direct legislation of Congress was the only rule, to agree that he has been all the while acting in mistake, and as an usurper." Mr. Justice Catron.

Claiborne the place of the intendant-general, Morales; the laws of Spain remaining in force and administered by American judges, and the whole provincial administration going on as if no change of government had taken place. It was a royal despotic government, and everybody knew it, and no one thought of testing it by the Constitution (some few new members in the House excepted) than by the Koran " (p. 60).

" And now for the men who passed these acts—who established these governments—so incompatible with the Constitution and so fully asserting absolute power over this new territory. Who were they? They were the men of the Revolution—of the ordinance of 1787—of the Constitution of that year—of the first administration of the Federal Government in its early age —and the authors of the acquisition of Louisiana. Mr. Jefferson was President, Mr. Madison Secretary of State, and the two Houses of Congress filled with men who had acted their good part in founding and putting into operation the new Federal Government. These were the men who did these things and who ought to be allowed to know something of their own work; and, if they did not, somebody existing at the time ought to have known of their dreadful usurpations and proclaimed them to the world. No such discovery was made " (p. 69).

Speaking of the doctrine of the *proprio vigore* extension of the Constitution to territory, Mr. Benton said : " Mr. Calhoun declared its effect when he proclaimed it, saying :

" ' I deny that the laws of Mexico can have the effect attributed to them (that of keeping slavery out of New Mexico and California). As soon as the treaty between the two countries is ratified, the sovereignty and authority of Mexico in the territory acquired by it becomes extinct, and that of the United States is substituted in its place, conveying the Constitution with its overriding control over all the laws and institutions of Mexico inconsistent with it.' Oregon Debate, 1848.

" This is the declared effect of the transmigration of the Constitution to free territory by the author of the doctrine ; and great is the extent of country, either acquired or to be acquired, in which the doctrine is to have application. All New Mexico and California at the time it was broached ; all the Territories

now held, wherever situated, and as much as can be added to them—these additions have already been considerable, and vast and varied accessions are still expected. Arizona has been acquired; fifty millions were offered to Mexico for her northern half, to include Monterey and Saltillo; a vast sum is now offered for Sonora and Sinaloa, down to Guaymas; Tehuantepec, Nicaragua, Panama, Darien, the Spanish part of Santo Domingo, Cuba, with islands on both sides of the tropical continent. Nor do we stop at the two Americas, their coasts, and islands, extensive as they are, but circumvolving the terraqueous globe, we look wistfully at the Sandwich Islands, and on some gem in the Polynesian group, and plunging to the antipodes pounce down upon Formosa in the China Sea. Such were the schemes of the last administration, and must continue, if its policy should continue. Over all these provinces, isthmuses, islands, and ports, now free, our Constitution must spread (if we acquire them, and the decision of the Supreme Court stands), overriding and over-ruling all anti-slavery law in their respective limits; and planting African slavery in its place, beyond the power of Congress or the people there to prevent it" (p. 29).

III. THE INTERNAL REVENUE LAWS HAVE NOT BEEN HERETOFORE
UNIVERSAL IN APPLICATION.

*Internal duties:* Under the Constitution the internal revenue laws should be as universal and uniform in application as the tariff laws. Were they framed for universal application, and have they been so applied?

The first internal revenue tax was on spirits distilled in the United States, and was levied by the act of March 3, 1791, which, for purposes of collection, provided "that the United States shall be divided into fourteen districts, each consisting of one State." 1 U. S. Stat. sec. 4. pp. 199, 200. That act provided (secs. 14 and 15) that duties should be paid upon all spirits distilled "within the United States," but no provision was made for the collection of the tax in the territory not included in the boundaries of the existing fourteen States. Other instructive phrases of that act are as follows (secs. 53, 55): "Without the limits of the United States;" "relanded in any other part

of the same;" "within the limits of any part of the United States."

The following acts, June 5, 1794, as to carriages, and of the same date as to retail liquor licenses (id. 373, 376), although imposing a tax upon "all carriages for the conveyance of persons" and upon "every person who shall deal in the selling of wines," respectively, provided for collection only in the districts created by the act of 1791. Another act of the same date (id. 378) expressly extends the tax on distilled spirits and stills to "the territories northwest and south of the river Ohio" by authorizing the President to erect new districts and appoint the necessary officers in that region; and still another act of that date laid a duty upon snuff and refined sugar "manufactured or made in the United States," without any indication that the extension of the distilled-spirits tax over the Northwest Territory should also cover these additional articles. Similarly the act of June 9, 1794 (id. 397), imposing duties on property sold at auction, refers seemingly to the "several supervisors of the revenue" and the "respective districts" in the fourteen States only. These duties, along with the tax on stamped paper, act of July 6, 1797, 1 Stat. 527, in which the phrase "throughout the United States" is used, were altered, amended, or repealed, and later reënacted by various acts, in the interval before the whole body of internal revenue laws was repealed in 1817; but the entire course of legislation shows that the taxes were not applied outside the States included in the original act or those subsequently admitted, unless the tax laws were expressly extended to the Territories of the United States. Thus, the act of July 11, 1798, 1 Stat. 591, fixed the compensation of officers employed in collecting the internal revenues, but mentions no districts except those in the sixteen States then forming the Union. But, consistently with the extension of the distilled spirits tax to the Northwest Territory, it appears that there was a supervisor of revenue in that district whose compensation was fixed by section 4 of the act of April 6, 1802, 2 Stat. 148.

By the act of July 22, 1813, 3 Stat. 22, the collection of direct taxes and internal duties was jointly regulated, and no provision was made for the collection of either species of tax

outside the eighteen States at that time. The last section of that act, requiring separate accounts of the direct taxes and internal duties to be kept, indicates that the only sums received were those received from "each State" as enumerated in the beginning of the act.

The act of August 2, 1813, with the previous acts therein referred to, 3 Stat. 82, and note *a*, reënacted the various internal duties which had previously been abolished, and charged the collectors appointed under the acts, *supra*, erecting the various collection districts in the States, with the collection of the duties imposed and by section 2 expressly authorized the President "to divide respectively the several Territories of the United States and the District of Columbia" into convenient districts for the purpose of collecting the internal duties specified and to appoint collectors, thus for the first time extending these laws generally and comprehensively to the territory of the United States outside the limits of the States; and that act provided (sec. 3) that the several duties "shall be laid and collected in the several Territories of the United States and in the District of Columbia in the same manner and under the same penalties" as in the "districts" of the old and reënacted laws, that is, in the States; and extended the existing acts to the "several Territories of the United States and to the District of Columbia." In other sections of that act and throughout the later acts such phrases as "within the several Territories of the United States and the District of Columbia" and "within the United States or Territories thereof" constantly appear. *Vide* act December 21, 1814, 3 Stat. 152; act January 18, 1815, id. 180.

The internal revenue law of July 1, 1862, 12 Stat. 432, which was the basis of all the succeeding laws amending its provisions or supplying new provisions, provided "that the States and Territories of the United States and the District of Columbia" should be divided into convenient collection districts, and "within the United States or Territories thereof" and "of the United States or Territories" (e. g., secs. 75, 82) are the phrases used to describe or locate the persons or property subject to tax.

The most important subsequent acts are those of March 3,

1863, 12 Stat. 713; March 7, 1864, 13 Stat. 14; June 30, 1864, id. 223, which was a new general act supplanting the act of 1862, of which section 46 provided for the execution of the law "in a State or Territory of the United States or any part thereof, or within the District of Columbia," as soon as the authority of the United States therein shall be reëstablished, if, for any cause, the laws could not be executed therein; and the last section, carried into the Revised Statutes as section 3140, provided that wherever the word "State" is used in the act, it shall be construed to include the Territories and the District of Columbia where such construction is necessary to carry out the provisions of the act. The act of July 13, 1866, 14 Stat. 98, was also a general law and largely reduced the duties; and the act of July 20, 1868, 15 Stat. 125, made new provisions for the taxation of distilled spirits and tobacco. Section 104 of this act also construed the word "State" as including a Territory and the District of Columbia, and section 107 provided that the internal revenue laws imposing taxes upon distilled spirits, fermented liquors, tobacco, snuff, and cigars shall be held and construed to extend to such articles produced within the exterior boundaries of the United States, whether within a collection district or not. The latter section was construed by the court in the *Cherokee Tobacco Case*, 11 Wall. 616, which determined that the section "extends the revenue laws over the Indian Territories only as to liquo.s and tobacco. In all other respects the Indians in those Territories are exempt." The dissenting opinion held that "it was not the intention of Congress to extend the internal revenue law to the Indian Territory; that Territory is an exempt jurisdiction," partly on the ground that the express and special privilege given to the Cherokees by the treaty of 1866 was not repealed by the subsequent general law, and partly on the ground that the language of section 107 could be applied to territory within the exterior boundaries of the United States without embracing the Indian Territory, to wit, to the Territory of Alaska. It was not suggested in the court below (*United States* v. *Tobacco Factory*, 1 Dill. 264; Fed. Cas. No. 16,528), nor in the Supreme Court that without express provision by Congress these laws would extend to the Territories,

because, being taxes or duties, they must constitutionally "be uniform throughout the United States." The debates in Congress show that section 107 was offered as an amendment or addition to the act in the Senate by Mr. Sherman, and was adopted without explanation or debate. Cong. Globe, part 4, 2d session, 40th Cong. 1867–68, p. 3779.

It is to be noticed that the act of 1868, *supra*, section 55, and the act of June 6, 1872, 18 Stat. 230, amending the same (sec. 12), in making it a misdemeanor intentionally to reland distilled spirits shipped for exportation used the phrase "within the jurisdiction of the United States."

Beginning with the passage of the act of July 14, 1870, 16 Stat. 256, the large list of internal revenue taxes was gradually reduced until the enactment of the war revenue act of 1898, the language of which adds no specially significant phrase to the former legislation, although the construction given to it in *Knowlton* v. *Moore, post,* confirms our contention as to the purpose and scope of the rule of uniformity.

Direct taxes: Direct taxes do not, perhaps, present a close analogy, being imposed by the rule of apportionment "among the several States according to their respective numbers." The States and their respective quotas were necessarily specified in such laws, and there were no general expressions to render doubtful the divisions of territory in which direct taxes were intended to be laid. It is worthy of remark, however, that if the duties which are to be "uniform throughout the United States" must also apply universally throughout acquired and dependent territory, then quite as clearly must be applied universally the direct taxes which are to be "apportioned among the several States." The uniform duties clause and the direct tax provisions both show the scrupulous care of the framers of the Constitution for equality among the States, and neither rule looks beyond the States to apply a fixed and self-acting ordinance to regions which the future might annex, but were not then in the States, nor under the definite compact recognized by the Constitution as to the Northwest Territory.

How has Congress construed their power and function relative to direct taxes? The act of 1798, 1 Stat. 580, provided for

valuations in the States, but not in the Northwest Territory, although this coterminous region was recognized as intimately connected territory of the United States, or even as a portion thereof, under the Constitution. So also the similar act of 1813 provided (3 Stat. 22), and the direct taxes of 1813 and 1815 (id. 53, 164) were so laid. On the other hand, a direct tax was expressly imposed by Congress in the District of Columbia by the act of 1815, 3 Stat. 216, which was before the court in *Loughborough* v. *Blake, infra.* The enactment itself is proof that the interposition of Congress was conceived to be necessary, not only to provide the collecting machinery in the District, but also to carry the constitutional provisions beyond the limits of the States in "laying a direct tax upon the United States." And the decision simply determined that Congress had this power.

The direct tax of 1861, 12 Stat. 292, was specifically apportioned among the existing States, Territories, and the District of Columbia, and although the income tax imposed by the forty-ninth section of that act was levied upon the annual income of "every person residing in the United States," Congress was careful in subsequent sections to provide the machinery for the assessment and collection of that tax, not by any general phrase such as "throughout the United States," but "in each of the States and Territories of the United States, and in the District of Columbia."

The census acts, upon which the direct tax laws are based, show that in 1790 (1 Stat. 101) the marshals of the several districts (each one of the fourteen States then constituting a judicial district) were directed to take the enumeration. In 1800 (2 Stat. 11) the direction was given to the marshals of the several districts and the secretaries of the Northwest Territory and the Mississippi Territory. In 1810 (id. 564) the marshal of the District of Columbia and the secretaries of the additional Territories were added. In 1820 (3 Stat. 548) marshals having then been provided for the Territories, those officers alone were specified, and so the law continued for several decades, the act of 1850 (9 Stat. 428) providing the machinery under which the subsequent censuses were taken until the establishment of the

Census Office by the act of March 3, 1879, 20 Stat. 473, which regulated the taking of the census "within each State or Territory."

Thus, while Congress has provided throughout the United States and its Territories for the enumeration upon which direct taxes have been apportioned, except in 1790, when, indeed, the Northwest Territory was in large part wild and unoccupied, but little more so than some of the States, it never seems to have been supposed that such taxes must be levied beyond the States or apportioned to the Territories unless Congress saw fit so to provide.

## IV. ALASKA.

In 1868 the customs, commerce, and navigation laws were extended over Alaska (Rev. Stat. sec. 1954), but not the internal revenue laws, except so far as section 107 of the act of July 20, 1868, had that effect. Nor was any further change made in this respect by the act of 1884, 23 Stat. 24, which provided a civil government for Alaska but not fully organized territorial government, under which civil status the act of March 3, 1899, 30 Stat. 1253, gives to the "district of Alaska" (meaning, doubtless, the judicial district) a code of criminal procedure. Section 477 of this act recognizes the wide application of the taxes on intoxicating liquors and impliedly directs their enforcement in Alaska as follows: "That nothing in this act shall in any way repeal, conflict, or interfere with the public general laws of the United States imposing taxes on the manufacture and sale of intoxicating liquors, for the purpose of revenue, and known as the 'internal revenue laws.'" In practice, internal revenue duties have been collected in Alaska upon liquors and tobacco since December, 1872, when the Territory was added to the internal revenue district of Oregon by Executive order under the authority of sections 103 and 107 of the act of 1868, *supra*, for which action the laws embodied in section 3141, Revised Statutes, would also give authority.

So far as the internal revenue records show, it seems that internal revenue duties have in the past been collected in Alaska and the Indian Territory only upon the articles subjected to tax by

section 107 of the act of 1868; for which, perhaps, a practical reason also might be given, namely, that in the conditions prevailing in those Territories for a long period after 1868 no articles were produced subject to tax except those named in section 107, other such articles entering those districts tax paid.

## V. OKLAHOMA.

A point was made on the former argument as to the sources from which the Government has acquired this Territory.

The "Indian country," defined in the act of June 30, 1834, 4 Stat. 1729, and described in *United States* v. *43 Gallons of Whisky,* 93 U. S. 188, and *Bates* v. *Clark,* 95 U. S. 204, was narrowed under advancing civilization and by successive treaties which extinguished the Indian titles, and at the time of the adoption of the Revised Statutes, comprised the region known as the Indian Territory, the somewhat indefinite boundaries of which had been gradually defined as new States and Territories were erected. The previous laws, preserved in chapter 4 of Title XXVIII of the Revised Statutes, were applied to its government, and it was itself definitely bounded by the act of March 1, 1889, 25 Stat. 783; 1 Supp. R. S. 670, and note. By the act of May 2, 1890, the Territory of Oklahoma was erected and organized, and the limits defined to include a certain portion of the Indian Territory and the "Public Land Strip," with a provision for incorporating into the Territory the unoccupied portion of the "Cherokee Outlet," and lands remaining in the Indian Territory, whenever the respective Indian tribal owners should assent.

A question of long standing between the United States and Texas as to the title to what was known as "Greer County" being involved in that act, the dispute was settled by the decision in *United States* v. *Texas,* 162 U. S. 1, which held that the title to that portion of Oklahoma Territory was in the United States, and that the tract had been acquired by the United States under the treaty with Spain of 1819. It is manifest from the reasoning of the opinion in that case and the authorities cited, and especially from the compromise act of September 9, 1850, 9 Stat. 446, by which the northern and western boundaries

of Texas were defined, and all territory claimed by her exterior to said boundaries was relinquished, that all the land now included in the Territory of Oklahoma had been claimed by the United States against Spain and her successors in title and sovereignty, Mexico and Texas, as under the Louisiana purchase, and that the Territory of Oklahoma as now constituted was necessarily embraced either in the Louisiana purchase or under the treaty of 1819 with Spain, or under the cession of territory by Texas in 1850.  All of this country lies far east of the cession by Mexico in 1848, and there seems to be no doubt that the entire territory was included in the Louisiana purchase, excepting the portion decided by *United States* v. *Texas*, to have been acquired under the treaty with Spain, and excepting the "Public Land Strip," which apparently was part of the territory claimed by Texas exterior to her boundaries as settled, which she surrendered in 1850.  It is evident that in one of these ways all of the Indian Territory and Oklahoma must have been acquired, since the three acquisitions in question (whatever may have been the variations in boundary lines and surveys) taken together covered the whole of that country.  See "The Louisiana Purchase" by the present Commissioner of the General Land Office, pages 36, 39.  The passage on page 36 says that the Louisiana purchase proper embraces  .  .  .  "all of the Indian Territory and *part* of Oklahoma Territory."  It is learned from the Land Office that the only parts of Oklahoma Territory not included in the Louisiana purchase are those here stated to have been acquired under the treaty with Spain or through the cession by Texas.

The Indian Territory was added to the internal revenue district of Kansas August 8, 1881, in the same way as Alaska was added to the district of Oregon; and Oklahoma, since its separation from the Indian Territory, remains in the Kansas district.

We have seen that the one hundred and seventh section of the internal revenue act of July 20, 1868, was construed in the *Cherokee Tobacco* case to carry the internal revenue laws as to distilled spirits, fermented liquors, tobacco, snuff, and cigars to the Indian Territory as then constituted.  The Oklahoma act of 1890 contains (sec. 28) a provision generally applied in ex-

press terms to all the Territories as they are organized, namely, "That the Constitution and all the laws of the United States not locally inapplicable, except so far as modified by this act, have the same force and effect as elsewhere within the United States." This is in accordance with section 1891 of the Revised Statutes, which applies this provision to "all the organized Territories and in every Territory hereafter organized as elsewhere within the United States." It is evident that the internal revenue laws are not inapplicable in an organized Territory, and such provisions taken in connection with the authority conferred upon the President by section 3141, Revised Statutes, are the ground upon which all the internal revenue laws are executed in the organized Territories; while section 107 of the act of 1868, *supra*, is the original basis for collecting the tax upon distilled spirits, fermented liquors, tobacco, snuff, and cigars in the Territory of Alaska, thus far not fully organized in the legal sense, to which, however, the act of 1899 extended the taxes on intoxicating liquors.

It seems that in practice at the present time taxes accruing under the war revenue act, as well as all internal revenue taxes, are collected in Alaska and the Indian Territory. This practice is based partly on section 107 (*ante*), reënacted as section 3448, Revised Statutes, and, as to Alaska, under the act of 1899 (*supra*), and partly on the ruling of the internal revenue authorities that these laws operate with respect to Alaska so as to subject to stamp tax articles not produced in the Territory but destined for consumption there. The practice means no more than that now, as in former years, the growth and manufacture of tobacco and production of spirits in the Indian Territory and the sale of these articles in Alaska are properly made to bear their burdens under the law; and substantially that other articles subject to tax before the war revenue act of 1898 are not produced in those Territories, but must enter them correctly stamped or tax paid. And taxes are levied there under the latter act because its language, construed in the light of its evident purpose and spirit, has been held by the Treasury Department to carry its provisions over those two Territories.

## VI. HAWAII, PORTO RICO.

On this review of the status of the Territories in respect to the internal revenue laws, and of the varying action by Congress under different circumstances—always in strict conformity to the doctrine that these laws do not, without special provision, of themselves or by force of the Constitution, apply to the territorial possessions or dominion of the United States —it is logical and consistent to find Congress recognizing in the Alaska act of 1899, as above shown, the validity of the internal duties of most general importance, as previously extended there and established in practice; providing that the Constitution and, with certain exceptions, the laws of the United States shall have equal force and effect in Hawaii, and that the Territory shall constitute an internal revenue district (secs. 5, 87, act of April 30, 1900, 31 Stat. 141); and recognizing in section 3 of the act of April 12, 1900 (id. 77), the internal revenue taxes at Porto Rico, and in section 14 excepting our internal revenue laws from those statutes of the United States which are to have the same force and effect in Porto Rico as in the United States.

Thus, finally, in the case of the internal revenue laws to a striking degree, and also in the case of the direct tax laws—a somewhat analogous instance—Congress has uniformly and specifically legislated for the Territory or Territories of the United States whenever it was their intention to execute those laws beyond the limits of the States; and the only case in which their action has been challenged or questioned was the *Cherokee Tobacco* case, wherein the legislation was resisted, not on grounds which drew in question the constitutional authority of Congress as now presented, but simply because the Indian treaty established a lawful exemption which, it was claimed, had not been repealed by Congress. Administrative practice, dealing through a long period of time with many novel, different, and peculiar conditions, has followed this view of the matter with substantial consistency; and no decisions on these laws can be found in which the soundness of the Government view is doubted or controverted, much less overthrown.

Counsel for Armstrong contend that the term "United

States" means the United States Government, composed of States and outlying Territories and embracing the people residing in both the States and outlying Territories (p. 33).

In this contention they entirely disregard the fact that the term "United States" is used sometimes in a geographical sense, sometimes in a sense describing the governing entity, and sometimes as describing the States of the Union.

It is also asserted that the theory of our Government is that duties are to be levied and collected upon the products of foreign countries. "Until now whoever dreamed that we could collect duties upon our own people."

The States, in the days of the Confederation, levied duties upon goods brought from one State into another. The States are still denominated foreign so far as the judgments of their courts are concerned.

The quality of "foreign," in connection with tariff laws, is one inserted only by the statute. Great Britain always imposed duties on merchandise brought into her home ports from the colonies, and does so now. Many of her colonies impose duties *ad libitum* upon imports from the home country.

The question is not one of domestic and of foreign ports, but one relating to the States and to Territories, the former being the constituent parts of the Union and the latter being territory belonging to the United States.

On page 47 of their brief counsel make the astonishing statement that for nearly one hundred years no distinction has been made between that part of the national domain which was States and that which was Territories. The direct opposite of this is the truth, as shown by the history of our Government, its legislation, and its judicial decisions.

Counsel assert that the President of the United States has no right to exercise legislative function. If by this is meant that he is not a legislative branch of the Government within the meaning of the Constitution, no fault can be found with the doctrine. It is too elementary to be even alluded to. But when as commander in chief he exercises government over conquered territory, he has, by the undoubted law of nations, the

right not only to govern but to make laws for the territory so occupied. The legislative functions thus exercised are not a part of the legislative power conferred by the Constitution upon Congress, and have no relation to it. They are merely incidents under the public law of belligerent right, vested by the Constitution in the President as commander in chief of the army and navy. They are not unconstitutional, but are exercised by virtue of the Constitution, not by any express clause which confers them, but are implied in the functions and duties of the commander in chief. Such legislative functions are not national, but local and peculiar, and relate only to the particular extent of country occupied by the military forces. This doctrine is so well understood and has been so frequently asserted, both by the executive and by the courts, that citation seems hardly necessary. I refer especially to what was said on this subject in my brief in the *Goetze* case (p. 117, etc.), and what was said by this court in the case of *Cross* v. *Harrison*, 16 Howard, 164.

In that case, speaking of the continuance of the temporary government of California and New Mexico, the court said :

" It had been instituted during the war by the command of the President of the United States. It was the government when the territory was ceded as a conquest and it did not cease, as a matter of course or as a necessary consequence of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress might have put an end to it, but that was not done. The right inference from the inaction of both is that it was meant to be continued until it had been legislatively changed. No presumption of a contrary intention can be made. Whatever may have been the causes of delay, it must be presumed that the delay was consistent with the true policy of the Government."

This claim of counsel for the appellant would be subversive and destructive of every vestige of organized government set up and sustained in the Philippine Islands from the time of our occupation of Manila until the present time, notwithstanding Congress has permitted the executive department to continue

in the administration of the government of those islands without interference or action on its part.

VII. TARIFF AND REVENUE LAWS OF THE UNITED STATES DO NOT TAKE EFFECT IN CEDED TERRITORY IMMEDIATELY UPON THE RATIFICATION OF THE TREATY OF CESSION.

Counsel for appellants contend that immediately on the ratification of the treaty with Spain, and immediately upon the approval of the resolution annexing the Hawaiian Islands as territory of the United States, the tariff laws of the United States, became operative in the territories thus acquired.

Such a construction of the law and Constitution could not be made without grave prejudice to the United States, and ought not to be made unless the Constitution clearly and unmistakably requires it. Such a construction would overrule the direct provisions of Congress in the Hawaiian act, and the manifest purpose of the President and the Senate in negotiating the Paris treaty.

It is not to be credited that the founders of the Government intended the Constitution and laws of the United States to have such absolute and inconvenient application.

There must be in the nature of things a time between the deed of acquisition and the assumption by the United States of the full government of acquired territory when the relation between the Federal Government and the acquired territory will be inchoate. In these particular cases, when the treaty was ratified and the Hawaiian resolution approved, there were no collection districts, no revenue officers, no provision for turning over the proceeds of the revenue to the General Treasury, no means of enforcing the criminal laws passed to punish frauds upon the revenue, or anything, in fact, to enforce to the slightest extent the rights of the Government, or the provisions of the law, which, it is contended, nevertheless extended to the new possessions. Neither Porto Rico nor the Philippine Islands were possessed at the time of their acquisition of any autonomous government of their own after the Spanish sovereignty was eliminated. They were incapable of levying or collecting taxes for their own support.

There might be cases of the acquisition of territory which possess no organized form of government whatsoever, not even of a local or municipal kind. Whether such territory should have any local government would depend entirely upon the will of Congress; the contention of the appellants would create the absurd necessity of having acts of Congress as to revenue and other matters extended in theory through tracts of country in which they were utterly incapable of enforcement, all the agencies of government being absent.

It could never have been contended that such a condition of theoretical law and practical anarchy should arise.

*Cross* v. *Harrison* is authority against the position of appellants on this point.

*Mr. Solicitor General* for the United States.

If the court please: Before entering upon a discussion of the grave questions raised in these five cases, I desire very briefly to refer to some matters of jurisdiction. I do this, not for the purpose of securing a disposition of the cases other than upon the merits, but because counsel have adopted in these different suits different and inconsistent methods of testing the constitutionality of revenue exactions, and the Government does not desire to be taken as acquiescing in what it considers an improper course of procedure.

In the *Goetze* case, already argued fully before the court, the method taken of raising the question whether duties could lawfully and constitutionally be levied upon goods imported from Porto Rico after the treaty of peace and before the act of Congress, was by a protest under the customs administrative act, which was passed upon first by the collector and then by the board of appraisers, and then came through the regular judicial channel to this court. We believe that that method was the proper one of raising the questions sought to be raised, but that method has not been pursued in these cases.

In the *De Lima* and the *Downes* cases, the goods coming from Porto Rico to New York were entered under the customs laws and the duties were paid. It is said they were paid under

protest and for the purpose of securing the possession of the goods. But they were paid. Having paid the duties, we submit that the importer could not bring a common-law action against the collector to recover them back. The case of *In re Fassett*, 142 U. S. 479, does not apply. That was a case where Mr. Vanderbilt brought a pleasure yacht into the port of New York. He did not enter it and pay the duties upon it. He declined to do so, and when the collector seized the yacht he brought the proper action in a United States court to recover possession of the vessel. Now, if counsel desired to stand upon the proposition that no articles had been imported into the United States within the meaning of the revenue law, they should have refused to enter the goods, and then have taken the proper steps to secure possession of them. But they entered them, and they paid the duties upon them, and now they seek to bring an action against the collector to recover back the money paid, although the law required the collector to pay that money into the Treasury of the United States, and has expressly provided that he shall not be subject to a suit of this kind.

We also make the point that in one of these cases, the *Downes* case, there is not involved a sufficient sum of money to give the United States court jurisdiction, our claim being that there must have been involved the sum of $2,000, when it appears in the record that only six hundred odd dollars was involved.

Mr. Justice Harlan. Does that apply to revenue cases?

The Solicitor General. This is not a revenue case, so opposing counsel insist. They don't concede it is a revenue case; they insist it is a common-law action to recover back money unlawfully exacted by an officer outside his authority and without authority.

In the *Dooley* cases and in the *Armstrong* case, suits have been brought against the Government of the United States. In the *Armstrong* case the suit was brought in the Court of Claims; in the *Dooley* cases under the concurrent jurisdiction act, in the United States Circuit Court. Now, if these cases are revenue cases, the suits do not lie. Suits cannot be brought against the United States either in the Court of Claims or in the Circuit Court to recover back revenue collected by officers

of the United States.  That jurisdiction has not been given to those courts, nor such a privilege accorded to those who pay money into the Treasury of the United States.  And the reason is obvious.  If such suits lie, there is no statute of limitations, and the Government could never know the amount of claims outstanding against it resulting from the collection of revenue through its agents.  The Government has, therefore, provided exclusive methods of determining whether revenue was rightfully collected or not.  When those methods are pursued, the officers of the Government are able to tell right along what claims exist against it, and Congress can provide for them.  On the other hand, if these cases are not revenue cases, then they sound in tort, and neither court, as I understand, takes jurisdiction of cases of that sort.  And so for these reasons, which are supported, as we think, by the authorities, we claim that the courts below had no jurisdiction of any of these cases.

Now I come to a consideration of the very serious questions raised in these cases.  And in order that the court may understand how the questions arise, and the order in which I shall discuss them, I desire to state categorically the specific duties which were collected, the validity of which is contested.

In the first place, there were duties collected on goods imported into Porto Rico from the United States, during the military occupation of the island, after the signing of the protocol and before the ratification of the treaty of Paris.  Such were some of the duties collected in the *Armstrong* case.  I had supposed that similar duties were exacted in the first *Dooley* case, but I find I am mistaken.

In the second place, there were duties collected on goods imported into Porto Rico from the United States during the military occupation, but after the cession of Porto Rico by the ratification of the treaty and before the passage of the Porto Rican act.  Such duties were collected in the *Armstrong* case and in the first *Dooley* case.

In the third place, there were duties collected on goods imported from Porto Rico into the United States after the ratification of the treaty of Paris and before the taking effect of the

Porto Rican act. Such were the duties exacted in the *De Lima* case.

In the fourth place, there were duties collected on goods coming into the United States from Porto Rico after the Porto Rican act took effect. The validity of these exactions is brought in question in the *Downes* case.

Finally, there were duties collected on goods coming into Porto Rico from the United States after the taking effect of the Porto Rican act. Such were the duties exacted in the second *Dooley* case.

I shall first consider the validity of the duties exacted in Porto Rico by the President prior to the treaty.

These duties, we claim, were imposed in Porto Rico by Executive order during the military occupation of the island prior to the ratification of the treaty of peace, and were rightfully levied by the President, as commander in chief, acting under belligerent right, at a time when hostilities between the United States and Spain had only been suspended, not terminated, and when Porto Rico had not been ceded to the United States, and when the right and obligation of conducting a civil government by the military authority was imposed upon the President. I am at a loss to perceive any reasonable grounds for opposing the validity of these exactions. It appears from the brief in the *Armstrong* case that the authority of the President in promulgating those executive orders and providing a civil government for the island is attacked as being an exercise of a legislative power in a time of peace, and also—they say—when Porto Rico had been ceded to the United States and had become a part of the United States. Apparently, from a reading of their brief, the position of counsel in the *Armstrong* case is logically this:

*First.* By the protocol Porto Rico was ceded to and became a part of the United States.

*Second.* That the suspension of hostilities which followed the signing of the protocol ended the war and brought about peace.

*Third.* That consequently an end was put to the authority of the President to govern Porto Rico under the war power.

Now, these propositions seem to me so absurd that to state them is to refute them. I really feel as if I ought to beg the pardon of the court for calling attention to the provisions of the protocol. The protocol says, in the second article, " Spain will cede to the United States the island of Porto Rico." That is not a cession; that is a promise to cede in the event a treaty of peace should be concluded and ratified. The protocol also provides in the sixth article, " Upon the conclusion and signing of this protocol hostilities between the two countries shall be suspended," not terminated. And it further provides in the fifth article, that the United States and Spain " will each appoint not more than five commissioners to treat of peace." There was no peace then. There was a suspension of hostilities and a promise to cede, and a provision that commissioners should be appointed to treat of peace; but there was no peace, and no termination of hostilities, and no cession of Porto Rico; and if the two countries had failed to conclude a treaty of peace, or that treaty had failed of·ratification, the suspension of hostilities would have terminated and the war would have been resumed. So our claim is that during this entire period, until peace had been concluded, the President was in the legitimate exercise of the war. power; and that brings me to another suggestion.

Counsel talk about peace, about there being no war in Porto Rico, about the protocol placing a limitation upon the power of the President acting under belligerent right. They assume that under the war power all the President can do is to fight. It is true the President makes war in order to win a peace, and to that end he fights, as commander in chief, and he invades the enemy's territory and subjugates it if he can, and he holds and occupies it. After he has conquered the enemy's territory, he stops fighting there because there is no one there to fight, but his power does not therefore cease under belligerent right. It then becomes his duty to occupy and hold this subjugated territory until disposed of by the treaty of peace, and in exercising that duty he should put in operation a government there that will cover the entire field of civil life, that will preserve order and protect life and property, and collect revenues sufficient to

pay the expenses of the provisional government he thus institutes. He has a right to provide courts; he has a right to provide courts, not to pass upon purely military questions, but on all questions that arise between man and man, within the occupied territory. These propositions are so elementary it seems to me hardly necessary to refer to the authorities. I may do so later.

Now, I desire for but a moment to refer to the necessity in this case of the President providing a new system of customs regulations in Porto Rico. At the time the war began the commerce of Porto Rico was largely with Spain and with Cuba. Necessarily, the customs regulations were framed so as to meet that condition. When the war came and we occupied Porto Rico, naturally this trade was cut off. It was an impossibility then, having proper regard for the interests of the people of Porto Rico, to continue in force, unmodified, the Spanish customs laws. The President therefore put in force new customs regulations, and he changed them as developing circumstances showed they ought to be changed in the interests of Porto Rico and of the United States. He placed on the free list many articles brought into Porto Rico from the United States. For instance, all food supplies, implements of industry, machinery, etc., and in every way he endeavored to put in operation there a system of customs laws, enforced by the military authority, which might, if necessary, be continued in force after the conclusion and ratification of a treaty of peace, and until Congress should legislate for the island.

I refer in my brief to the cases of *Cross* v. *Harrison*, 16 How. 164, *Leitensdorfer* v. *Webb*, 20 How. 176, *The Grapeshot*, 9 Wall. 129, the *Mechanics' Bank* v. *The Union Bank*, 22 Wall. 276, and the *United States* v. *Rice*, 4 Wheat. 246, in support of what the President did in Porto Rico with reference to customs and revenues, both before and after the treaty of Paris was made. In the case of *Cross* v. *Harrison*, the customs laws and regulations for the conquered territory of California were first put in operation by the President through the military commander. It was a war tariff, and that war tariff continued to be enforced in California after the ratification of the treaty of

peace which, according to the contention of opposing counsel, made California a part of the United States. The war tariff, which was not the tariff then in force under the laws of the United States in the ports of the United States, was enforced until, I think, in August, 1848, when word was brought to California of the ratification of the treaty. Then there was substituted for that war tariff, by the order of the military commander, a tariff that was based upon and I suppose faithfully reproduced the provisions of the customs law then in force throughout the United States, and duties continued to be collected under that tariff until the arrival of agents of the Government authorized to put in force there the laws of the United States with reference to customs. But the court sustained the validity of the duties collected under all of these circumstances, even after the ratification of the treaty of peace. It held that the government which was rightfully instituted by the President under the law of belligerent right, continued in force necessarily and properly until another government should be substituted by Congress, and all the things done by the provisional government under authority of the President were sustained by the court in that case. The court said (p. 193): " The territory had been ceded as a conquest, and was to be preserved and governed as such until the sovereignty to which it had passed had legislated for it. That sovereignty was the United States, under the Constitution, by which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with the power also to admit new States into this Union, with only such limitations as are expressed in the section in which this power is given. The government, of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent right over a conquered territory. It had been instituted during the war by the command of the President of the United States. It was the government when the territory was ceded as a conquest, and it did not cease as a matter of course or as a necessary consequence of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but

he did not do so. Congress could have put an end to it, but that was not done. The right inference from the inactivity of both is, that it was meant to be continued until it had been legislatively changed. No presumption of a contrary intention can be made. Whatever may have been the causes of delay, it must be presumed that the delay was consistent with the true policy of the Government. And the more so as it was continued until the people of the Territory met in convention to form a state government, which was subsequently recognized by Congress under its power to admit new States into the Union."

And here is the conclusion of the case: " Our conclusion, from what has been said, is, that the civil government of California, organized as it was from a right of conquest, did not cease or become defunct in consequence of the signature of the treaty or from its ratification. We think it was continued over a ceded conquest, without any violation of the Constitution or laws of the United States, and that until Congress legislated for it, the duties upon foreign goods imported into San Francisco were legally demanded and lawfully received by Mr. Harrison, the collector of the port, who received his appointment, according to instructions from Washington, from Governor Mason."

In the argument so far I have briefly treated of the questions that arise from the importation into Porto Rico of goods from the United States, both before and after the treaty of peace, and before the taking effect of the Porto Rican act. Now, of course, there may be said to be involved in the collection of duties in Porto Rico on goods brought from the United States under the treaty of Paris, and before the Porto Rican act went into effect, a question similar to that which arises with regard to the exaction of duties on goods shipped into Porto Rico from the United States under the Porto Rican act. But I do not care to consider or discuss that question at this time. I prefer to take up and discuss the question which has been raised, and which in some respects is the vital question, as to the effect of the ratification of the treaty upon the relation of Porto Rico— and of course the Philippines—to the United States, because that is the primary question in these cases.

Counsel contend that upon the ratification of the treaty, and

upon the cession of Porto Rico to the United States, that terri-
tory became a part of the United States within the meaning of
the general grant of taxing power to the Federal Government,
subject to the limitation contained in that provision which re-
quires "all duties, imposts, and excises to be uniform through-
out the United States." In discussing the effect of the treaty,
I shall not repeat the historical argument so fully and elab-
orately presented by the Government in the discussion of the
*Goetze* case. I shall rather attempt, after going over the terms
of the treaty, to analyze the pertinent provisions of the Consti-
tution of the United States, with a view of determining what
was the real meaning intended by the framers of the Constitu-
tion to be given to the words "the United States" used in that
connection.

Reduced to a legal proposition, the denial of the power which
has been exercised and is being exercised by the President and
by Congress in the new possessions, amounts to this: Ceded
territory becomes, by the act of cession, an integral part of the
United States, to which the Constitution of its own force at
once applies, placing its people, its products, and its ports on an
immediate equality with ours, and conferring upon them all the
rights, privileges, and immunities enjoyed under the Constitu-
tion by the people, the products, and the ports of the several
States. Moreover, the limitations of the Constitution apply
there as here, requiring the same taxes, duties, imposts, and ex-
cises to be collected, and the same Anglo-Saxon system of trial
by jury to be used. Their people become at once our peo-
ple, citizens of the United States, our ports become their ports,
and our markets their markets. They are free to come here or
to sell their products here, while our taxes and our laws, however
unsuitable, must go there.

There is nothing obscure about this doctrine. It is plain and
unmistakable. The act of cession is all powerful; its effect im-
mutable. As soon as the title passes, the territory is incorpo-
rated within the United States, and the Constitution *ex proprio
vigore* does the rest. The proposition is true as stated, or not
true at all. Either the mere act of cession, irrespective of the
terms of the treaty (which I shall consider later) and regardless

of the action of Congress, makes acquired territory a part of the United States in the constitutional sense, or it does not. If it does, the treaty-making power, in acquiring territory, so far as the status of that territory is concerned, is necessarily limited to providing for the mere act of cession. It can make no terms. It cannot take temporarily or provisionally, or for this purpose or that. It can give no pledges; it can grant no privileges; it can reserve no questions for future disposition; in short, although called the treaty-making power, and granted without limitation, it is stripped of its proper functions; it cannot treat; it is lame, impotent, impossible, ridiculous.

On the other hand, if the territory does not, by the mere act of cession, become immediately an integral part of the United States in the constitutional sense, of necessity the provisions of the treaty and the action of Congress must determine whether it shall or shall not become or be deemed a part of the United States, and, if ever, when. In other words, the acquired territory becomes not a part but a possession of the United States —territory, to use the language of the Constitution, belonging to the United States—and its disposition and government rest, under the Constitution, with the treaty-making power and with Congress.

MR. JUSTICE BROWN. If it be territory belonging to the United States, then does it fall within the provisions of the Dingley act, which requires duties to be assessed upon goods from foreign countries, or does it not cease to be a foreign country?

MR. SOLICITOR GENERAL. I think not; not within the meaning of the customs law. The Dingley law treated as foreign all territory outside of the limits of the United States, meaning the States and Territories then treated for customs purposes as the United States, and that condition remained until Congress saw fit to change it.

In the noted case of *Fleming* v. *Page*, 9 How. 614, Mr. Justice Taney says that "the United States may demand the cession of territory as the condition of peace, in order to indemnify its citizens for the injuries they have suffered or to reimburse the Government for the expenses of the war." And in this connection I might also refer to the language of Chief Justice

Marshall in the famous *Canter Case*, 1 Peters, 541, in which he says that acquired territory "becomes a part of the nation to which it is annexed either on the terms stipulated in the treaty of cession, or on such as the new master shall impose." And in the case of *Cross* v. *Harrison*, 16 How. 164, Mr. Justice Wayne uses this language (p. 197): "By the ratification of the treaty California became a part of the United States." So it did, in the international sense—in the legislative sense—subject to the dominion of the United States; to be ruled and regulated by Congress, under the power granted to make all needful rules and regulations respecting the territory belonging to the United States. And he continues: "And as there is nothing differently stipulated in the treaty with respect to commerce, it became instantly bound and privileged by the laws Congress had passed to raise a revenue from duties on imports and tonnage."

MR. JUSTICE BROWN. That case did not involve the question involved here of an importation from California to New York.

MR. SOLICITOR GENERAL. That is true.

MR. JUSTICE BROWN. It involved quite a different question. That involved a case of importation from an admittedly foreign country into the United States.

MR. SOLICITOR GENERAL. Yes, although the court did say, if I remember correctly, that if these goods had been allowed by the military authorities to enter California free of duty, then duty would have been exacted on them in the ports of the United States if taken there. Here is what the court says on page 192: "The best test of the correctness of what has just been said is this: That if such goods had been landed there duty free, they could not have been shipped to any other port in the United States without being liable to pay duty." Of course, California was contiguous territory, and it was very much better, as a matter of policy, to bring it as soon as possible within the operation of the customs laws of the United States, and that was what was done. But that does not apply to Porto Rico or the Philippines.

Now if territory may be acquired for the purposes, or any of the purposes, mentioned by Chief Justice Taney, it certainly

may be taken and held upon such conditions as may be proper and necessary to carry the purpose into effect. Territory acquired to indemnify and reimburse may be taken and held as a pledge, or as a possession, provisionally, temporarily, or indefinitely, with the reserved power of disposition and control suitable to accomplish the desired end. To incorporate such territory into the Union and make it a part of the United States would defeat the very object of the acquisition. Once there it would have to stay, for no power exists within the Union to dismember it.

If Chief Justice Taney was wrong, and we cannot take territory *sub modo* to indemnify or reimburse us, but only to make it a part of the United States, then, before the President carries a war into the enemy's country, he should send ahead his advance agents—a commission to ascertain and report whether the territory he proposes to invade and subjugate is fit to be made a part of the United States. For observe, neither the treaty-making power nor Congress can, according to the contention of the other side, prevent that result if a cession follows conquest. Before the President sent Dewey to Manila he should have satisfied himself that the Philippines were suitable for incorporation into the Union, for we could destroy the Spanish power there only at the risk of having to assume the burdens of sovereignty ourselves.

The Constitution, while vesting in the President and Senate the treaty-making power, provides that : " This Constitution, and the laws of the United States which shall be made in pursuance thereof ; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land." The treaty of Paris was made under the authority of the United States, and contains the terms upon which we acquired these territories. It is unique in this, that while former treaties of cession all provided that the civilized inhabitants of the ceded territories should ultimately — not immediately, but ultimately—become citizens of the United States, and be incorporated in the United States, this treaty left the determination of their civil rights and political status to Congress.

Mr. Justice Harlan. State that proposition again.

Mr. Solicitor General. I say that the treaty of Paris is unique in this, that while former treaties, such as the Florida treaty, the Louisiana treaty, and others, provided that the civilized inhabitants of the ceded territories should ultimately—not immediately, but ultimately, in the course of time—become citizens of the United States, this treaty, the treaty of Paris, left the determination of their civil rights and political status to Congress.

Mr. Justice Harlan. What treaty has used the word "civilized"?

Mr. Solicitor General. I do not assume to quote the precise language of the particular treaties, but simply state the effect of them.

Mr. Justice Shiras. The treaty with Russia used that term.

Mr. Solicitor General. Yes, the Alaskan treaty does use it. It distinguishes the uncivilized tribes there.

Let me refer to some of the provisions of the treaty of Paris. Spain ceded to the United States the island of Porto Rico, the island of Guam, and the archipelago known as the Philippine Islands. Spanish subjects, natives of the Peninsula, residing in such territories, were given one year from the exchange of the ratifications—that is, until April 11, 1900—to preserve their allegiance to Spain by making a declaration in a court of record. In default of this they were to be held to have renounced it and to have adopted the nationality of the territory in which they may reside—not to have adopted the nationality of the United States, to which the treaty ceded the islands, but to have adopted the nationality of the territory in which they may reside. Then directly after that comes this provision : "The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by the Congress."

Spaniards residing in the territories were to be subject, under Article XI, to the jurisdiction of the courts of the country—not the courts of the United States—pursuant to the ordinary laws governing the same—presumably the Spanish or civil law—and were to have the right to appear and pursue the same course

therein " as citizens of the country to which the courts belong "
—not as citizens of the United States. Article IV reads as fol-
lows : " The United States will, for the term of ten years from
the date of the exchange of the ratifications of the present
treaty, admit Spanish ships and merchandise to the ports of the
Philippine Islands on the same terms as ships and merchandise
of the United States."

With regard to this, it is obvious that, unless a separate sys-
tem of customs regulations is adopted for the Philippines, which
applies to goods shipped into the Philippines from the United
States, then the treaty, if observed, throws open the ports of
the Philippines absolutely to Spanish ships and Spanish im-
portations, and provides an open door into the Philippines, and
thence into this country, for whatever goods Spain sees fit to
send there. I do not intend to pursue an argument of policy
based upon this provision, but simply call attention to the fact
that the treaty itself negatives the view that these islands were
to become a part of the United States within the meaning of
our customs laws.

Again, for ten years Spanish scientific, literary, and artistic
works were to be admitted free of duty into all the ceded terri-
tories, and that provision, as counsel has stated, has been in-
corporated into the Porto Rican act, for the purpose of carry-
ing out the pledge of the treaty. In short, neither of these
provisions can be carried out if the Constitution requires our
customs regulations to apply in those islands as here in the
United States.

The purpose of these provisions is plain. Although under
the power and protection of the United States, the territories
are to have their own laws, their own courts, their own ports,
their own commerce, their own citizenship, their own system
of revenue. A separate and distinct existence under, but with-
out, the United States, in the purely constitutional sense, as
used in the general grant of taxing power, is contemplated.
The parties to the treaty both knew that the location and con-
dition of these islands would not permit their incorporation into
the United States and the application to them of those laws of
commerce, of revenue, and of civil and criminal procedure which

the Constitution, according to the contention of opposing counsel, requires to be uniform throughout the United States. They provided, therefore, for a system of government which should be adapted to local conditions and needs.

Now, are we free to disregard the plain provisions of the treaty, which the Constitution says shall be the supreme law of the land? If so, what becomes of the consent of the treaty-making power to the acquisition? Would the President and the Senate have consented to take the territories upon any other terms? Would Spain have consented to cede them? Certainly the treaty never intended to make these tropical islands, with their savage and half-civilized and civilized people, a part of the United States in the constitutional sense, and just as certainly did make them a part of the United States in the international sense.

MR. JUSTICE HARLAN. What do you mean by the international sense?

MR. SOLICITOR GENERAL. I am just going to explain. The term "the United States" may mean the territory which governs, or the territory over which the Government extends. The former is the constitutional, the latter the international, or, it may be, the legislative sense. In the latter sense, in the international or legislative sense, States and Territories, all places subject to the jurisdiction of the national power, combine to constitute what Chief Justice Marshall in *Loughborough* v. *Blake*, 5 Wheaton, 319, termed "The American Empire," "Our Great Republic." "Does this term," said he, referring to "the United States," "designate the whole or any particular portion of the American empire? It is the name given to our great republic, which is composed of States and Territories." The great Chief Justice was clearly correct in holding that the taxing power extends throughout the United States in the international or legislative sense, although the limitation of the Constitution on the taxing power for Federal purposes applies, as we contend, only throughout the United States in the constitutional sense. What we are concerned with is, of course, the constitutional sense. For the vital question is whether the constitutional limitation upon the Federal taxing power which applies

" throughout the United States " operates in the new territories. As stated in the preamble—

Mr. Justice Peckham. Do you find any case where any such distinction has been drawn as you make now—between the United States in the constitutional sense and the United States in the international sense ?

Mr. Solicitor General. I think I could if it were desirable. I am going on to show what these words " the United States " mean in the constitutional sense. I think it perfectly apparent that the phrase " the United States " in the international sense comprehends all territory which is subject to our dominion.

Mr. Justice Peckham. Yes ; I understand what you state, but my question was whether you have in mind, or had come across in your research, any case in which such a distinction was drawn, between the United States in the constitutional sense and the United States in the international sense.

Mr. Solicitor General. The distinction has been clearly drawn in a decision of this court between the word " State " as used in the Constitution and the word " State " as used in a treaty, in the international sense. Thus, it was held in *Geofrey* v. *Riggs*, 133 U. S. 258, that the District of Columbia is a " State " in the international sense, but certainly it is not a State within the meaning of the Constitution. That has been expressly held in *Hepburn* v. *Ellzey*, 2 Cranch, 445.

As stated in its preamble, the Constitution of the United States was ordained and established by " the people of the United States " " for the United States of America." There is no ambiguity about the meaning of the words " United States of America," as here used. They mean the States united under the Constitution, and are named individually in the second section of the first article, relating to the apportionment of representatives among the then existing United States.

Mr. Justice Harlan. The existing United States—those constituting the existing United States ?

Mr. Solicitor General. No, I did not say that. I said that the United States which framed and adopted the Constitution are named specifically in the Constitution at the place stated. They were the thirteen colonies which had first become the

United States in the Declaration and under the Confederation, and which, through their people, framed the present Constitution, in order, among other things, " to form a more perfect Union." There never was any doubt in those days as to what that term meant. This conclusively appears from the sixth article, which provides that all debts contracted before the adoption of the Constitution " shall be as valid against the United States under the Constitution as under the Confederation."

MR. JUSTICE HARLAN. And that would include the States, of course, which afterwards came into the Union before the debts were paid?

MR. SOLICITOR GENERAL. You could hardly say that they were "under the Confederation." They were not " United States under the Confederation." Undoubtedly the debts would be valid against the United States, including the States which were subsequently admitted.

MR. JUSTICE WHITE. Do you make a distinction in your mind or is there any distinction, from the consideration which you have given to this case, between the States and the Territories of the United States, and the States and the territory of the United States? Does not " the territories " in these cases which you have quoted from refer to territories in which Congress has organized a government, thus making them impliedly a part of the United States? Does not the article of the Constitution giving power to dispose of the " territory " suggest a distinction between the Territories which have been organized, and " territory " belonging to the United States as such?

MR. SOLICITOR GENERAL. Does your honor mean to ask me whether territories subsequently acquired came within the power thus granted to Congress to make all needful rules and regulations for the government of the territory of the United States, or is it confined simply to the territory which existed at the time of the adoption of the Constitution, outside of the thirteen States?

MR. JUSTICE WHITE. You quoted the language of Chief Justice Marshall in *Loughborough* v. *Blake*, and then you speak of the United States in the constitutional and the international sense of the words " United States." But that language of

Chief Justice Marshall, in which he spoke of "Our Great Republic," "The American Empire," was used with reference to the exercise of the taxing power.

MR. SOLICITOR GENERAL. I know it was. He was correct, as I take it, in his conclusion that the taxing power of the United States extends over all the territory belonging to the United States; that it extends over all the States and Territories if Congress sees fit to exercise it. But I think what he says—which is the basis of the claim that the limitation that duties, excises, and imposts shall be uniform throughout the United States, applies to the Territories as well as the States—was not requisite to the decision of the case before him, and I am endeavoring to argue was incorrect.

MR. JUSTICE WHITE. That is my question. My question was to ascertain whether you were challenging the statement of Chief Justice Marshall in that case or whether you were concurring in it.

MR. SOLICITOR GENERAL. I have to challenge it.

MR. JUSTICE BROWN. The general expression, you mean?

MR. SOLICITOR GENERAL. I say looked at from the point of view of the decision he was correct, because in a geographical sense "the United States," throughout which Congress may exercise the taxing power for Federal purposes, includes necessarily all territory subject to the dominion of the United States. Now, that is the international or legislative sense. But I submit the constitutional sense covers only the States, and was so intended by the framers of the Constitution.

The primary source of the sovereign power was the people of the thirteen original States. These men believed they were forming a government which would endure for ages, and would dominate a continent, and probably territory outside—islands beyond the seas. In the treaty of alliance which Benjamin Franklin concluded with France, in 1778, there was this provision in the fifth section:

"If the United States should think fit to attempt the reduction of the British power remaining in the northern parts of America, or the islands of Bermudas, those countries or islands in case of success, shall be confederated with, or dependent upon the said United States."

So from that we can see how far-reaching was the vision of the stalwart men of the early days. Now, notwithstanding this expansive outlook, it does not appear that the fathers of the Constitution worried themselves about " the consent of the governed " outside of the States they lived in, which alone were to participate in political power. They formed a government in which the people of the States were alone represented and adopted a Constitution which, in its distribution and limitation of powers, applied almost wholly to the States, united or several.

In the early case of *Hepburn* v. *Ellzey*, 2 Cranch, 445, the question came before the Supreme Court whether a citizen of the District of Columbia could maintain an action against a citizen of Virginia. In support of the jurisdiction Mr. Lee insisted that to give the term " State " a limited construction would deprive the citizens of the District of the general rights of citizens of the United States and put them in a worse condition than aliens; and he put the pertinent question whether, in the face of the provision that " no tax or duty shall be laid on any articles imported from any State," Congress could levy a tax or duty on articles exported from the District of Columbia. But the court properly held that a citizen of the District is not a citizen of a State and cannot use the United States courts as such, Chief Justice Marshall saying: " The members of the American confederacy only are the States contemplated in the Constitution."

Yesterday, in connection with a quotation which I made from the case of *Loughborough* v. *Blake*, Mr. Justice White put to me a question in which he desired my opinion as to whether I recognized any difference between the words " the Territories " as used by Chief Justice Marshall and " the territory " which the Constitution places under the disposition of Congress. I did not hear the question distinctly nor comprehend the full purport of it. I do not recognize that the power of Congress over territory belonging to the United States ceases when such territory is organized and brought under the operation of the laws of the United States; but I do recognize a distinction between unorganized territory and the territories to which Chief

Justice Marshall may possibly have referred. If I gave the court the impression that I intended to say that, in using those words, Chief Justice Marshall referred to the States and Territories, meaning thereby to cover all territory under the dominion of the United States, which I had defined, whether correctly or incorrectly, as the international meaning, I think I was wrong. I am inclined to think that what Chief Justice Marshall had in mind was " the United States " in the legislative sense, meaning thereby the States of the Union, the District of Columbia, and the organized Territories, to which Congress had applied the revenue laws of the United States, thus including all that territory within the phrase " the United States," as designating the territory to which Congress had applied the revenue laws of the United States. So, really, there are four meanings which may be conveyed by the phrase " the United States."

In the first place, it may mean the sovereignty itself, what Chief Justice Marshall called " that grand corporation."

In the second place, it may mean, geographically, what Chief Justice Marshall calls " the American Confederacy," composed of the members of the Union, the States inhabited by the people who participate in the Government of the United States; and this is what I have termed the constitutional sense.

In the third place, in a geographical and legislative sense, it may mean the States and the District of Columbia and the Territories, which Congress has seen fit to treat as the United States for legislative purposes; over which Congress has extended, and to which it has applied, the laws of the United States which are applicable.

And in the fourth place, it may mean something broader, which is the international sense, as I take it; that is, all territory, wherever situated, under the dominion of the United States, whether organized or not, and whether ever brought within the operation of the specific laws of the United States. And our claim is that newly acquired territory does not become a part of the United States in the legislative sense until Congress shall so determine.

In the case of *Hepburn* v. *Ellzey*, 2 Cranch, 452, in which Marshall, C. J., defined the " American Confederacy," he said:

" The members of the American Confederacy only are the States contemplated in the Constitution. The House of Representatives is to be composed of members chosen by the people of the several States; and each State shall have at least one Representative. The Senate of the United States shall be composed of two Senators from each State. Each State shall appoint, for the election of the Executive, a number of electors equal to the whole number of Senators and Representatives. These clauses show that the word ' State ' is used in the Constitution as designating a member of the Union."

The States alone are the members of the American Confederacy. They constitute the Union, and the Union and 'the United States are equivalent terms in the Constitution. Thus the Constitution and " the laws of the United States " are made the supreme law of the land; yet Congress is to provide for calling forth the militia to execute " the laws of the Union." All legislative powers granted are vested in the Congress " of the United States," but the President is required from time to time to give to the Congress information of the state ' " of the Union."

In the first article, defining the legislative powers, it is provided that Representatives and direct taxes shall be apportioned " among the several States which may be included within this Union." This does not include the Territories, but does operate, evidently, throughout the United States.

Duties, imposts, and excises shall be uniform " throughout the United States." This, as we claim, is a geographical limitation, requiring indirect taxes to operate generally throughout the United States— that is, among the several States composing the Union. The history of the adoption of this provision will be found in interesting form in the learned opinion of Mr. Justice White in the case of *Knowlton* v. *Moore*, 178 U. S. 41, sustaining the constitutionality of the Federal tax on legacies. In the original draft the provision prohibiting any preference to the ports of one State over those of another, and that conferring and limiting the taxing power, were placed together. They really mean the same thing, that the States of the Union shall be treated alike in the regulation of commerce and the imposi-

tion of taxes. The uniformity required in each case was a uniformity among the several States of the Union, and this is shown by the decision in the *Cherokee Tobacco Case,* 11 Wallace, 616, affirming the constitutionality of the act of 1868 extending the excise tax on liquors and tobacco alone to the Indian Territory. A minority of the court held that, in view of the treaty provisions, it was not the intention of Congress to extend even the tax on liquor and tobacco to the Indian Territory. Obviously, the court was unanimous in the opinion that, although the Indian Territory was within the exterior boundaries of the United States, the provision of the Constitution requiring excises to be uniform throughout the United States did not apply within the Indian Territory.

The Constitution gives Congress power to regulate commerce " among the several States," and to establish a uniform rule of naturalization and uniform laws on the subject of bankruptcy "throughout the United States." Now, we submit that this latter was to remedy the mischief resulting from the diverse and conflicting legislation of the several States upon these subjects by securing uniform provisions throughout the States of the Union. I refer to No. 41 of the Federalist, written by Mr. Madison, upon that point, in which he says such was the object of that provision. The early laws of this character applied only within the States. The recent acts have properly been extended to the Territories, which Congress in its discretion has seen fit to include within the limits of the United States, legislatively treated.

It is provided that " no tax or duty shall be laid on articles exported from any State ; " but nothing is said about any Territory. And that " no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another ; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another ; " but nothing is said about the ports of any Territory.

The prohibitions of the tenth section of the first article apply only to the States. " No State shall pass any bill of attainder or *ex post facto* law, or law impairing the obligation of contracts, or grant any title of nobility. No State shall,

without the consent of Congress, lay any imposts or duties on imports or exports," etc. All these limitations apply only to the States of the Union.

In the second article, which grants and defines the Executive power, it is provided that Congress may determine the date on which the electors shall give their votes, which day shall be the same "throughout the United States." Necessarily, the United States here means the States of the Union which alone take part in electing the President. Later, it is provided, that during his term of office the President shall not receive, in addition to his stated compensation, any other emolument from "the United States or any of them," showing that the States united were alone in mind.

MR. JUSTICE BREWER. Do you think in that connection that the various Territories can add to the President's salary; in view of that, can the various Territories add to the emoluments of the President?

MR. SOLICITOR GENERAL. No, I think the spirit of this would prevent that. I think there is no direct application to the Territories, but I dare say the spirit of it would forbid what you suggest. Territorial action might, in a certain sense, be treated as the action of the United States, seeing that a Territory could not act outside of the authority of the United States, being under the complete control of Congress. It might, in a certain sense, be treated as the action of the United States, if a Territory attempted to do that. However, I prefer to say that the general spirit of this provision applies and would prevent what is suggested by your honor.

The third article applies to the judicial power of the United States. It has been repeatedly held that the territorial courts are not organized under this article, and are, therefore, not courts of the United States. The article constantly keeps in mind the relation of the United States to the several States, and of those States and their citizens to one another. No mention is made of the Territories or their citizens.

The fourth article guards the rights of each State and its citizens with respect to every other State. The public acts of each shall have full faith and credit in all others. The citizens

of each shall be entitled to the privileges and immunities of the citizens in the several States. Fugitives from justice shall be surrendered; new States may be admitted into " this Union; " and a republican form of government to every State in the Union is guaranteed. But there is no safeguard or guarantee whatever in the case of a Territory and its citizens. No republican form of government for the Territories is guaranteed. On the contrary, just preceding the guarantee to the States, and following the provision for the admission of new States, the following grant of plenary power is made:

" Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

Notice the phraseology. Territory is treated as property, as something distinct from the United States—something belonging to the United States, a subject to be ruled and disposed of by Congress in its discretion as conditions may require, without being hampered by the restrictions which were framed for the States.

MR. JUSTICE BREWER. Right there, do you understand that Congress has absolute power over territory acquired, to do as it pleases with it?

MR. SOLICITOR GENERAL. No; I deny that utterly, as I shall show to your honor.

MR. JUSTICE BREWER. What limitations?

MR. SOLICITOR GENERAL. I shall point out specifically the limitations later. I say that Congress is subject to all applicable limitations, and I shall point out later what I mean by applicable limitations, in view of the decisions of this court.

In the case of *McCulloch* v. *Maryland*, 4 Wheaton, 442, in which the supremacy of the United States within the sphere of its action was sustained, Chief Justice Marshall, emphasizing the authority conferred on Congress to select the means for carrying into execution the powers vested by the Constitution, said: " The power to make all needful rules and regulations respecting the territory or other property belonging to the United States is not more comprehensive than the power to

make all laws which shall be necessary and proper for carrying into execution the powers of the Government."

Apparently, he took the territorial grant as the test and standard of plenary power, as the maximum of comprehensiveness.

The Thirteenth Amendment contains an explicit recognition of the fact that a place subject to the jurisdiction of the United States is not necessarily a part of the United States, for it provides: "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

In this connection, in addition to the many instances cited by the Attorney General where Congress has drawn a distinction between the United States and the Territories, let me refer to the act of March 2, 1807, 2 Stat. 426, prohibiting the importation of slaves into this country. That act provided that it should be unlawful for any person to import or bring from any foreign country any slaves—now, I am quoting—"into the United States or the Territories thereof." And in the subsequent act of 1818, 3 Stat. 450, which supplemented this act, the same phraseology was used, the first section providing that it should be unlawful to import any negroes "into the United States or Territories thereof."

And as illustrating the fact that this court has drawn a distinction between the rights before this court of Territories and territorial legislation, as distinguished from States and state legislation, I wish to refer the court to the case of *Miner's Bank* v. *Iowa*, 12 Howard, 1, in which the court held that the validity of a territorial act repealing the charter of a bank granted by a Territory, could not be brought before the Supreme Court, under the twenty-fifth section of the judiciary act, either on the ground that there was drawn in question the validity of a statute of, or an authority exercised under, any State, or on the ground that there was drawn in question the validity of a statute or authority exercised under the authority of the United States. In holding that there was not drawn in question the validity of an act passed by a State, Mr. Justice Daniel, speak-

ing for the court, said (p. 7) : " In order to give this court jurisdiction, the statute, the validity of which is drawn in question, must be passed by a State, a member of the Union, and a public body owing obedience and conformity to its Constitution and laws. That if public bodies, not duly admitted into the Union, undertake as States, to pass laws which might encroach on the Union or its granted powers, such conduct would have to be reached either by the power of the Government to put down insurrection or by the ordinary penal laws of the States and Territories within which these bodies are situated and acting ; but their measures are not examinable by this court upon a writ of error. They are not States, and cannot pass statutes within the meaning of the judiciary acts.

" Other cases cited by the court, in the opinion just quoted [referring to the case of *Scott* v. *Jones*, in the 5th Howard], might be adduced to show the difference ever taken by the court in reference to its relation to the States as States, and as contradistinguished from the Territories of the United States. It seems to us, that the control of these territorial governments properly appertains to that branch of the Government which creates and can change or modify them to meet its views of public policy, viz., the Congress of the United States. That control certainly has not been vested in this court, either in mode or substance, by the twenty-fifth section of the judiciary act."

In holding that the territorial charter could not be regarded as an act of Congress, the court said : " The charter of the Bank of Dubuque enacted in all its details and powers ever possessed by it (and according to which it was in fact organized) by the legislature of Wisconsin, must be looked upon as the creature of that legislature. To regard it as we are urged to do by the argument of the plaintiff in error, would constitute it rather a bank of the United States, situated without the United States, and operating within the Territory of Wisconsin."

And I think in the opinion the court will find the word " without " italicized—" *without* the United States."

I believe that a careful examination of the Constitution leads but to one conclusion, that the power of Congress over the Territories is plenary and absolute. Whether it follows from the

power to acquire and hold territory, or is conferred by the clause of the Constitution which declares that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," it is full and complete, and is unhampered by those limitations and restrictions which were intended to apply only within the States of the Union.

There is a line of decisions of the Supreme Court running back to the early days which sustains this view. Some years after the decision in *Loughborough* v. *Blake*, the case of *Insurance Company* v. *Canter*, 1 Pet. 511, came before the Supreme Court, over which Chief Justice Marshall still presided. A court of the Territory of Florida, composed of a notary and five jurors, had sold a wrecked cargo of cotton on a salvage claim and transferred the title to Canter, the purchaser. It was insisted that upon the acquisition of Florida it became a part of the United States over which the Constitution extended, and that under the Constitution admiralty jurisdiction could be exercised only by the courts of the United States. It had to be conceded that the territorial court was not organized in accordance with the Constitution, which requires judges to be appointed for service during good behavior. The opinion of Chief Justice Marshall is worthy of careful study. Its logic is unanswerable. While the power of Congress to govern ceded territory was declared to be inevitable and absolute, the limitations of the Constitution upon the exercise of the judicial power of the United States was expressly held to be confined to the States, the Chief Justice saying (p. 545): "Although admiralty jurisdiction can be exercised in the States in those courts, only, which are established in pursuance of the third article of the Constitution, the same restriction does not extend to the Territories. In legislating for them, Congress exercises the combined powers of the General and of a state Government."

The doctrine thus enunciated by the great Chief Justice has been approved and followed by his successors in a long line of cases, I think all of which were cited by the Attorney General. Note the language used. Chief Justice Waite speaks of the Territories as "the outlying dominion of the United States"

101 U. S. 129, 133—an apt phrase. "The outlying dominion!" Lying outside of what? Outside of the governing body—the United States. The "outlying dominion of the United States," not a part of the United States. He says that Congress "may do for the Territories what the people, under the Constitution of the United States may do for the States," the fullest and clearest expression of Constitutional power without limitation.

MR. JUSTICE HARLAN. Please read that again.

MR. SOLICITOR GENERAL. That Congress "may do for the Territories what the people, under the Constitution of the United States, may do for the States." Can there be any fuller expression of plenary power than that? Mr. Justice Matthews says that "the people of the United States, as sovereign owners of the National Territories, have supreme power over them and their inhabitants." "It rests with Congress to say whether, in a given case, any of the people, resident of the Territory, shall participate in the election of its officers, or the making of its laws." 114 U. S. 15, 44. In other words, Congress can at any time repeal an act giving local government to a Territory, and take the authority to itself. Mr. Justice Bradley says that "It would be absurd to hold that the United States has power to acquire territory and no power to govern it when acquired." 136 U. S. 1, 42. And Mr. Justice Harlan says that "The whole subject of the organization of the territorial courts, etc., was left by the Constitution with Congress, under this plenary power over the Territories of the United States." 141 U. S. 174, 188. And then he inquires, "Has Congress, under 'the general right of sovereignty' existing in the Government of the United States as to all matters submitted to its exclusive control, including the making of needful rules and regulations respecting the Territories of the United States, any less power over the judges of the Territories than a State, if unrestrained by its organic law, might exercise over the judges of its own creation?" 141 U. S. 174, 1890. And Mr. Justice Gray says that, "By the Constitution, as is now well settled, the United States, having rightfully acquired the Territories, and being the only Government which can impose laws upon them, has the entire dominion and sover-

eignty, national and municipal, Federal and state, over all the Territories, so long as they remain in a territorial condition."

And now I come to the subject of limitations. Are there no limitations on this plenary power of Congress to govern the Territories? I believe there are. If there are any who believe that the President or Congress can govern the new possessions outside of the Constitution, and wholly irrespective of all its limitations, I am not of them. Neither the executive, nor the legislative, nor the judicial branches of the Federal Government can act except through a power conferred by the Constitution. Wherever a particular power is exercised the limitation placed upon it by the Constitution must be observed. The Constitution was formed by the people of the thirteen original States. They provided the Government, conferred upon it certain powers, and subjected it in the exercise of some of these powers to certain limitations. It expressly prohibited the exercise of certain powers under any circumstances, and wholly irrespective of the place where exercised. Moreover, since certain powers were reserved to the States composing the Union, certain limitations and prohibitions were laid upon the States. In any case involving the exercise of a power claimed under the Constitution, the first question is, Was the power granted? and the next is, What are the limitations?

The difficulty of a clear conception of the important question in these cases has been increased by the use of campaign catchwords, of political phrases. "The Constitution follows the flag" is one of these. It is made use of to induce people to believe that the Government is contending that the President and Congress, in dealing with the new possessions, avowedly act outside of the Constitution; that the Government claims that the Constitution stays here, within the United States, leaving the President and Congress power unlimited and despotic with respect to the new possessions. This claim is designed and calculated to put both the President and Congress in a position obnoxious to a liberty-loving people. The position is one they have never taken and do not now occupy. Both the President and Congress concede, as I understand it, that they have no power except under the Constitution, and

that they are subject in the exercise of their powers to every limitation properly applicable. The Constitution and the flag go together. Wherever the flag flies as the symbol of the sovereignty of this country it is raised by an authority created and existing under the Constitution. The flag now floats in the Philippines by virtue of the war and treaty-making power through which we have acquired that territory. It was raised in Porto Rico under the same authority. It waves there now as the symbol of the sovereignty of the Republic over rightfully acquired territory, which the Constitution expressly intrusts the regulation and disposition of to Congress. The Constitution is in force in the Philippines and is in force in Porto Rico, but not all of its provisions. Only those provisions operate there, or operate on Congress in legislating for the new possessions, which the framers of the Constitution intended should apply. Opposing counsel speak of the Constitution as if all of its provisions apply everywhere throughout the scope of the authority of the government it creates. This is not true. The United States, in the broadest sense, is composed of States and Territories, organized and unorganized. There are certain prohibitions and limitations which clearly apply only to the States as bodies politic. They were not intended to and do not apply to the Federal Government at all. There are other limitations which apply to the General Government when acting within the States united under the Constitution. There are other limitations which apply both throughout the States and the Territories, organized and unorganized. There are other limitations which apply everywhere, both within and without the United States in the broadest sense. So, after all, it is a question of the scope and application of specific limitations. Because an inapplicable limitation is not in force in the new possessions, it does not follow that applicable prohibitions and limitations can or would be ignored.

To repeat, the United States of America—which Chief Justice Marshall, in *Dixon* v. *The United States*, said is "the true name of that grand corporation which the American people have formed, and the charter will, I trust, long remain in full force and vigor"—is a body politic, of which the States alone

are integral constituent parts, they only, as the same Chief Justice said in *Hepburn* v. *Ellzey*, being "the members of the American Confederacy," and this governing entity exercises sovereignty over "the American Empire," "our Great Republic," which is composed of States and Territories—and, in the broadest sense, if he does not mean by this, territory unorganized, then over that too. The Territories are not integral parts but possessions of this "grand corporation." The governing unit, composed of the States, possesses and exercises dominion over the Territories, subject only to the applicable restrictions and limitations of the Constitution. All the provisions of the Constitution do not and cannot have uniform operation both within the States and Territories whose political *status* and relation to the governing body are so widely different. It is true that every part of the national domain is within the jurisdiction of the Constitution, but it does not follow that every part is subject to all of its provisions. Each part is subject to some one or more of them, but all parts are not subject to all of them.

The Territories, not being parts, but possessions, of the governing body, are not within the scope or purpose of those limitations and restrictions which were designed to preserve and protect the rights of the States composing the Union. In legislating for the Territories Congress is not limited to jealously guarded national powers, but exercises the combined powers of the General and of a state Government.

Mr. Justice Harlan. Where is the *Dixon* case you referred to?

Mr. Solicitor General. In 1 Brockenbrough, 177. It was a case decided on the circuit.

The safeguard when Congress thus acts outside of those limitations to which I am going now to refer, and which I regard as applicable, is what Chief Justice Marshall refers to in *Gibbons* v. *Ogden*, 9 Wheaton, 1, where, meeting the objection that, according to the position taken by counsel for the Government, despotic power was given by the clause authorizing Congress to regulate commerce among the several States, he said (p. 197): "The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents pos-

sess at elections are, in this, as in many other instances—as that, for example, of declaring war—the sole restraints on which they have relied to secure them from its abuse. They are the restraints on which the people must often rely solely in all representative governments.

But there are limitations which apply to Congress in exercising the territorial grant. Obviously those limitations which are laid upon the exercise by Congress of a special power, irrespective of the place where exercised, do apply, such as those forbidding Congress to pass any bill of attainder, or any *ex post facto* law, or confer any title of nobility. These, as Madison said in No. 43 of the Federalist, are contrary to the first principles of the social compact. The prohibition of slavery operates by express provision everywhere. But these are not the only limitations. It is always to be borne in mind that this is a Government framed by the people, among other things, to establish justice and to secure the blessings of liberty. A Government thus dedicated to liberty and justice is based on fundamental principles, and at all times must show respect for fundamental rights. This, I take it, is what Mr. Justice Bradley meant when he said in the *Mormon Church Case*, 136 U. S. 44—
"Doubtless Congress, in legislating for the Territories, would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions."

And obviously it was to this that Mr. Justice Harlan, speaking for the court, referred in *McAllister* v. *United States*. 141 U. S. 188, when he said :

"How far the exercise of that power [the power to govern the Territories] is restrained by the essential principles upon which our system of government rests, and which are embodied in the Constitution, we need not stop to inquire."

MR. JUSTICE BROWN. Can Congress take private property for public use without compensation in the Territories ?

MR. SOLICITOR GENERAL. Well, I suppose the court will have to

define the fundamental limitations. I do not think I can. The court has not categorically stated them as yet. The court has contented itself with saying there are fundamental principles embodied in the Constitution.

MR. JUSTICE BROWN. You prefer the court should define the limitations and do not care to state them yourself? [Laughter.]

MR. SOLICITOR GENERAL. I prefer to have the court define the limitations rather than try to do so myself. I think it would be presumptuous in me to act as pioneer in this matter. I am content to follow the court.

The Government has never asserted, and does not believe, that Congress has the power of a despot in Porto Rico. The fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments, referred to by Mr. Justice Bradley, stand in the way of everything suggested which shocks the moral sense. Congress could not pass any *ex post facto* law, or declare an attainder, or grant any title of nobility, or provide for the trial or punishment of treason in any other way than that marked out in the Constitution, all these things being prohibited by direct and applicable provisions. If the first ten Amendments do not limit by direct application Congress in legislating for our new possessions—I put this as a possible case—neither do they operate within the States which compose the Union. As this court, speaking by Mr. Justice Waite, said in *United States* v. *Cruikshank*, 92 U. S. 552 : " The first Amendment to the Constitution prohibits Congress from abridging " the right of the people to assemble and to petition the Government for a redress of grievances." This, like the other Amendments proposed and adopted at the same time, was not intended to limit the powers of the state governments in respect to their own citizens, but to operate upon the National Government alone."

" Protection to life, liberty, and property rests primarily with the States," as Chief Justice Fuller said in *In re Kemmler*, 136 U. S. 448. " The Constitution makes no provision for protecting the citizens of the different States in their religious liberties ; this is left to the state constitutions and laws," said Mr. Justice Catron, speaking for the court in *Permoli* v. *First Municipality*, 3 How. 609.

The Constitution forbids the States to pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts, or to grant any title of nobility, and the Fourteenth Amendment provides that "no State shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" but outside the range of these limitations the people of the State, through its constitution and laws, are supreme. They can define treason against the State as they see fit; they can limit the freedom of speech and of the press; they can restrict the bearing of arms; they can provide for the quartering of troops.

MR. JUSTICE HARLAN. Could a State have an established religion?

MR. SOLICITOR GENERAL. I have already read what the court said in regard to that in connection with the First Amendment. That question came before this court in the *Permoli* case, and the court said that the Constitution makes no provision for protecting the citizens of the respective States in their religious liberties.

MR. JUSTICE HARLAN. What does the word "liberty" in the Fourteenth Amendment mean?

MR. SOLICITOR GENERAL. That is a broad question which the court has not yet fully answered. I stand by the decision of the court upon a specific point, and if that is overruled by a general expression, I must yield.

MR. JUSTICE HARLAN. What would you say as to an act of Congress which absolutely forbade all trade between Porto Rico and the States? If Congress could not do that, what is the provision of the Federal Constitution that would stand in the way?

MR. SOLICITOR GENERAL. I think Congress could, if it saw fit, prohibit all trade.

MR. JUSTICE HARLAN. And could prohibit the people in that country from coming here at all, to the States?

MR. SOLICITOR GENERAL. I am disposed to think that goes along with the other. I will, however, discuss that phase of the question later. But let me say here, with respect to these ex-

treme illustrations of what might be done under a claimed power, that I understand this court has repeatedly taken the position that although a certain thing is not expressly prohibited, still if it is arbitrary and tyrannical, destructive of fundamental rights, and, therefore, opposed to fundamental principles, the court will find a way to protect the people against it. In the opinions of this court, where power in Congress has been upheld, carefully guarded language has been used, so as to leave the court free to protect the people, in case Congress should exercise such power in a way destructive of fundamental rights. Thus, in the case of *Knowlton* v. *Moore*, in which the court upheld the graded feature of the legacy tax, the following language is used, (178 U. S. 109): " The grave consequences which it is asserted must arise in the future if the right to levy a progressive tax be recognized, involves in its ultimate aspect the mere assertion that free and representative government is a failure, and that the grossest abuses of power are foreshadowed unless the courts usurp a purely legislative function. If a case should ever arise where an arbitrary and confiscatory exaction is imposed, bearing the guise of a progressive or any other form of tax, it will be time enough to consider whether the judicial power can afford a remedy by applying inherent and fundamental principles for the protection of the individual, even though there be no express authority in the Constitution to do so."

The people of the State, through its constitution and laws, can provide for the trial of capital or otherwise infamous crimes, upon information and without indictment, and without a jury, and they have done so; and they can do away with the trial by jury in civil cases, and they have done so ; and they can do many other things which I need not enumerate.

In other words, the right of the people of the States to change their laws and system of procedure so as to conform them to changed views of administration, or the developing exigencies of their social life, has been sustained. And now, I ask the question, if the Constitutional guarantees relating to indictment by a grand jury and trial by a petit jury do not tie the hands of the inhabitants of a Territory when organizing a State, why

should they be held to tie the hands of the President and Congress in preserving order and protecting life and property in our new possessions?

It is a strange contention that as soon as the treaty went into effect the power of the President and Congress to preserve order in the new possessions ceased. There were no grand juries, no petit juries, no machinery for punishing crime by the processes of the Anglo-Saxon law; and yet, according to the contention of the other side, if all the limitations of the Constitution apply everywhere throughout the scope of its authority, crime could be punished in no other way. The Constitution which gave the United States power to acquire territory by treaty and imposed upon Congress the duty of disposing of and governing it, did not leave the National Government helpless by demanding impossibilities. Until the progress of the people of the newly acquired territory will permit of the organization of courts and juries after our system, these guarantees must be held inoperative, or the preservation of peace and order, and the protection of life and property under the civil government be abandoned. The situation resembles that discussed in the case of *In re Ross*, 140 U. S. 453, which I commend to opposing counsel, who contend that everywhere throughout the scope of authority of the United States under the Constitution, all limitations apply. In that case, a conviction of murder by a consular court in Japan, acting under an act of Congress, and therefore under authority of the Constitution, without a jury, and upon information, was sustained. Mr. Justice Field said, respecting these guarantees of an indictment and trial by jury in criminal cases (p. 464): " And, besides, their enforcement abroad in numerous places, where it would be highly important to have consuls invested with judicial authority, would be impracticable from the impossibility of obtaining a competent grand or petit jury. The requirement of such a body to accuse and to try an offender would, in a majority of cases, cause an abandonment of all prosecution."

Having discussed the general question, I pass to the consideration of the Porto Rican act. This act provides that on and after a certain date the duties imposed by the Dingley law on goods brought into the United States shall be levied and col-

lected on all articles imported into Porto Rico from ports other than those of the United States, with three exceptions :

A duty of 5 cents a pound is levied on coffee. This is in order to protect the coffee industries there against the cheap coffee of South America.

Spanish scientific, literary, and artistic works are to be admitted free of duty for ten years. This is to carry out the provision of the treaty.

American publications are placed upon the same footing with Spanish.

Now, of course, these duties are not involved in this case, but as a temporary measure to provide revenue for Porto Rico until a system of local taxation could be framed by a provisional government—a local government created by the act—it was provided that, upon all goods coming into Porto Rico from the United States and coming into the United States from Porto Rico, a duty equivalent to 15 per cent of the duties levied by the Dingley law should be imposed. In addition, on goods brought into the United States from Porto Rico which had been manufactured in Porto Rico, the internal revenue tax imposed by the laws of the United States on similar articles manufactured here should be imposed ; and on articles manufactured in the United States and taken into Porto Rico, the internal revenue tax which might be imposed there upon similar goods should be collected. This internal revenue tax is to be levied and collected by the imposition of stamps under regulations to be promulgated by the Commissioner of Internal Revenue. The revenues collected from this tax are to be applied for the use and benefit of Porto Rico. It was also provided, as I have indicated, that just as soon as the legislative assembly of Porto Rico, created by this act, should put in operation a system of taxation sufficient to meet the local needs, and the President should make proclamation of that fact, all tariff duties on goods coming into Porto Rico from the United States and coming into the United States from Porto Rico should cease. And it further provided that in no event shall any duties be collected after the 1st day of March, 1902, on merchandise

and articles going into Porto Rico from the United States or coming into the United States from Porto Rico.

I have in my brief, on page 74 and the succeeding pages, quoted from a speech of Senator Foraker, who had charge of the bill in the Senate, in which he stated with clearness the situation in Porto Rico which led to the enactment of the measure, and epitomizes its provisions. In this he says : "The committee found upon investigation that a civil government should be at once established in Porto Rico, and found that this government would require for its support not less than about $3,000,000 annually. They also found that an additional million dollars would be required to support the municipal governments of the island, making an aggregate of not less than $4,000,000."

They found that the total valuation of property of all kinds situated in the island would not exceed for taxation purposes $100,000,000. They found that this property was already burdened with a private debt, evidenced by mortgages on record, to the amount of about $26,000,000 of principal, with an accumulation of several years' interest, at extravagant rates, which swelled the sum to probably $30,000,000.

The committee further found that no system of property taxation was in force in the island, or ever had been, and that it would require at least a year, and probably two years, to inaugurate one and secure returns from it, and that, inasmuch as the people had no familiarity with such a system, it would be difficult, probably, to enforce it, at least for a time.

The committee also found that the public revenues of the island, except only such as were raised by a burdensome excise tax on incomes and business vocations, had always been chiefly received from duties on imports and exports—a system with which the people were therefore familiar.

The committee further found that this system was already in operation, and that revenues were then constantly being collected, upon which, so far as they went, the Government could at once depend.

The committee further found that our internal revenue law,

if applied in that island, would prove oppressive and ruinous to many people and interests.

To collect our heavy internal revenue taxes—far heavier than Spain ever imposed—on these products and vocations would be to invite violations of law so innumerable as to make prosecutions impossible, and to almost certainly alienate and destroy the friendship and good will of that people for the United States.

Now, it was in view of those considerations, and in order to find some way to exempt the people of Porto Rico both from the direct taxation of their property—such taxation as is imposed in every State and organized Territory of the United States—and also from the onerous burdens of an immediate application of our internal revenue laws, that this temporary system of taxing the exports from the island and the imports into the island was framed and put in operation. Manifestly, by the passage of the Porto Rican act, not only because of these temporary fiscal provisions, but also because of other provisions to which I call attention in my brief, Congress did not intend to recognize or treat the island as a part of the United States, but as a possession thereof, with a political existence under the sovereignty, but outside of the limits, of the United States, legislatively treated. The inhabitants are made citizens of Porto Rico, and as such entitled to the protection of the United States. A temporary civil government is provided, with a revenue system quite separate and distinct from that of the United States. The duties provided by the act, both on goods coming into the United States from Porto Rico and coming into Porto Rico from the United States, "shall be used for the government and benefit of Porto Rico." The taxation, therefore, is of a purely local nature. It cannot be said that the revenues derived from these duties were to be used "to pay the debts and provide for the common defence and welfare of the United States."

These duties are not laid by Congress under the general grant of the taxing power contained in the first clause of section 8 of article I, but under the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. The fact that the limita-

tion in the first clause of section 8 of article I, and indeed the provisions of that clause generally, only apply to taxes which are levied to pay the debts and provide for the common defence and general welfare of the United States, is supported by what Mr. Justice Miller says in his work on the Constitution, page 230, and what Chief Justice Marshall says in *Gibbons* v. *Ogden*, 9 Wheaton, 199. In that case, with reference to the taxing power, Chief Justice Marshall says: " Congress is authorized to lay and collect taxes, etc., to pay the debts, and provide for the common defence and general welfare of the United States. This does not interfere with the power of the States to tax for the support of their own governments; nor is the exercise of that power by the States an exercise of any portion of the power granted to the United States."

But if the contention of the other side is correct, and because the duties on exports from Porto Rico into the United States are collected in this country, although the proceeds are applied for the benefit of the Porto Rican governments, if because of the collection here this clause applies, and these duties must be uniform throughout the United States, then my answer is that they are uniform throughout the United States, being uniformly collected in the ports of every State into which goods may be brought from Porto Rico.

Now, Congress has determined that this temporary local revenue measure is for the welfare of Porto Rico, and I submit that that determination is conclusive, unless there is some other limitation or prohibition which prevents. The only other provision suggested as applicable is that which provides " that no tax or duty shall be laid on articles exported from any State." The only goods which could possibly be regarded as articles exported from any State are the goods which are imported into Porto Rico from the United States. But these goods are not exports from any State. They are imports into Porto Rico. A duty laid on exports is a duty laid upon the goods at the time they are shipped abroad, and because of that fact. When goods are received at the port of destination, they cease to be exports and become imports, and a tax then laid upon them because of their importation is not a tax upon exports, but a duty upon imports.

Whether the tax shall be considered as a tax upon exports or as a duty upon imports may depend upon the application of the revenue collected.   In this case the revenue is all to be applied for the benefit of Porto Rico.   The revenue collected in Porto Rico on what the other side claim are exports from the United States, is applied to the use of Porto Rico, and I say that fact is sufficient, in testing these two views, to determine that the goods are to be regarded as imports into Porto Rico.

MR. JUSTICE HARLAN. As far as the question of power is concerned, it would be the same, would it or not, if the duties collected upon Porto Rican products were paid into the Treasury of the United States and remained here?

MR. SOLICITOR GENERAL. I think it makes a material difference as to whether the revenue is to be paid to the United States or Porto Rico.

MR. JUSTICE HARLAN. As to the question of power?

Mr. SOLICITOR GENERAL. As to the authority to levy this particular duty.

MR. JUSTICE HARLAN. I do not say it does not.   I want to get your views.

MR. SOLICITOR GENERAL. I contend that this is, in a sense, a local revenue measure.   It is not a case where Congress exercises the Federal power of taxation to raise revenue to pay the debts and to provide for the general welfare and the common defence, under that section of the Constitution, but it is a measure providing local revenue for Porto Rico, under the provision which authorizes Congress to pass all needful rules and regulations for Porto Rico.   And what I am inquiring now is whether there is any other provision of the Constitution, any other limitation, which prevents.

MR. JUSTICE BREWER. Under that power, would it be competent for Congress to pass an act requiring a duty to be paid on all goods shipped from the other States into New Mexico, for the support of New Mexico?

MR. SOLICITOR GENERAL. New Mexico might be placed, as I take it, by Congress, if Congress saw fit, in the exact position of Porto Rico.   I think logically I would have to so contend. Alaska might, if circumstances demanded, be placed in the exact

position of Porto Rico. I believe Congress has full power over them, subject, however, I should say, to certain provisions which protect citizens of the United States in the enjoyment of certain rights. Now, whether the vested rights and privileges which follow citizenship would prevent what you suggest, I confess I am not able at once to state. I believe that Congress could sell Alaska if it saw fit. I think that so long as territory remains under the plenary power marked out in the Constitution, it is for Congress to say whether that territory shall be taken into the Union as a State, and so indissolubly become a part of the United States, or whether the general welfare would be better subserved by parting with the territory, making, at the same time, due provision for safeguarding all rights of citizenship, and all rights of property belonging to citizens of the United States residing there.

MR. JUSTICE BREWER. Does not the effect of that argument come to this, that the uniformity clause of the Constitution in respect of duties, etc., applies solely to the States?

MR. SOLICITOR GENERAL. The uniformity clause does, I insist, apply solely to the States, unless Congress has seen fit to provide otherwise.

MR.. JUSTICE BREWER. Unless Congress has extended the power?

MR. SOLICITOR GENERAL. Yes, unless Congress has enlarged the boundaries of the United States—I mean within the meaning of the taxing laws.

MR. JUSTICE BREWER. If it enlarges, it can restrict?

MR. SOLICITOR GEMERAL. Certainly, unless vested rights intervene to prevent.

MR. JUSTICE WHITE. You say Congress would have the right in your judgment to dispose of Arizona and New Mexico, provided it made provision in the treaty to protect the rights of citizenship, and so on?

MR. SOLICITOR GENERAL. Yes.

MR. JUSTICE WHITE. But how would those rights of citizenship come into being and require protection, unless Arizona, for instance, has become a part of the United States and citizenship has resulted?

MR. SOLICITOR GENERAL. Congress has entire authority over the matter of naturalization, and it may naturalize not only by a law applying uniformly, but collectively, by special acts, and it has done so. It has naturalized Indians who lived in the Indian Territory, although the Indian Territory has not been regarded as a part of the United States in the imposition of our excise taxes. Many instances of collective naturalization might be given. And so I say, that if we have conferred citizenship, why, then, in disposing of territory that belongs to the United States, but has not become an inseparable part of the Union, doubtless the treaty-making power or Congress would provide for the safeguarding and protection of all personal and property rights flowing from citizenship in such territory.

I believe that the Government can dispose of the Philippines if it deems best to do so. The power that can acquire, can sell or exchange. I do not occupy the position from which the other side cannot escape, that the cession made the Philippines an integral part of the United States, inseparably incorporated under the Constitution, and with rights unalterably fixed by the Constitution. I believe they are but a possession—territory belonging to the United States—which we can part with whenever it becomes apparent that their interests or our welfare demands a separation.

It may be further suggested that within the decision of *Woodruff* v. *Parham*, 8 Wallace, 123, the goods shipped into Porto Rico from the United States are not exports from the States, because not shipped to a foreign country. The commerce, I take it, between Porto Rico and the United States since the passage of the Porto Rican act is not foreign commerce, but domestic commerce. It is commerce passing between countries under the sovereignty of the United States, commerce which is regulated by Congress, possibly under the power to regulate commerce either among the several States or with foreign nations—I say possibly, having in mind the opinion in the case of *Stoutenburgh* v. *Hennick*, 129 U. S. 141, in which the court held that the action of the local authorities of the District of Columbia in taxing a commercial traveler was in violation of the commerce clause—or under the power, as I have said, to make all need-

ful rules and regulations respecting the territory or other property belonging to the United States.

I submit that the authority to regulate these insular possessions includes authority to regulate their commerce, both with foreign countries and with the United States. Commerce is always a rightful subject of regulation by a governing body. It is true that the Constitution places certain limitations upon the power of Congress to regulate the commerce of the States. While Congress is given express power to regulate commerce with the foreign nations, and among the several States and with the Indian tribes, it is provided that no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another. But obviously this Porto Rican act gives no preference to the ports of one State over those of another. All States are treated alike. Goods going into Porto Rico pay a certain duty there, no matter from what State or port shipped; and goods coming into the United States from Porto Rico pay a certain duty here, no matter to what port or State shipped. It is true that the Constitution declares that the citizens of each State are entitled to all the privileges and immunities of citizens of the several States. That is what I referred to a moment ago in answering the question of Mr. Justice Brewer with reference to Arizona; but I fail to see in what way the rights of a citizen of any State can be infringed by the Porto Rican act. All citizens are treated alike.

MR. JUSTICE HARLAN. Suppose they are not treated alike. Suppose this act had given a preference to the commerce coming to this country to the ports of one State over the ports of another. Under your view, what clause of the Constitution would forbid Congress from doing that?

MR. SOLICITOR GENERAL. The very clause I have read.

MR. JUSTICE HARLAN. You call that a regulation of commerce, do you?

Mr. SOLICITOR GENERAL. I do, most emphatically. But the clause applies also to any " regulation of revenue." Moreover, no privilege or immunity granted to the people of Porto Rico by the treaty of Paris is infringed by this legislation, for the treaty itself expressly provided that their civil rights and polit-

ical *status* should be determined by Congress; and Congress has declined to make them citizens of the United States, restricting their *status* to citizens of Porto Rico, entitled to the protection of the United States. As such, Congress has framed a measure peculiarly adapted to raise the insular revenues in the easiest way, thus avoiding the imposition upon them of burdens which would become intolerable if our internal revenue taxes were extended to them.

Before the adoption of the Constitution—and I will now direct myself, possibly, to something that is in the mind of Mr. Justice Harlan—the States had severally the power to lay duties and imposts on imports and exports, and they exercised it. The Constitution forbade the further exercise of this power without the consent of Congress and unless the net proceeds of all duties and imposts so laid should be applied for the use of the Treasury of the United States, the clause reading as follows:

" No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of the Congress."

" Now, this seeming prohibition—I should not say seeming— this prohibition, is equivalent to an implied grant of authority to a State, or a recognition of authority existing in a State, to lay imposts or duties on imports or exports, providing Congress shall consent, and upon the condition that the net produce of such duties shall be for the use of the Treasury of the United States. And it is a recognition of the fact that the needs of both a State and of the United States might be promoted by special duties on the imports or exports of a State. The condition thus recognized and provided for in the case of a State has, in this particular instance, been legislated for by Congress, which possesses both state and Federal jurisdiction in the case of Porto Rico. I might say in this connection, respecting the levying of duties by a State on imports with the consent of

Congress, that the same limitation and grant applies in the case of tonnage duties, and that the legislative history of the country shows that Congress has given its consent to a great many measures where a State levied duties, either on tonnage or on imports. With reference to tonnage duties, Chief Justice Marshall said (9 Wheaton, 202): "A duty on tonnage is as much a tax, as a duty on imports or exports; and the reason which induced the prohibition of those taxes extends to this also. This tax may be imposed by a State, with the consent of Congress."

I have here a list of thirty acts, passed from 1790 to 1847, in which the assent of Congress was given to the acts of States levying duties on imports or tonnage for harbor improvements or other local purposes.

It may be insisted that the constitutional provision which requires all duties, imposts, and excises to be uniform throughout the United States lays down a fundamental rule of taxation applicable everywhere; that no special mode of taxation, to meet the needs of a particular territory, can be framed by Congress, but that all duties and excises must be laid uniformly throughout all the territory over which the sovereignty of the United States extends. With respect to this, I beg to say that there was a good reason for requiring duties and excises to be uniform throughout the States of the Union, and that reason is stated clearly in the opinion of the court in *Knowlton* v. *Moore*. But there is neither reason nor justice in requiring the same taxes to be imposed wherever the flag flies. The collection of our internal revenue taxes is impossible and impracticable in Porto Rico and the Philippines. They were framed to meet conditions here; they would be ruinous there. We are not engaged at present in collecting taxes in Porto Rico for the benefit of the United States. The only taxes collected are used for the benefit of Porto Rico. Of course Porto Rico receives the benefit of the general revenues to a certain degree, for the General Government is there with its agencies supported at the general expense, and it would be only fair, if Porto Rico could stand it, to make her bear her fair share of the national burdens in return for the benefits she receives. But, after all, the entire

matter is left with Congress, and the uniform imposition in Porto Rico of the national system of taxation would not relieve the island from the necessity of responding to further exactions, should Congress deem them necessary in order to meet the local expenses of the government of the island. Congress possesses over Porto Rico, to use the language of Mr. Justice Gray in *Shively* v: *Bowlby*, "the entire dominion and sovereignty, national and municipal, Federal and state." What good purpose could be served, then, by attempting to apply in Porto Rico the provision that Federal taxes shall be uniform throughout the States. It is all right to require Federal taxes to be uniform throughout the States. This secures a uniform contribution from the States for a uniform benefit. Only the national taxes are raised in the States by the Federal authority. The States raise their own state, county, and municipal taxes. They regulate these to suit themselves. Congress has no say about them. But in Porto Rico Congress has power to raise not merely national but all insular revenues, everything needed to carry on the local government. It is not necessary, as I understand it, that in raising taxes for a Territory Congress should distinguish between the purposes to which the taxes are to be applied and levy specific taxes for national purposes and other taxes for other purposes. Especially is this true before a territorial government has been organized and has established and put in operation a system of local taxation. Congress may and must necessarily combine the sources of revenue and apply the proceeds as the circumstances require. The power and the necessity of doing this prevents any just comparison between the revenue system established by Congress in a Territory and that in force for purely Federal purposes in the States.

Respecting the territorial governments, with their courts and laws, Mr. Justice Nelson, speaking for the court, said in *Benner* v. *Porter*, 9 How. 242: "They are legislative governments, and their courts legislative courts, Congress, in the exercise of its powers in the organization and government of the Territories, combining the powers of both the Federal and state authorities. There is but one system of government, or of laws

operating within their limits, as neither is subject to the constitutional provisions in respect to state and Federal jurisdiction."

With regard to the matter of taxation in Porto Rico, it is quite pertinent to put the question which Mr. Justice Harlan, speaking for the court, put in the case of *McAllister* v. *United States*, 141 U. S. 190, respecting the power of Congress over the courts of a Territory:

" Has Congress, under ' the general right of sovereignty ' existing in the Government of the United States as to all matters committed to its exclusive control, including the making of needful rules and regulations respecting the Territories of the United States, any less power over the judges of the Territories than a State, if unrestricted by its own organic law, might exercise over judges of its own creation ? "

In other words, to paraphrase this, has Congress, under " the general right of sovereignty " existing in the Government of the United States as to all matters committed to its exclusive control, including the making of needful rules and regulations respecting the Territories of the United States, any less power in raising territorial revenue than a State, if unrestrained by its own organic law, might exercise in raising revenue within its borders?

In the argument of counsel on the other side, reference was made to the ordinance of 1787, as showing that the term "the United States" includes the territory belonging to the United States. Counsel called attention to the fact that in the treaty between this country and Great Britain the description of the United States included the vast expanse outside of the limits of the thirteen Colonies, but claimed by them as the successors of the royal power, stretching into the great West, and insisted that that constituted the United States. I think a careful reading of the ordinance of 1787 and the history of the release by the Colonies, which composed the United States under the Confederation, of their claims to the territory covered by the ordinance of 1787 shows conclusively that a distinction was drawn between the United States under the Confederation and the territory belonging to them which lay northwest of the Ohio. The ordinance itself says that it is an ordinance " for the gov-

ernment of the territory of the United States northwest of the Ohio River." This territory had been ceded by certain of the Colonies—Virginia, New York and others—who claimed it, to the United States, because the Colonies properly claimed that unless they succeeded in the war with Great Britain the title would amount to nothing. It was being won by the blood and treasure of all, and therefore should belong to all, and the Colonies conceded this to be a fact, and therefore turned over their title and claim to the United States. And then this ordinance for the government of the territory was passed, and it says it is an ordinance for the government of the territory of the United States northwest of the Ohio River.

With respect to members of the general assembly it provides that no person shall be eligible unless he shall have been "a citizen of one of the United States three years." Did that mean a citizen of the Northwest Territory? Evidently not, because it goes on to provide, "and be a resident in the district, or unless he shall have resided in the district three years." In other words, a citizen of one of the United States was eligible if he resided in the district, while a person not a citizen of one of the United States must have resided in the district three years to be eligible.

"For extending the fundamental principles of civil and religious liberty, which form the basis whereon these republics, their laws and constitutions, are erected," it was provided and declared that certain articles should be considered "as articles of compact" between the original States (that is, the United States under the Confederation) "and the people and States in the said territory, and forever remain unalterable, unless by common consent." Here is a distinct recognition that the Northwest Territory was not a part of the United States. The ordinance forms a compact between the United States under the Confederation and the people and States to be formed in the Northwest Territory.

In the fourth article it is provided that the navigable waters leading into the Mississippi and St. Lawrence, etc., shall be common highways, and forever free, "as well to the inhabitants of the said Territory as to the citizens of the United States, and

those of any other States that may be admitted into the Confederacy."

As I have sat and listened to these elaborate arguments, whereby counsel, ignoring the plain and simple provisions of the Constitution, seek, by a refinement of reasoning, to induce this court to take away from the President and Congress the power to govern newly acquired territory according to its nature and needs—a power which has been exercised, from the days of the founders of the Republic, by the nation which then, to use the words of the Declaration, assumed, "among the powers of the earth, the separate and *equal* station to which the laws of nature and of nature's God entitled it," I cannot but recall the impressive language of the great Chief Justice Marshall, at the close of the remarkable opinion which he delivered in the case of *Gibbons* v. *Ogden:*

"Powerful and ingenious minds, taking, as postulates, that the powers expressly granted to the Government of the Union, are to be contracted by construction, into the narrowest possible compass, . . . may, by a course of well-digested but refined and metaphysical reasoning, founded on these premises, explain away the Constitution of our country, and leave it, a magnificent structure, indeed, to look at, but totally unfit for use. They may so entangle and perplex the understanding, as to obscure principles, which were before thought quite plain, and induce doubts where, if the mind were to pursue its own course, none would be perceived."

We have the new territories. We are responsible for them, responsible to their people, to ourselves, to the world. We must provide them a government. May we not give them a government adopted to their needs? May we not in governing them carry out the solemn stipulations of the treaty through which we acquired sovereignty over them? The path of duty is plain. May we not walk in it? Does the Constitution prevent? Is the Constitution a stumbling block, or a trap, caught in which we shall excite the pity of our friends and the derision of our foes? I refuse to believe so. The Constitution is no mere declaration of denials. It created a nation to which was intrusted the full power asserted in the Declaration of Inde-

pendence—" to levy war, conclude peace, contract alliances, establish commerce, and to do all other acts and things which independent States may of right do." When it conferred power, it took care not to cripple action. It still remains the most perfect instrument ever struck off at a given time by the brain and purpose of man, under which we are armed for every emergency, and able to cope with every condition.

MR. JUSTICE BROWN delivered the opinion of the court.

This case raises the single question whether territory acquired by the United States by cession from a foreign power remains a "foreign country" within the meaning of the tariff laws.

1. Did the question of jurisdiction raised by the demurrer involve only the jurisdiction of the Circuit Court as a Federal court, we should be obliged to say that the defendant was not in a position to make this claim, since the case was removed to the Federal court upon his own petition. It is no infringment upon the ancient maxim of the law that consent cannot confer jurisdiction, to hold that, where a party has procured the removal of a cause from a state court upon the ground that he is lawfully entitled to a trial in a Federal court, he is estopped to deny that such removal was lawful, if the Federal court could take jurisdiction of the case or that the Federal court did not have the same right to pass upon the questions at issue that the state court would have had, if the cause had remained there. Defendant neither gains nor loses by the removal, and the case proceeds as if no such removal had taken place. *Cowley* v. *Northern Pacific Railroad Co.*, 159 U. S. 569, 583 ; *Mansfield Railway Co.* v. *Swan*, 111 U. S. 379 ; *Mexican Nat. Railroad* v. *Davidson*, 157 U. S. 201.

This, however, is more a matter of words than of substance, as the defendant unquestionably has the right to show that the state court had no jurisdiction, or that the complaint did not set forth facts sufficient to constitute a cause of action. This we understand to be the substance of the defence in this connection.

By Rev. Stat. sec. 2931, it was enacted that the decision of

the collector "as to the rate and amount of duties" to be paid upon imported merchandise should be final and conclusive, unless the owner or agent entered a protest, and within thirty days appealed therefrom to the Secretary of the Treasury; and, further, that the decision of the Secretary should be final and conclusive, unless suit were brought within ninety days after the decision of the Secretary. By Rev. Stat. sec. 3011, any person having made payment under such protest was given the right to bring an action at law and recover back any excess of duties so paid.

The law stood in this condition until June 10, 1890, when an act known as the Customs Administrative Act was passed, 26 Stat. 131, c. 407, by which the above sections Rev. Stat. secs. 2931, 3011, were repealed and new regulations established, by which an appeal was given from the decision of the collector "as to the rate and amount of the duties chargeable upon imported merchandise," if such duties were paid under protest, to a Board of General Appraisers, whose decision should be final and conclusive (sec. 14) "as to the construction of the law and the facts respecting the classification of such merchandise and the rate of duties imposed thereon under such classification," unless within thirty days one of the parties applied to the Circuit Court of the United States for a review of the questions of law and fact involved in such decision. Sec. 15. It was further provided that the decision of such court should be final, unless the court were of opinion that the question involved was of such importance as to require a review by this court, which was given power to affirm, modify or reverse the decision of the Circuit Court.

The effect of the Customs Administrative Act was considered by this court in *In re Fassett, Petitioner,* 142 U. S. 479, in which we held that the decision of the collector that a yacht was an imported article might be reviewed upon a libel for possession filed by the owner, notwithstanding the Customs Administrative Act. It was held that the review of the decision of the Board of General Appraisers, provided for by section fifteen of that act, was limited to decisions of the board "as to the construction of the law and the facts respecting the classi-

fication " of imported merchandise " and the rate of duties imposed thereon under such classification," and that it did not bring up for review the question whether an article be imported merchandise or not, nor, under section fifteen, is the ascertainment of that fact such a decision as is provided for. Said Mr. Justice Blatchford : " Nor can the court of review pass upon any question which the collector had not original authority to determine. The collector has no authority to make any determination regarding any article which is not imported merchandise ; and if the vessel in question here is not imported merchandise, the court of review would have no jurisdiction to determine any matter regarding that question, and could not determine the very fact which is in issue under the libel in the District Court, on which the rights of the libellant depend."

" Under the Customs Administrative Act, the libellant, in order to have the benefit of the proceedings thereunder, must concede that the vessel is imported merchandise, which is the very question put in contention under the libel, and must make entry of her as imported merchandise, with an invoice and consular certificate to that effect." It was held that the libel was properly filed.

The question involved in this case is not whether the sugars were importable articles under the tariff laws, but whether, coming as they did from a port alleged to be domestic, they were imported from a foreign country—in other words, whether they were *imported* at all as that word is defined in *Woodruff* v. *Parham*, 8 Wall. 123, 132. We think the decision in the *Fassett* case is conclusive to the effect that, if the question be whether the sugars were imported or not, such question could not be raised before the Board of General Appraisers ; and that whether they were imported merchandise for the reasons given in the *Fassett* case that a vessel is not an importable article, or because the merchandise was not brought from a foreign country, is immaterial. In either case the article is not *imported*.

Conceding then that section 3011 has been repealed, and that no remedy exists under the Customs Administrative Act, does it follow that no action whatever will lie ? If there be an ad-

mitted wrong, the courts will look far to supply an adequate remedy. If an action lay at common law the repeal of sections 2931 and 3011, regulating proceedings in customs cases, (that is, turning upon the classification of merchandise,) to make way for another proceeding before the Board of General Appraisers in the same class of cases, did not destroy any right of action that might have existed as to other than customs cases; and the fact that by section 25 no collector shall be liable " for or on account of any rulings or decisions as to the classification of such merchandise or the duties charged thereon, or the collection of any dues, charges or duties on or on account of any such merchandise," or any other matter which the importer might have brought before the Board of General Appraisers, does not restrict the right which the owner of the merchandise might have against the collector in cases not falling within the Customs Administrative Act. If the position of the Government be correct, the plaintiff would be remediless; and if a collector should seize and hold for duties goods brought from New Orleans, or any other concededly domestic port, to New York, there would be no method of testing his right to make such seizure. It is hardly possible that the owner could be placed in this position. But we are not without authority upon this point.

The case of *Elliott* v. *Swartwout*, 10 Pet. 137, 154, was an action of assumpsit against the collector of the port of New York to recover certain duties upon goods alleged to have been improperly classified. It was held that as the payment was purely voluntary, by a mutual mistake of law, no action would lie to recover them back, although it would have been different if they had been paid under protest. Said Mr. Justice Thompson: " Here, then, is the true distinction: when the money is paid voluntarily and by mistake to the agent, and he has paid it over to his principal, he cannot be made personally responsible; but if, before paying it over, he is apprised of the mistake, and required not to pay it over, he is personally liable." If the payment of the money be accompanied by a notice to the collector that the duties charged are too high, and that the person paying intends to sue to recover back the amount erro-

neously paid, it was held that such action must lie " unless the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him, but that recourse must be had to the Government for redress." The case recognized the fact that, with respect to money paid under a mistake of law, the collector stood in the position of an ordinary agent and could be made personally liable in case the money were paid under protest.

This decision was made in 1836. Apparently in consequence of it an act was passed in 1839 requiring moneys collected for duties to be deposited to the credit of the Treasurer of the United States; and it was made the duty of the Secretary of the Treasury to draw his warrant upon the Treasurer in case he found more money had been paid to the collector than the law required. It was held by a majority of this court in *Cary* v. *Curtis*, 3 How. 236, that this act precluded an action of assumpsit for money had and received against the collector for duties received by him, and that the act of 1839 furnished the sole remedy. It was said of that case in *Arnson* v. *Murphy*, 109 U. S. 238, 240 : " Congress, being in session at the time that the decision was announced, passed the explanatory act of February 26, 1845, which, by legislative construction of the act of 1839, restored to the claimant his right of action against the collector, but required the protest to be made in writing at the time of payment of the duties alleged to have been illegally exacted, and took from the Secretary of the Treasury the authority to refund conferred by the act of 1839.  5 Stat. 349, 727. This act of 1845 was in force, as was decided in *Barney* v. *Watson*, 92 U. S. 449, until repealed by implication by the act of June 30, 1864," c. 171, 13 Stat. 202, 214, carried into the Revised Statutes as sections 2931 and 3011.  In the same case of *Arnson* v. *Murphy*, 109 U. S. 238, it was decided that the common-law right of action against the collector to recover back duties illegally collected was taken away by statute, and a remedy given, based upon these sections, which was exclusive. The decision in *Elliott* v. *Swartwout* was recognized, but so far as respected *customs cases* (*i. e.*, classification cases) was held to be superseded by the statutes.  So in *Schoenfeld* v. *Hendricks*, 152

U. S. 691, it was held that an action could not be maintained against the collector, either at common law or under the statutes, to recover duties alleged to have been exacted, in 1892, upon an importation of merchandise, the remedy given through the Board of General Appraisers being exclusive.

The criticism to be made upon the applicability of these cases is, that they dealt only with *imported* merchandise and with the duties collected thereon, and have no reference whatever to exactions made by a collector, under color of the revenue laws, upon goods which have never been imported at all. With respect to these the collector stands as if, under color of his office, he had seized a ship or its equipment, or any other article not comprehended within the scope of the tariff laws. Had the sugars involved in this case been admittedly imported, that is, brought into New York from a confessedly foreign country, and the question had arisen whether they were dutiable, or belonged to the free list, the case would have fallen within the Customs Administrative Act, since it would have turned upon a question of classification.

The fact that the collector may have deposited the money in the Treasury is no bar to a judgment against him, since Rev. Stat. sec. 989 provides that, in case of a recovery of any money exacted by him and paid into the Treasury, if the court certifies that there was probable cause for the act done, no execution shall issue against him, but the amount of the judgment shall be paid out of the proper appropriation from the Treasury.

We are not impressed by the argument that, if the plaintiffs insisted that these sugars were not imported merchandise, they should have stood upon their rights, refused to enter the goods, and brought an action of replevin to recover their possession. It is true that, to prevent the seizure of the sugars, plaintiffs did enter them as imported merchandise; but any admission derivable from that fact is explained by their protest against the exaction of duties upon them as such. They waived nothing by taking this course. The collector lost nothing, since he was apprised of the course they would probably take. It is true that in the *Fassett Case,* 142 U. S. 479, the proceeding was

by libel for possession of the vessel, which is analogous to an action of replevin at common law; but it would appear that Rev. Stat. sec. 934 would stand in the way of such a remedy here, since by that section "all property taken or detained by any officer or other person under authority of any revenue law of the United States shall be irrepleviable, and shall be deemed to be in the custody of the law and subject only to the orders and decrees of the courts of the United States having jurisdiction thereof." If the words "under authority of any revenue law" are to be construed as if they read "under color of any revenue law," it would seem that these sugars could not be made the subject of a replevin; but even conceding that replevin would lie, we consider it merely a choice of remedies, and that the plaintiffs were at liberty to waive the tort and proceed in assumpsit.

We are all of opinion that this action was properly brought.

2. Whether these cargoes of sugar were subject to duty depends solely upon the question whether Porto Rico was a "foreign country" at the time the sugars were shipped, since the tariff act of July 24, 1897, c. 11, 30 Stat. 151, commonly known as the Dingley act, declares that "there shall be levied, collected and paid upon all articles imported from foreign countries" certain duties therein specified. A foreign country was defined by Mr. Chief Justice Marshall and Mr. Justice Story to be one exclusively within the sovereignty of a foreign nation, and without the sovereignty of the United States. *The Boat Eliza,* 2 Gall. 4; *Taber* v. *United States,* 1 Story, 1; *The Ship Adventure,* 1 Brock. 235, 241.

The *status* of Porto Rico was this: The island had been for some months under military occupation by the United States as a conquered country, when, by the second article of the treaty of peace between the United States and Spain, signed December 10, 1898, and ratified April 11, 1899, Spain ceded to the United States the island of Porto Rico, which has ever since remained in our possession, and has been governed and administered by us. If the case depended solely upon these facts, and the question were broadly presented whether a country which had been ceded to us, the cession accepted, possession delivered,

and the island occupied and administered without interference by Spain or any other power, was a foreign country or domestic territory, it would seem that there could be as little hesitation in answering this question as there would be in determining the ownership of a house deeded in fee simple to a purchaser, who had accepted the deed, gone into possession, paid taxes and made improvements without let or hindrance from his vendor. But it is earnestly insisted by the Government that it never could have been the intention of Congress to admit Porto Rico into a customs union with the United States, and that, while the island may be to a certain extent domestic territory, it still remains a "foreign country" under the tariff laws, until Congress has embraced it within the general revenue system.

We shall consider this subject more at length hereafter, but for the present call attention to certain cases in this court and certain regulations of the executive departments which are supposed to favor this contention.

In *United States* v. *Rice,* 4 Wheat. 246, which was an action of debt brought by the United States upon a bond for duties upon goods imported into Castine, in the district (now State) of Maine, during its temporary occupation by the British troops in the war of 1812, it was held the action would not lie, though Castine was subsequently evacuated by the enemy and restored to the United States. The court said that, by the military occupation of Castine, the enemy acquired a possession which enabled him to exercise the fullest rights of sovereignty; that the sovereignty of the United States was suspended, and our laws could be no longer rightfully enforced there, or be obligatory upon the inhabitants; that by the surrender the inhabitants passed under a temporary allegiance to the British government, and were only bound by the laws of that government, and that Castine was during this period to be deemed a foreign port; that goods brought there were subject to duties which the British government chose to impose, and were in no correct sense imported into the United States; and that the subsequent evacuation by the enemy did not change the character of the transaction, since the goods were not liable to American duties when imported. In that case the character of the port, as foreign or

domestic, was held to depend upon the question of actual occupation, and the right of the defendant determinable by the facts then existing, and further, that the subsequent reoccupation of the port by the United States was ineffectual to change the right of the defendant or to vest a new right in the United States.

A case, somewhat to the converse of this, was that of *Fleming* v. *Page*, 9 How. 603, which was an action against the collector at Philadelphia, to recover back duties upon merchandise imported from Tampico, in Mexico, during a temporary military occupation of that place by the United States. It was held that, although Tampico was within the military occupation of the United States, it had not ceased to be a foreign country, in the sense in which these words are used in the acts of Congress. In delivering the opinion of the court, Mr. Chief Justice Taney observed: "The United States, it is true, may extend its boundaries by conquest or treaty, and may demand the cession of territory as the condition of peace, in order to indemnify its citizens for the injuries they have suffered, or to reimburse the government for the expenses of the war. But this can be done only by the treaty-making power or the legislative authority, and is not a part of the power conferred upon the President by the declaration of war. . . . While it was occupied by our troops, they were in an enemy's country, and not in their own ; the inhabitants were still foreigners and enemies, and owed to the United States nothing more than a submission and obedience, sometimes called temporary allegiance, which is due from a conquered enemy, when he surrenders to a force which he is unable to resist."

This was clearly a sufficient reason for disposing of the case adversely to the importer, but the learned Chief Justice proceeded to put the case upon another ground, that "there was no act of Congress establishing a custom house at Tampico, nor authorizing the appointment of a collector; and consequently there was no officer of the United States authorized by law to grant the clearance and authenticate the coasting manifest of the cargo in the manner directed by law, where the voyage is from one port of the United States to another;" that the only

collector was one appointed by the military commander, and that a coasting manifest granted by him could not be recognized in the United States as the document required by law, when the vessel is engaged in the coasting trade, nor exempt the cargo from the payment of duties. He states that this construction of the tariff laws had been uniformly given by the administrative department of the Government, and cited the case of Florida, after it had been ceded to the United States and the military forces had taken possession of Pensacola: "That is, that, although Florida had, by cession, actually become a part of the United States, and was in our possession, yet, under our revenue laws, its ports must be regarded as foreign until they were established as domestic, by acts of Congress. And it appears that this decision was sanctioned at the time by the Attorney General of the United States, the law officer of the Government. And, although not so directly applicable to the case before us, yet the decisions of the Treasury Department in relation to Amelia Island, and certain ports in Louisiana, after that province had been ceded to the United States, were both made upon the same grounds. And in the later case, after a custom house had been established by law, (2 Stat. 418,) at New Orleans, the collector at that place was instructed to regard as foreign ports Baton Rouge and other settlements still in the possession of Spain, whether on the Mississippi, Iberville, or the seacoast. The department, in no instance that we are aware of, since the establishment of the Government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress."

While we see no reason to doubt the conclusion of the court that the port of Tampico was still a foreign port, it is not perceived why the fact that there was no act of Congress establishing a custom house there or authorizing the appointment of a collector, should have prevented the collector appointed by the military commander from granting the usual documents required to be issued to a vessel engaged in the coasting trade. A collector, though appointed by a military commander, may be presumed to have the ordinary power of a collector under an

act of Congress, with authority to grant clearances to ports within the United States, though, of course, he would have no power to make a domestic port of what was in reality a foreign port.

It. is not intended to intimate that the cases of *United States* v. *Rice* and *Fleming* v. *Page* are not harmonious. In fact, they are perfectly consistent with each other. In the first case it was merely held that duties could not be collected upon goods brought into a domestic port during a temporary occupation by the enemy, though the enemy subsequently evacuated it; in the latter case, that the temporary military occupation by the United States of a foreign port did not make it a domestic port, and that goods imported into the United States from that port were still subject to duty. It would have been obviously unjust in the *Rice* case to impose a duty upon goods which might already have paid a duty to the British commander. It would have been equally unjust in the *Fleming* case to exempt the goods from duty by reason of our temporary occupation of the port without a formal cession of such port to the United States.

The next case is that of *Cross* v. *Harrison*, 16 How. 164. This was an action of assumpsit to recover back moneys paid to Harrison while acting as collector at the port of San Francisco for tonnage and duties upon merchandise imported from foreign countries into California between February 2, 1848,—the date of the treaty of peace between the United States and Mexico— and November 13, 1849, when the collector appointed by the President (according to an act of Congress passed March 3, 1849,) entered upon his duties. Plaintiffs insisted that, until such collector had been appointed, California was and continued to be after the date of the treaty a foreign territory, and hence that no duties were payable as upon an importation into the United States. The plaintiffs proceeded upon the theory, stated in the *dictum* in *Fleming* v. *Page*, that duties had never been held to accrue to the United States in her newly acquired territories until provision was made by act of Congress for their collection, and that the revenue laws had always been held to speak only as to the United States and its territories existing at the time when the several acts were passed. The collector had

been appointed by the military governor of California, and duties were assessed, after the treaty, according to the United States tariff act of 1846. In holding that these duties were properly assessed, Mr. Justice Wayne cited with apparent approval a despatch written by Mr. Buchanan, then Secretary of State, and a circular letter issued by the Secretary of the Treasury, Mr. Robert J. Walker, holding that from the necessities of the case the military government established in California did not cease to exist with the treaty of peace, but continued as a government *de facto* until Congress should provide a territorial government. "The great law of necessity," says Mr. Buchanan, "justifies this conclusion. The consent of the people is irresistibly inferred from the fact that no civilized community could possibly desire to abrogate an existing government, when the alternative presented would be to place themselves in a state of anarchy, beyond the protection of all laws, and reduce them to the unhappy necessity of submitting to the dominion of the strongest." These letters will be alluded to hereafter in treating of the action of the executive departments.

The court further held in this case that "after the ratification of the treaty, California became a part of the United States, or a ceded, conquered, territory;" that, "as there is nothing differently stipulated in the treaty with respect to commerce, it became instantly bound and privileged by the laws which Congress had passed to raise a revenue from duties on imports and tonnage;" that (p. 193) "the territory had been ceded as a conquest, and was to be preserved and governed as such until the sovereignty to which it had passed had legislated for it. That sovereignty was the United States, under the Constitution, by which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. . . . That the civil government of California, organized as it was from a right of conquest, did not cease or become defunct in consequence of the signature of the treaty, or from its ratification, . . . and that until Congress legislated for it, the duty upon foreign goods imported into San Francisco were legally demanded and lawfully received by Mr. Harrison."

To the objection that no collection districts had been established in California, and in apparent dissent from the views of the Chief Justice in *Fleming* v. *Page*, he added (p. 196): "It was urged that our revenue laws covered only so much of the territory of the United States as had been divided into collection districts, and that out of them no authority had been given to prevent the landing of foreign goods or to charge duties upon them, though such landing had been made within the territorial limits of the United States. To this it may be successfully replied, that collection districts and ports of entry are no more than designated localities within and at which Congress had extended a liberty of commerce in the United States, and that so much of its territory as was not within any collection district must be considered as having been withheld from that liberty. It is very well understood to be a part of the law of nations that each nation may designate, upon its own terms, the ports and places within its territory for foreign commerce, and that any attempt to introduce foreign goods elsewhere, within its jurisdiction, is a violation of its sovereignty. It is not necessary that such should be declared in terms, or by any decree or enactment, the expressed allowance being the limit of the liberty given to foreigners to trade with such nation."

The court also cited the cases of Louisiana and Florida, and seemed to take an entirely different view of the facts connected with the admission of those territories from what had been taken in *Fleming* v. *Page*. The opinion, which is quite a long one, establishes the three following propositions: (1) That under the war power the military governor of California was authorized to prescribe a scale of duties upon importations from foreign countries to San Francisco, and to collect the same through a collector appointed by himself, until the ratification of the treaty of peace. (2) That after such ratification duties were legally exacted under the tariff laws of the United States, which took effect immediately. (3) That the civil government established in California continued from the necessities of the case until Congress provided a territorial government.

It will be seen that the three propositions involve a recognition of the fact that California became domestic territory im-

mediately upon the ratification of the treaty, or, to speak more accurately, as soon as this was officially known in California. The doctrine that a port ceded to and occupied by us does not lose its foreign character until Congress has acted, and a collector is appointed, was distinctly repudiated with the apparent acquiescence of Chief Justice Taney, who wrote the opinion in *Fleming* v. *Page,* and still remained the Chief Justice of the court. The opinion does not involve directly the question at issue in this case: whether goods carried from a port in a ceded territory directly to New York are subject to duties, since the duties in *Cross* v. *Harrison* were exacted upon foreign goods imported into San Francisco as an American port; but it is impossible to escape the logical inference from that case that goods carried from San Francisco to New York after the ratification of the treaty would not be considered as imported from a foreign country.

The practice and rulings of the executive departments with respect to the *status* of newly acquired territories, prior to such *status* being settled by acts of Congress, is, with a single exception, strictly in line with the decision of this court in *Cross* v. *Harrison, supra.* The only possessions in connection with which the question has arisen are Louisiana, Florida, Texas, California and Alaska. We take these up in their order.

LOUISIANA: By treaty between France and Spain, October 1, 1800, 8 Stat. 202, His Catholic Majesty promised to cede to the French Republic the colony or province of Louisiana; and by treaty between the United States and the French Republic of April 30, 1803, France ceded to the United States, "forever and in full sovereignty, the said territory with all its rights and appurtenances," with a provision, (Art. 3,) "that the inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution." This treaty was ratified October 21, 1803. Possession of the territory was not delivered by Spain to France until November 30, 1803, and by France to the United States, December 20, 1803. In the meantime, and on October 31, 1803, Congress authorized the President to take possession of the territory, and to administer it

until Congress had further acted upon the subject. 2 Stat. 245. On February 24, 1804, Congress passed another act, 2 Stat. 251, taking Louisiana within the Customs Union, and repealing certain special laws laying duties upon goods imported from that territory into the United States. This act was to take effect March 25, 1804. We are then concerned only with the interval between December 20, 1803, when possession was delivered to the United States, and March 25, 1804, when the act of February 24 took effect.

In a letter to President Jefferson of July 9, 1803, Mr. Gallatin, then Secretary of the Treasury, expressed the opinion that all the duties on exports, now payable at New Orleans by Spanish laws, should cease, and all articles the growth of Louisiana, which, when imported into the United States, now pay duty, should continue to pay the same, or at least such rates as would on the whole not affect the revenue. Writings of Gallatin, vol. 1, p. 127.

The instructions of the Treasury Department with respect to this interval are contained in a letter by Mr. Gallatin to Governor Claiborne, who was about to start for his post as governor of the new province, under date of October 3, 1803, in which he says: "It is understood that the existing duties on imports and exports, which by the Spanish law are now levied within the province, will continue until Congress shall have otherwise provided." On November 14, 1803, Mr. Gallatin issued an order directed to Mr. Trist, who had been designated as collector of the port of New Orleans, as follows: "You will also be pleased to observe, first, that the taxes and the duties to be collected under your direction are precisely the same which by the existing laws and regulations of Louisiana were demandable under the Spanish government at the time of taking possession. . . . 10. That until otherwise provided for, the same duties are to be collected on the importation of goods in the Mississippi district, from New Orleans and *vice versa*, as heretofore."

On February 28, 1804, Mr. Gallatin issued a circular letter notifying the collectors of the passage of the act of February 24, and that the same would go into effect March 25, and "that by the third section of said act so much of any law or laws impos-

ing duties on the importations into the United States of goods, wares and merchandise from New Orleans, which is the only port of entry in said territories, has been repealed."

These instructions undoubtedly show that Mr. Gallatin treated New Orleans as a foreign port until Congress, by the act of February 24, 1804, admitted it within the Customs Union, and, so far, is an authority in favor of the position taken by the collector in this case. But it should be borne in mind in this connection, that his instructions to collect duties levied by the *Spanish law* upon foreign importations into New Orleans, is manifestly inconsistent with the position subsequently taken by this court in *Cross* v. *Harrison, supra,* wherein it is said (p. 189) of the action of Mr. Harrison in California: "That war tariff, however, was abandoned as soon as the military governor had received from Washington information of the exchange and ratification of the treaty with Mexico, and duties were afterwards levied in conformity with such as Congress had imposed upon foreign merchandise imported into other ports of the United States, Upper California having been ceded by the treaty to the United States." After saying that this action had been recognized by the President, Mr. Justice Wayne adds: "We think it was a rightful and correct recognition under all the circumstances, and when we say rightful we mean that it was constitutional, although Congress had not passed an act to extend the collection of tonnage and import duties to the ports of California." Indeed, it is quite evident from this case that the court took an entirely different view of the relations of California to the Union from that which had been taken by Mr. Gallatin as to Louisiana in his instructions to the collector of New Orleans.

FLORIDA: Florida was ceded by Spain to the United States by treaty signed February 22, 1819, but not ratified until October 29, 1820. 8 Stat. 252. By act of March 3, 1821, 3 Stat. 637, Congress authorized the President to take possession of the Floridas and extend thereto the revenue laws of the United States. Possession of East Florida was not delivered until July 10, 1821; nor of West Florida until July 17. It is true that certain ports of Florida were in the military occupation of the United States prior to the actual delivery of possession by

Spain, but the cession did not take effect until there had been a voluntary and complete delivery under the treaty. As the act extending the revenue laws to the Floridas was passed before the surrender of the province to the United States, there was no interval of time upon which the Treasury Department could act, the provinces, immediately upon the surrender, becoming subject to the act of March 3, 1821.

An opinion of Mr. Wirt, then Attorney General, of August 20, 1821, in the case of *The Olive Branch*, 1 Ops. Atty. Gen. 314, 483, is instructive in this connection as illustrating the views of the administration. After stating that possession of East Florida was not delivered until July 17, (a mistake for July 10,) he held that the cargo of the Olive Branch, which had cleared from the port of St. Augustine, July 14, was imported into Philadelphia from a foreign port or place, and consequently subject to duty, because possession had not been delivered, citing the case of *The Fama*, 5 Ch. Rob. 97, and adding: "On the other hand, I apprehend that goods imported into a port of Florida before the delivery, remaining in port on shipboard until after the delivery, and then brought into the United States in the same vessel, or by transhipment into others, having never been entered in the Spanish customs houses, nor landed, nor the duties thereon paid or secured, but having continued all the while water-borne, would be subject to our revenue laws. . . . Our laws impose duties only on goods imported into the United States from some foreign port or place. If, therefore, in the case put, the importation be, in contemplation of law, an importation from the Floridas, the case is not within our laws; because at the time of the importation the Floridas were not foreign ports or places." The learned Attorney General evidently took the view that the Floridas ceased to be a foreign country upon a delivery of possession under the treaty. In a subsequent letter of January 24, 1823, 5 Ops. Atty. Gen. 748, Mr. Wirt admits that he had been misled by the newspapers in the belief that East Florida had been surrendered prior to July 14, on which day the Olive Branch left St. Augustine, and recommended that the case be sent to the President, as it seemed to involve a dispute with Great Britain.

TEXAS: On March 1, 1845, Congress adopted a joint resolution consenting to the annexation of Texas upon certain conditions, 5 Stat. 797, but it was not until December 25, 1845, that it was formally admitted as a State. 9 Stat. 108. In this interval, and on July 29, 1845, the Secretary of the Treasury issued a circular letter directing the collectors to collect duties upon all imports from Texas into the United States until Congress had further acted. Of course, there could be no question that Texas remained a foreign state until December 25, when she was formally admitted. The circular, therefore, is of no pertinence to the question here involved.

CALIFORNIA : California was ceded by Mexico to the United States by treaty signed February 2, 1848, ratifications of which were exchanged May 30, 1848, and proclamation made July 4. 9 Stat. 922. On March 3, 1849, an act was passed, 9 Stat. 400, including San Francisco within one of the collection districts, and on November 13 the collector appointed by the President entered upon his duties. California had been in our military possession since August, 1847. There was therefore an interval of one year and nine months between the date of the treaty, February 3, 1848, and November 13, 1849, when the collector entered upon his duties.

On October 7, 1848, Mr. Buchanan, then Secretary of State, addressed a letter to Mr. Vorhies, already referred to, in which he states that, although the military government ceased to exist with the conclusion of the treaty of peace, it would continue with the presumed consent of the people until Congress should provide for them a territorial government, and then adds : " This government *de facto* will, of course, exercise no power inconsistent with the provisions of the Constitution of the United States, which is the supreme law of the land. For this reason no import duties can be levied in California on articles of growth, produce or manufacture of the United States, as no such duties can be imposed in any other port of our Union on the productions of California. Nor can new duties be charged in California upon such foreign productions as have already paid duties in any of our ports of entry, for the obvious reason that California is within the territory of the United

States. I shall not enlarge upon this subject, however, as the Secretary of the Treasury will perform that duty." Ex. Docs. 2d Sess. 30th Cong. vol. 1, p. 47.

Mr. Walker, then Secretary of the Treasury, did perform that duty in a circular letter of the same date to the collectors, in which he instructed the collectors as follows: "First, All articles of the growth, produce or manufacture of California, shipped therefrom at any time since the 30th day of May last," (the date when the ratifications were exchanged), "are entitled to admission free of duty into all the ports of the United States; and, second, all articles of the growth, produce or manufacture of the United States are entitled to admission free of duty into California, as are also all foreign goods which are exempt from duty by the laws of Congress, or on which goods the duties prescribed by those laws have been paid to any collector of the United States previous to their introduction into California." Ibid. p. 45. He adds that foreign goods imported into California, not paying duties there, will be subject to duty if shipped thence to any port or place in the United States. In a letter from Mr. Marcy, Secretary of War, to Colonel Mason, the military commander, of October 9, 1848, he uses the same language.

These letters are cited with approval by this court in *Cross* v. *Harrison*, 16 How. 184, and although the question there related only to duties on goods imported from foreign countries, the tenor of the opinion, as already stated, is a virtual indorsement of the position taken by the executive departments. It is evident that the administration took an entirely different view of the law from what had been taken by Mr. Gallatin in his instructions regarding Louisiana, and established a practice which has never since been departed from, of treating territory ceded to the United States and occupied by its troops as being domestic and not foreign territory.

This correspondence with reference to California took place in 1848. The decision in *Fleming* v. *Page*, 9 How. 603, was pronounced in 1850, yet as appears from the list of documents submitted by Mr. Johnson upon the argument of that case, (p. 611,) the attention of the court was not called to these instructions, though other letters and circulars were introduced

bearing date of 1846 and 1847, as well as the treaty of peace of February 2, 1848. Had the correspondence above cited been laid before the court it is incredible that the Chief Justice should have said " that the department in no instance that we are aware of, since the establishment of the government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress."

ALASKA : This territory was ceded to us by Russia by treaty ratified June 20, 1867, 15 Stat. 539, and possession was delivered to us at the same time. No act of Congress extending the revenue laws to Alaska and erecting a collection district was passed until July 27, 1868. 15 Stat. 240, c. 273. A period of thirteen months then elapsed before Alaska was formally recognized by Congress as within the Customs Union, yet during that period goods from Alaska were, under a decision of the Secretary of the Treasury, admitted free of duty. By letter of Mr. McCullough, then Secretary of the Treasury, to the collector of the port of New York, dated April 6, 1868, he acknowledges receipt of a request from the Russian Minister for the free entry of certain oil shipped from Sitka to San Francisco and reshipped to New York. He states : " The request for the free entry of said oil was made on the ground that the oil was shipped from Sitka after the ratification of the treaty, by which the territory of Alaska became the property of the United States. The treaty in question was ratified on the 20th of June, 1867, and the collector at San Francisco has reported that the manifest of the vessel shows the oil to have been shipped from Alaska on the 6th day of July, 1867, and that the shipment consisted of fifty-two packages. Under these circumstances you are hereby authorized to admit the said fifty-two packages of oil free of duty."

This position was indorsed by the Secretary of State, Mr. Seward, in a letter dated January 30, 1869, in which he said : " I understand the decision of the Supreme Court in the case of *Harrison* v. *Cross*, 16 How. 164, to declare its opinion that, upon the addition to the United States of new territory by conquest and cession, the acts regulating foreign commerce attach

to and take effect within such territory *ipso facto,* and without any fresh act of legislation expressly giving such extension to the preëxisting laws. I can see no reason for a discrimination in this effect between acts regulating foreign commerce and the laws regulating intercourse with the Indian tribes."

As showing the construction put upon this question by the legislative department, we need only to add that sec. 2 of the Foraker act makes a distinction between foreign countries and Porto Rico, by enacting that the same duties shall be paid upon " all articles imported into Porto Rico from ports other than those of the United States, which are required by law to be collected upon articles imported into the United States from foreign countries."

From this *résumé* of the decisions of this court, the instructions of the executive departments, and the above act of Congress, it is evident that, from 1803, the date of Mr. Gallatin's letter, to the present time, there is not a shred of authority, except the *dictum* in *Fleming* v. *Page,* (practically overruled in *Cross* v. *Harrison,*) for holding that a district ceded to and in the possession of the United States remains for any purpose a foreign country. Both these conditions must exist to produce a change of nationality for revenue purposes. Possession is not alone sufficient, as was held in *Fleming* v. *Page;* nor is a treaty ceding such territory sufficient without a surrender of possession. *Keene* v. *McDonough,* 8 Pet. 308 ; *Pollard's Heirs* v. *Kibbe,* 14 Pet. 353, 406 ; *Hallett* v. *Hunt,* 7 Ala. 882, 899 ; *The Fama,* 5 Ch. Rob. 97. The practice of the executive departments, thus continued for more than half a century, is entitled to great weight, and should not be disregarded nor overturned except for cogent reasons, and unless it be clear that such construction be erroneous. *United States* v. *Johnston,* 124 U. S. 236, and other cases cited.

But were this presented as an original question we should be impelled irresistibly to the same conclusion.

By Article II, section 2, of the Constitution, the President is given power, " by and with the advice and consent of the Senate, to make treaties, provided that two-thirds of the senators present concur ;" and by Art. VI, " this Constitution and the laws

of the United States, which shall be made in pursuance thereof; and all treaties made or which shall be made, under the authority of the United States, shall be the supreme law of the land." It will be observed that no distinction is made as to the question of supremacy between laws and treaties, except that both are controlled by the Constitution. A law requires the assent of both houses of Congress, and, except in certain specified cases, the signature of the President. A treaty is negotiated and made by the President, with the concurrence of two thirds of the Senators present, but each of them is the supreme law of the land.

As was said by Chief Justice Marshall in *The Peggy*, 1 Cranch, 103, 110 : " Where a treaty is the law of the land, and as such affects the rights of parties litigating in court, that treaty as much binds those rights, and is as much to be regarded by the court as an act of Congress." And in *Foster* v. *Neilson*, 2 Pet. 253, 314, he repeated this in substance : " Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision." So in *Whitney* v. *Robertson*, 124 U. S. 190 : " By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either ; but if the two are inconsistent, the one last in date will control the other, provided always that the stipulation of the treaty on the subject is self-executing." To the same effect are the *Cherokee Tobacco*, 11 Wall. 616, and the *Head Money Cases*, 112 U. S. 580.

One of the ordinary incidents of a treaty is the cession of territory. It is not too much to say it is the rule, rather than the exception, that a treaty of peace, following upon a war, provides for a cession of territory to the victorious party. It was said by Chief Justice Marshall in *American Ins. Co.* v. *Canter*, 1 Pet. 511, 542 : "The Constitution confers absolutely upon the Gov-

ernment of the Union the powers of making war and of making treaties ; consequently that Government possesses the power of acquiring territory, either by conquest or by treaty." The territory thus acquired is acquired as absolutely as if the annexation were made, as in the case of Texas and Hawaii, by an act of Congress.

It follows from this that by the ratification of the treaty of Paris the island became territory of the United States—although not an organized territory in the technical sense of the word.

It is true Mr. Chief Justice Taney held in *Scott* v. *Sandford,* 19 How. 393, that the territorial clause of the Constitution was confined, and intended to be confined, to the territory which at that time belonged to or was claimed by the United States, and was within their boundaries, as settled by the treaty with Great Britain ; and was not intended to apply to territory subsequently acquired. He seemed to differ in this construction from Chief Justice Marshall in the *American &c. Ins. Co.* v. *Canter,* 1 Pet. 511, 542, who, in speaking of Florida before it became a State, remarked that it continued to be a Territory of the United States, governed by the territorial clause of the Constitution.

But whatever be the source of this power, its uninterrupted exercise by Congress for a century, and the repeated declarations of this court, have settled the law that the right to acquire territory involves the right to govern and dispose of it. That was stated by Chief Justice Taney in the *Dred Scott* case. In the more recent case of *National Bank* v. *County of Yankton,* 101 U. S. 129, it was said by Mr. Chief Justice Waite that Congress " has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments. It may do for the Territories what the people, under the Constitution of the United States, may do for the States." Indeed, it is scarcely too much to say that there has not been a session of Congress since the Territory of Louisiana was purchased, that that body has not enacted legislation based upon the assumed authority to govern and control the Territories. It is an authority which arises, not necessarily from the territorial clause of the Constitution, but from the necessities of the case, and from the inability of the States to act upon the

subject. Under this power Congress may deal with territory acquired by treaty; may administer its government as it does that of the District of Columbia; it may organize a local territorial government; it may admit it as a State upon an equality with other States; it may sell its public lands to individual citizens or may donate them as homesteads to actual settlers. In short, when once acquired by treaty, it belongs to the United States, and is subject to the disposition of Congress.

Territory thus acquired can remain a foreign country under the tariff laws only upon one of two theories: either that the word "foreign" applies to such countries as were foreign at the time the statute was enacted, notwithstanding any subsequent change in their condition, or that they remain foreign under the tariff laws until Congress has formally embraced them within the customs union of the States. The first theory is obviously untenable. While a statute is presumed to speak from the time of its enactment, it embraces all such persons or things as subsequently fall within its scope, and ceases to apply to such as thereafter fall without its scope. Thus, a statute forbidding the sale of liquors to minors applies not only to minors in existence at the time the statute was enacted, but to all who are subsequently born; and ceases to apply to such as thereafter reach their majority. So, when the Constitution of the United States declares in Art. I, sec. 10, that the States shall not do certain things, this declaration operates not only upon the thirteen original States, but upon all who subsequently become such; and when Congress places certain restrictions upon the powers of a territorial legislature, such restrictions cease to operate the moment such Territory is admitted as a State. By parity of reasoning a country ceases to be foreign the instant it becomes domestic. So, too, if Congress saw fit to cede one of its newly acquired territories (even assuming that it had the right to do so) to a foreign power, there could be no doubt that from the day of such cession and the delivery of possession, such territory would become a foreign country, and be reinstated as such under the tariff laws. Certainly no act of Congress would be necessary in such case to declare that the laws of the United States had ceased to apply to it.

The theory that a country remains foreign with respect to the tariff laws until Congress has acted by embracing it within the Customs Union, presupposes that a country may be domestic for one purpose and foreign for another. It may undoubtedly become necessary for the adequate administration of a domestic territory to pass a special act providing the proper machinery and officers, as the President would have no authority, except under the war power, to administer it himself; but no act is necessary to make it domestic territory if once it has been ceded to the United States. We express no opinion as to whether Congress is bound to appropriate the money to pay for it. This has been much discussed by writers upon constitutional law, but it is not necessary to consider it in this case, as Congress made prompt appropriation of the money stipulated in the treaty. This theory also presupposes that territory may be held indefinitely by the United States; that it may be treated in every particular, except for tariff purposes, as domestic territory; that laws may be enacted and enforced by officers of the United States sent there for that purpose; that insurrections may be suppressed, wars carried on, revenues collected, taxes imposed; in short, that everything may be done which a government can do within its own boundaries, and yet that the territory may still remain a foreign country. That this state of things may continue for years, for a century even, but that until Congress enacts otherwise, it still remains a foreign country. To hold that this can be done as matter of law we deem to be pure judicial legislation. We find no warrant for it in the Constitution or in the powers conferred upon this court. It is true the nonaction of Congress may occasion a temporary inconvenience; but it does not follow that courts of justice are authorized to remedy it by inverting the ordinary meaning of words.

If an act of Congress be necessary to convert a foreign country into domestic territory, the question at once suggests itself, what is the character of the legislation demanded for this purpose? Will an act appropriating money for its purchase be sufficient? Apparently not. Will an act appropriating the duties collected upon imports to and from such country for the benefit of its government be sufficient? Apparently not. Will

acts making appropriations for its postal service, for the establishment of lighthouses, for the maintenance of quarantine stations, for erecting public buildings, have that effect? Will an act establishing a complete local government, but with the reservation of a right to collect duties upon commerce, be adequate for that purpose? None of these, nor all together, will be sufficient, if the contention of the Government be sound, since acts embracing all these provisions have been passed in connection with Porto Rico, and it is insisted that it is still a foreign country within the meaning of the tariff laws. We are unable to acquiesce in this assumption that a territory may be at the same time both foreign and domestic.

A single further point remains to be considered : It is insisted that an act of Congress, passed March 24, 1900, c. 339, 31 Stat. 151, applying for the benefit of Porto Rico the amount of the customs revenue received on importations by the United States from Porto Rico since the evacuation of Porto Rico by the Spanish forces, October 18, 1898, to January 1, 1900, together with any further customs revenues collected on importations from Porto Rico since January 1, 1900, or that shall hereafter be collected under existing law, is a recognition by Congress of the right to collect such duties as upon importations from a foreign country, and a recognition of the fact that Porto Rico continued to be a foreign country until Congress embraced it within the Customs Union. It may be seriously questioned whether this is anything more than a recognition of the fact that there were moneys in the Treasury not subject to existing appropriation laws. Perhaps we may go farther and say that, so far as these duties were paid voluntarily and without protest, the legality of the payment was intended to be recognized; but it can clearly have no retroactive effect as to moneys theretofore paid under protest, for which an action to recover back had already been brought. As the action in this case was brought March 13, 1900, eleven days before the act was passed, the right to recover the money sued for could not be taken away by a subsequent act of Congress. Plaintiffs sue in assumpsit for money which the collector has in his hands, justly and equitably belonging to them. To say that Congress could by a subsequent

act deprive them of the right to prosecute this action, would be beyond its power. In any event, it should not be interpreted so as to make it retroactive. *Kennett's Petition*, 24 N. H. 139; *Alter's Appeal*, 67 Penn. St. 341; *Norman* v. *Heist*, 5 W. & S. 171; *Donavan* v. *Pitcher*, 53 Ala. 411; *Palairet's Appeal*, 67 Penn. St. 479; *State* v. *Warren*, 28 Maryland, 338.

We are therefore of opinion that at the time these duties were levied Porto Rico was not a foreign country within the meaning of the tariff laws but a territory of the United States, that the duties were illegally exacted and that the plaintiffs are entitled to recover them back.

*The judgment of the Circuit Court for the Southern District of New York is therefore reversed and the case remanded to that court for further proceedings in consonance with this opinion.*

MR. JUSTICE McKENNA, (with whom concurred MR. JUSTICE SHIRAS and MR. JUSTICE WHITE,) dissenting.

MR. JUSTICE SHIRAS, MR. JUSTICE WHITE and myself are unable to concur in the conclusion of the court, and the importance of the case justifies an expression of the grounds of our dissent.

Settle whether Porto Rico is " foreign country " or " domestic territory," to use the antithesis of the opinion of the court, and, it is said, you settle the controversy in this litigation. But in what sense, foreign or domestic? Abstractly and unqualifiedly—to the full extent that those words imply—or limitedly, in the sense that the word foreign is used in the customs laws of the United States? If abstractly, the case turns upon a definition, and the issue becomes single and simple, presenting no difficulty, and yet the arguments at bar have ranged over all the powers of government, and this court divides in opinion. If at the time the duties, which are complained of, were levied, Porto Rico was as much a foreign country as it was before the war with Spain; if it was as much domestic territory as New York now is, there would be no serious controversy in the case. If the former, the terms and the intention of the Dingley act would apply. If the latter, whatever its words or

intention, it could not be applied. Between these extremes there are other relations, and that Porto Rico occupied one of them and its products hence were subject to duties under the Dingley Tariff act can be demonstrated. Indeed, we have the authority of a member of the majority of the court, and the organ of the court's opinion in this case, that even if Porto Rico were domestic territory, its products could be legally subjected to tariff duties. This principle is expressed by him in *Downes* v. *Bidwell.* The other members of the court, though agreeing with him in the case at bar, do not agree with him in *Downes* v. *Bidwell.* They assert that Porto Rico, being a territory of the United States, tariff duties on its products are inhibited by the Constitution of the United States. Their judgment and his only unite in the case at bar, and, we may assume, that the reasoning of the opinion just announced is the road which has brought them together, and, assuming further, that such reasoning is the best judicial support of the conclusion it is presented to establish, we address ourselves to the consideration of that reasoning.

(1) The statement of the opinion is that whether the cargoes of sugar were subject to duty depends solely upon the question whether Porto Rico was a foreign country at the time they were shipped, and a foreign country is defined to be, following Chief Justice Marshall, "'one exclusively within the sovereignty of a foreign nation' and without the sovereignty of the United States." This makes sovereignty the test and gives a rule as sure and exact in its application as it is clear and simple in its expression. There is no difficulty in applying it. Difficulty comes with attempts to limit it. The difference between our country and one not ours would seem to be of substance, not needing words to explain the difference, but defying words to confound it, and having the consequence of carrying, not only one law, but all laws. The court does not go so far, and why? Is there weakness in the logic or do its consequences repel? The argument of the court certainly proceeds as if the test is universal—illustrations are used to make it unmistakable.

Under the effect of the treaty of cession and our government of Porto Rico, it is said, if the question was broadly presented

whether it was "a foreign country or domestic territory," there would be as little hesitation in answering the question "as there would be in determining the ownership of a house deeded in fee simple to a purchaser, after he had gone into possession, paid taxes and made improvements, without let or hindrance, from his vendor." And we would have as little hesitation in applying all of the consequences and concomitants of ownership. But we do not care to join issue on an illustration, although it may suggest wrong principles. We submit that the administration of a government has more complexity—must consider more things—than the management of a piece of real estate. But even the conveyance of real estate may be conditional, all of the incidents of ownership not immediately. applying. However, we need not dwell on insufficient analogies. There are better ones. The history of our country has examples of the acquisition of foreign territory—examples of what relation such territory bears to the United States—authorities, executive, legislative and judicial, as to what was wise in statesmanship, as well as what was legal and constitutional, in withholding or extending, our laws to such territory; and finding these examples 'and authorities in the way the opinion of the court attempts to answer or distinguish or overrule them.

*United States* v. *Rice,* 4 Wheat. 246, is reviewed. In that case, Castine, a port of the United States, was in temporary occupation by the British during the war of 1812, and it was declared to be a foreign country within the meaning of our customs laws; as much, the court said by Mr. Justice Story, as if "Castine had been a foreign territory ceded by treaty to the United States, and the goods had been previously imported there." In other words, not a cession to another country, but the accidental occupation by the armed forces of another country made a port in the State of Maine foreign territory. The conclusion had the sanction of great names and the authority of this court. Temporary sovereignty, not permanent dominion, was seemingly made the test.

*Fleming* v. *Page,* 9 How. 603, is also reviewed. The case involved the legality of duties levied in Philadelphia upon goods imported from Tampico. Tampico was a port of Mexico, tem-

porarily occupied by the United States forces—the exact condition which, in the *Rice* case, made a port in one of the States of our Union English territory. Tampico was nevertheless held to be a foreign country within the meaning of our revenue laws. In other words, the military occupation and the sovereignty which attended it, which determined in the *Rice* case, was rejected in the *Fleming* case. There is apparent antagonism between the cases, and the court in the case at bar observe it. And strangely enough, that which is "somewhat of the converse" (to quote the court in the case at bar) of the *Rice* case is held sufficient for the judgment in the *Fleming* case, and other grounds of decision are declared to be *dicta*.

An attempt is made, however, to reconcile the cases, and we think they can be reconciled, but not upon the grounds stated by the court in the opinion in the case at bar. Harmony cannot be established between them by that which in the *Fleming* case is the converse of the *Rice* case, and by rejecting as *dicta* all other grounds as unnecessary to the judgment in the *Fleming* case. However, we will proceed to the consideration of the latter case.

Delivering the opinion of the court, Chief Justice Taney substantially said that the boundaries of our country could not be enlarged or diminished by the advance or retreat of armies, and based his opinion besides and the judgment of the case on the absence of an act of Congress establishing a custom house at Tampico, and authorizing the appointment of a collector, " and, consequently, there was no officer of the United States authorized by law to grant the clearance and authenticate the coasting manifest of the cargo, in the manner directed by law, where the voyage is from one port of the United States to another," and the necessity of a legal permit and coasting manifest was expressly asserted. He further said :

" This construction of the revenue laws has been uniformly given by the administrative department of the government in every case that has come before it. And it has, indeed, been given in cases where there appears to have been stronger ground for regarding the place of shipment as a domestic port. For after Florida had been ceded to the United States, and the forces

of the United States had taken possession of Pensacola, it was decided by the Treasury Department that goods imported from Pensacola before an act of Congress was passed erecting it into a collection district, and authorizing the appointment of a collector, were liable to duty. That is that although Florida had, by cession, actually become a part of the United States, and was in our possession, yet, under our revenue laws, its ports must be regarded as foreign until they were established as domestic, by act of Congress; and it appears that this decision was sanctioned at the time by the Attorney General of the United States, the law officer of the government. And although not so directly applicable to the case before us, yet the decisions of the Treasury Department in relation to Amelia Island, and certain ports in Louisiana, after that province had been ceded to the United States, were both made upon the same grounds. And in the latter case, after a custom house had been established by law at New Orleans, the collector at that place was instructed to regard as foreign ports Baton Rouge and other settlements still in the possession of Spain, whether on the Mississippi, Iberville, or the seacoast. The department in no instance that we are aware of since the establishment of the government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress."

The opinion in the case at bar disregards this reasoning and the conclusion from it, and says: "While we see no reason to doubt the conclusion of the court (in *Fleming* v. *Page*) that the port of Tampico was still a foreign port, it is not perceived why the fact that there was no act of Congress establishing a custom house there and authorizing the appointment of a collector should have prevented the collector appointed by the military commander from granting the usual documents required to be issued to the vessel engaged in the coasting trade." Such power, it was said, "a military commander may be presumed to have," but, "of course, he would have no power to make a domestic port of what was in reality a foreign port." But why did it remain a foreign port? Castine did not remain a domestic port. We, however, need not dwell any longer on this point

for, under the latest utterances of this court, the test of dominion breaks down. Cuba is under the dominion of the United States. We held in the *Neely Case*, 180 U. S. 109, that it is a foreign country.

We think that *Fleming* v. *Page* is disposed of too summarily by the majority in the case at bar, and we have shown that it is not antagonistic to the *Castine* case. Both cases recognized inevitable conditions. At Castine the instrumentalities of the custom laws had been divested; at Tampico they had not been invested, and hence the language of the court: "The department, in no instance that we are aware of, since the establishment of the government, has ever recognized a place in a newly acquired country as a domestic port, from which the coasting trade might be carried on, unless it had been previously made so by act of Congress."

We submit that the principle upon which *Fleming* v. *Page* was based is still a proper principle for judicial application. Does it not make government provident, not haphazard, ignoring circumstances and producing good or ill accidentally? Does it not leave to the executive and the legislative departments that which pertains to them? Did it not stand as a guide to the executive—a warrant of action, so far as action might affect private rights? Indeed, what is of greater concern—so far as action might affect great public interests? It should, we submit, be accepted as a precedent. It is wise in practice; considerate of what government must regard, and of the different functions of the executive, legislative and judicial departments and of their independence. Why should it then be discarded as *dictum?* If constancy of judicial decision is necessary to regulate the relations and property rights of individuals, is not constancy of decision the more necessary when it may influence or has influenced the action of a nation? If the other departments of the government must look to the judicial for light, that light should burn steadily. It should not, like the exhalations of a marsh, shine to mislead.

The case of *Cross* v. *Harrison*, 16 How. 164, is relied on especially. The curiosity of that case is that all parties cite it, and this court even finds it as convenient and as variously adapt-

ive.    It therefore challenges the application of the wise maxim
expressed by Chief Justice Marshall, " that general expressions
in every opinion are to be taken in connection with the case in
which those expressions are used."    And certainly to ascertain
the meaning of the court we must see what was before the court,
and interpret its opinion by that, and, if there is confusion in
its language, it may resolve itself into satisfactory meaning.

It is cited to sustain the proposition that immediately upon
the cession of territory it becomes a part of the United States,
"instantly bound and privileged by the laws which Congress
has passed to raise a revenue from duties on imports and ton-
nage."    This is the strongest expression of the case.    It is at-
tempted to be made its controlling one—the point decided.    It
was neither the point decided nor was it the controlling expres-
sion.    It was immediately accompanied by the qualification
"as there is nothing differently stipulated in the treaty in re-
spect to commerce."    The effect of the qualification the opinion
in the present case does not explicitly notice, and we shall at-
tempt to show with what meaning the expression was used, and
what was decided.

The case involved the legality of duties on imports into Cali-
fornia between the 3d of February, 1848, and the 13th of No-
vember, 1849.    The time was divided by the plaintiffs in the
case "into two portions," the court said, "to each of which
they supposed that different rules of law attached ;" and further,
that "the claim covered various amounts of money which were
paid at intervals between the 3d of February, 1848, and the
13th of November, 1849."    The first of those dates was that of
the treaty of peace between the United States and Mexico, and
the latter when Mr. Collier, a person who had been regularly
appointed collector at that port, entered upon the performance
of the duties of his office.    "During the whole of this period it
was alleged by the plaintiffs that there existed no legal authority
to receive or collect any duty whatever accruing upon goods im-
ported from foreign countries."

Meeting the contention and replying to it fully, the court held
that the duties were legally levied and collected during the whole
of the period—from the 3d of February, 1848, until some time

in the following fall under the war tariff instituted by Governor Mason; after that under the Walker tariff.. In other words, before and after cession, under the war tariff. Speaking of that tariff, the court said: "They (duties) were paid until some time in the fall of 1848, at the rate of the war tariff, which had been established early in the year before, by the direction of the President of the United States." And speaking of the action of Governor Mason, and the law which sanctioned it, it was further said:

"He may not have comprehended fully the principle applicable to what he might rightly do in such a case, but he felt rightly, and acted accordingly. He determined, in the absence of all instruction, to maintain the existing government. The territory had been ceded as a conquest, and was to be preserved and governed as such until the sovereignty to which it had passed had legislated for it. That sovereignty was the United States, under the Constitution, by which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with the power also to admit new States into this Union, with only such limitations as are expressed in the section in which this power is given. The government, of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent right over a conquered territory. It had been instituted during the war by the command of the President of the United States. It was the government when the territory was ceded as a conquest, and it did not cease, as a matter of course, or as a necessary consequence of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress could have put an end to it, but that was not done. The right inference from the inaction of both is that it was meant to be continued until it had been legislatively changed. No presumption of a contrary intention can be made. Whatever may have been the causes of delay, it must be presumed that the delay was consistent with the true policy of the government. And the more so, as it was continued until the people of the territory met in

convention to form a state government, which was subsequently recognized by Congress under its power to admit new States into the Union."

And further replying to the contention that there was neither treaty nor law permitting the collection of duties, "it having been shown that the ratification of the treaty made California a part of the United States, and that as soon as it became so the territory became subject to the acts which were in force to regulate foreign commerce with the United States, after those had ceased which had been instituted for its regulation as a belligerent right."

An important inquiry is, when did the laws cease "which had been instituted for the regulation of the territory as a belligerent right," and how did they cease? The answer is instant—they ceased when the President withdrew them and because he withdrew them. The laws of Congress did not instantly apply upon the cession. There was an interval of time, during which they did not apply, and if there can be such interval, who is to judge of what duration it shall be? Who can but the political department of the government, and how impracticable any other ruling would be. It is not for the judiciary to question it. It involves circumstances which the judiciary can take no account of or estimate. It is essentially a political function.

We have quoted largely from *Cross* v. *Harrison* because it is made the pivot of the opinion of the court in the present case, and we will recur to it again. But it should be said now that some of the expressions may be accounted for and understood by the state of precedent opinion.

It is a matter of some surprise that the only explicit provision of the Constitution of the United States in regard to the territory not embraced within the jurisdiction of a State is expressed in the following provision : "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States." What was meant by it, what its relation was to other provisions of the Constitution, was the subject of discussion. Gouveneur Morris, who wrote the provision, subsequently declared

that it was intended to confer power to govern acquisitions of territory as "provinces and allow them no voice in our councils." He admitted, however, that it was not expressed more pointedly in order to avert opposition. In his mind it certainly contemplated the government of after-acquired territory. In *Scott* v. *Sandford,* 19 How. 393, however, the provision was declared to be confined, and was intended to be confined, to the territory which at that time belonged to the United States. " It was a special provision for a known and particular territory, and to meet a present emergency, and nothing more." This conclusion was claimed to be established by the history of the times, " as well as the careful terms in which the article is framed." We will not stop to reconcile this conflict between him who wrote the provision and the court who interpreted it. The conflict was but an incident in the evolution of opinion. And there were other conflicts, or rather diversities of view, caused or encouraged by the silence of the Constitution. That instrument contained no provision for acquiring new territory. The power was derived from the powers of making war and of making peace, and might be accomplished by conquest or by treaty. There was a question, however, of the effect of an acquisition. It is certain that Mr. Jefferson doubted the power of incorporating new territory into the Union without an amendment to the Constitution, and the debates in Congress exhibit the diverse views held by public men on the relation which such territory would bear to the United States, the application of the laws to and the power of Congress over the acquired territory under the Constitution. We shall not stop to quote the debates. That will be done in a subsequent case, and the conclusion which they demonstrate expressed. It is only necessary for us to observe that distinctions always existed between territory which might be acquired (whether by purchase or by conquest) and that which was within the acknowledged limits of the United States, and also that which might be acquired by the establishment of a disputed line. These distinctions were conspicuous in the opinion of Mr. Justice Johnson, at circuit, in the case of *American Insurance Company* v. *Canter,* 1 Pet. 511. In that case the relation of Florida to the United States

was necessary to be considered, and of that relation the learned Justice said:

"It is obvious that there is a material distinction between the territory now under consideration and that which is acquired from the aborigines, (whether by purchase or conquest,) within the acknowledged limits of the United States, as also that which is acquired by the establishment of a disputed line. As to both these, there can be no question that the sovereignty of the State or territory within which it lies, and of the United States, immediately attach, producing a complete subjection to all the laws and institutions of the two governments, local and general, unless modified by treaty. The question now to be considered relates to territories previously subject to the acknowledged jurisdiction of another sovereign; such as was Florida to the crown of Spain. *And on this subject we have the most explicit proof that the understanding of our public functionaries is, that the government and laws of the United States do not extend to such territory by the mere act of cession.*" The italics are ours.

All the history and utterances of the past declare the same way.

And how important those utterances and decisive of the present controversy! They were not the utterances of inattention and ignorance, and therefore to be discarded. They were the utterances of men whose actions illustrated them. They were the utterances of men (to borrow the thought of Benton) whose sacrifices made the Constitution possible, whose genius conceived and wrote it. Shall it be said that the farther time separates us from them the better we understand them—better than they understood themselves?

*American Insurance Co.* v. *Canter* came to this court and was argued by Mr. Webster. We may quote what he said. His views were more than those of an advocate. He expressed them elsewhere when a different, if not higher, duty demanded reflection, consideration and sincerity. "What is Florida?" he asked. "It is no part of the United States. How can it be? How is it represented? Do the laws of the United States reach Florida? Not unless by particular provision." And, responding to the argument, the court decided through Chief Justice

JUSTICES MCKENNA, SHIRAS and WHITE, dissenting.

Marshall that the judicial power of the United States, as declared by the Constitution, did not extend to Florida, and the title to one hundred and fifty-six bales of cotton was held to pass by a sale under the order of a court, which consisted of a notary and five jurors, established by an act of the governor and council of Florida.

From the light of previous opinions the language of Mr. Justice Wayne, in *Cross* v. *Harrison*, receives explanation. The treaty with Mexico, following the war, defined the " boundaries of the United States," and made the reclaimed territory, which included California, a part of the United States. In other words, the acquisition (if it can be called such) of California was in recognition of boundaries, and hence the learned justice called it a part of the United States. But not uniformly. Mark this sentence: " But after the ratification of the treaty, California became a part of the United States or a ceded conquered territory." That his language marked a distinction there can be no doubt, but it was of no consequence to observe. The principle enforced did not need it. In either case the action of the president was the potent thing.

2. The line of judicial precedents relied upon in the opinion of the court in the case at bar ends with *Cross* v. *Harrison*, and the practice and rulings of the executive departments of the government are considered. They are said to be in accordance with the ruling ascribed to *Cross* v. *Harrison*, with but a single exception. If there is one legal exception the rule is gone. It is not a case where an exception can prove the rule; it is one where the exception destroys the rule. The exception was Louisiana. Between December 20, 1803, when possession was delivered to the United States, and March 25, 1804, when the act of February 24 became effective, Louisiana was treated as a foreign country under the customs laws; but this the court in the opinion just announced says " it is manifestly inconsistent with the position subsequently taken by this court in *Cross* v. *Harrison*, wherein it is said of the action of Mr. Harrison in California: ' That war tariff, however, was abandoned as soon as the military governor had received from Washington information of the exchange and ratification of the treaty with Mexico,

and duties were afterwards levied in conformity with such as Congress had imposed upon foreign merchandise imported into the other ports of the United States, Upper California having been ceded by the treaty to the United States. This last was done with the assent of the executive of the United States or without any interference to prevent it. Indeed, from the letter from the then Secretary of the Treasury, we cannot doubt that the action of the military governor of California was recognized as allowable and lawful by Mr. Polk and his cabinet.' After saying that, and this action having been recognized by the President, Mr. Justice Wayne adds: 'We think it was rightful and correct recognition under all circumstances; and when we say rightful we mean that it was constitutional, although Congress had not passed an act to extend the collection of tonnage and import duties to the ports of California.'"

If the laws of Congress instantly applied, why was the recognition of the President necessary? They could gain no legal efficacy from such recognition which they did not have without it, under the supposition that they applied on cession by their own force. Surely so obvious a consequence would have occurred to the court in *Cross* v. *Harrison*, and we cannot believe that the court used its language carelessly or uselessly. If the assent and recognition of the President were not necessary, why dwell upon them? Why so confuse the statement of a simple principle—simple in application and expression—and cast doubt upon it by unnecessary qualifications? The case, therefore, is not inconsistent with the ruling in regard to Louisiana. For a period of time, after the cession of Louisiana, President Jefferson treated it as foreign territory under the custom laws, and duties were levied upon its products, and no one disputed the legality of it. If the instance was not the same as in *Cross* v. *Harrison*, the principle was the same. There was not an immediate change upon the cession of either California or Louisiana. In California, duties were levied for a time under the war tariff, and afterwards under the act of Congress; and of the latter it was said: " This last was done either with the assent of the executive of the United States, or without any interference to prevent it." And this, it was further said, was " recognized as

allowable and lawful by Mr. Polk and his cabinet." We are disposed to ask again, was the language inadvertent? Did not the court use it with full consciousness of its meaning and its necessity? Was the court in confusion as to the principles which applied and jumbled them together without seeing or making a distinction between the force of the act of Congress of itself and the action of the President in giving it efficacy, the necessity of its being recognized as "allowable and lawful by Mr. Polk and his cabinet?" Surely not. Rights were involved which depended upon the legality of the war tariff both before and after cession, and that legality was intended to be and was passed upon and sustained. An automatic effect was not given to the act of Congress as it is given in the case at bar. The act was applied by the President—not in simple execution of it, but as giving it legal effect. And it was this that the court said "was a rightful and correct recognition under all the circumstances." "Rightful," because "it was constitutional, although Congress had not passed an act to extend the collection of tonnage and import duties to the ports of California." In other words, an act of Congress was not necessary to extend the collection of duties; the power of the President was sufficient, and of that power the court left no doubt. Speaking of the duties which were collected under the war tariff after the cession, it was observed, "but after the ratification of the treaty, California became a part of the United States, or a ceded, conquered territory. Our inquiry here is to be, whether or not the cession gave any right to the plaintiffs to have the duties restored to them, which they may have paid between the ratification, and exchange of the treaty and the notification of that fact by our government to the military governor of California. It was not received by him until two months after the ratification, and not then with any instructions or even remote intimation from the President that the civil and military government which had been instituted during the war was discontinued. Up to that time, whether such an intimation had or had not been given, duties had been collected under the war tariff, strictly in conformity with the instructions which had been received from Washington."

Comment would seem to be unnecessary to make this passage clear. If the act of Congress applied by cession, it applied immediately. It could not be delayed by taking time for notice. Besides, it would by its own force displace all other provisions, and would not need for operation upon rights or the creation of rights, that the President give instructions or intimations, near or remote, " that the civil and military government, which had been instituted during the war, was discontinued." But we need not comment further. We may use the language of the court in summarizing its conclusion :

" Our conclusion from what has been said is that the civil government of California, organized as it was from a right of conquest, did not cease or become defunct in consequence of the signature of the treaty or from its ratification. We think it was continued over a ceded conquest, without any violation of the Constitution or laws of the United States, and that until Congress legislated for it the duties upon foreign goods imported into San Francisco were legally demanded and lawfully received by Mr. Harrison, the collector of the port, who received his appointment, according to instructions from Washington, from Governor Mason."

This explicit statement, as well as the analysis and review which have first been made, leaves no ground to sustain the conclusion that *Cross* v. *Harrison* held that the tariff laws of the United States were immediately operative in California without regard to the exercise of the President's discretion putting them in force. But purely for argument sake we may concede the contrary. The decision must have been, in any conception, based on the provisions of the treaty with Mexico. The court said so. But the treaty with Spain, instead of providing for incorporating the ceded territory into the United States, as did the treaty with Mexico, expressly declares that the *status* of the ceded territory is to be determined by Congress. This difference in the treaties removes *Cross* v. *Harrison* as a factor in the judgment of the case at bar, supposing its interpretation, in the opinion we are reviewing, be correct.

3. The opinion of the court says: "On March 1, 1845, Congress adopted a joint resolution consenting to the annexation

of Texas upon certain conditions, 5 Stat. 797, but it was not until December 25, 1845, that it was formally admitted as a State. 9 Stat. 108. In this interval, and on July 29, 1845, the Secretary of the Treasury issued a circular letter directing the collectors to collect duties upon all imports from Texas into the United States until Congress had further acted. Of course, there could be no question that Texas remained a foreign state until December 25, when she was formally admitted. The circular, therefore, is of no pertinence to the question here involved." We think otherwise. Even after her admission as a State it was deemed necessary to extend the laws of the United States to her. 9 Stat. 1. She was an example, as Florida was, as to what Congress believed to be necessary, and Oregon and Alaska are like examples. The simple rule of the automatic action of the custom and revenue laws seemingly did not occur to anybody; not even as to incorporated territory nor to a new State formed from foreign territory. Nor, as we have seen, did such theory seem to be sustainable when Chief Justice Taney announced in *Fleming* v. *Page* a contrary conclusion.

4. But independent of precedent the court says it is "irresistibly impelled to the same conclusion." The argument is mainly based upon the treaty-making power invested in the President and Senate. A treaty made by that power is said to be the supreme law of the land—as efficacious as an act of Congress; and if subsequent to and inconsistent with an act of Congress, repeals it. This must be granted, and also that "one of the ordinary incidents of a treaty is the cession of territory," and that "the territory thus acquired is acquired as absolutely as if the annexation were made, as in the case of Texas and Hawaii, by an act of Congress." But to tell us of the sources of the treaty-making power and to define the extent of that power helps us very little to the solution of the present problem.

The question occurs, What has the treaty-making power done? Is the treaty with Spain inconsistent with the Dingley act, and was it intended to work the repeal of that act? That act when passed was undoubtedly intended to apply to products from Porto Rico, and, we suppose, it will not be contended in determining whether the treaty has rendered the act inoperative, the

terms of the treaty are not to be looked at? Assuredly the treaty cannot have an automatic force contrary to its terms. That is, it cannot be contended, that the automatic force of the treaty is greater than the force of the treaty itself.

This court said, speaking by Mr. Justice Brown, in *Holden* v. *Hardy*, 169 U. S. 366:

" In the future growth of the nation, as heretofore, it is not impossible that Congress may see fit to annex territories whose jurisprudence is that of the civil law. One of the considerations moving to such annexation might be the very fact that the territory so annexed should enter the Union with its traditions, laws and systems of administration unchanged. It would be a narrow construction of the Constitution to require them to abandon these, or to substitute for a system, which represents the growth of generations of inhabitants, a jurisprudence with which they had had no previous acquaintance or sympathy."

The statement being accepted, may not a fiscal system be as important as other matters of administration? May not a change of taxation, new burdens of taxation suddenly imposed, be worthy of consideration?

The opinion of the case at bar has not discussed the treaty. It takes it for granted that the cession of Porto Rico was absolute, and the conclusion that it is not a foreign country, within the meaning of the revenue laws, is deduced from that. But necessarily that depends upon the treaty, and interpretation is called for. The power of Congress over ceded territory is asserted in the opinion in somewhat absolute terms—it " involves the right to govern and dispose of it." This being so, it would seem to be certain that the treaty-making power would not forestall Congress or accept with the cession of territory the destruction of the fiscal and industrial policies of the country. We should hesitate to so pronounce for reasons which must occur to every one, except upon the compulsion of the clearest expression.

The opinion of the court further says " territory thus acquired (by treaty) can remain a foreign country under the tariff laws only on one of two theories: either that the word ' foreign ' applies to such countries as were foreign at the time the statute

was enacted, notwithstanding any change in their condition, or that they remain foreign under the tariff laws until Congress has formally embraced them within the customs union of the States." Both theories are rejected as untenable. The first because, " while a statute is presumed to speak from the time of its enactment, it embraces all such persons or things as subsequently fall within its scope." But what constitutes the scope of a statute—its letter inevitably, or may its spirit be regarded as interpreting and applying its letter ? In other words, shall the purpose of its enactment be executed or defeated ? There can be but one answer to these questions, nor can confidence in the answer be lessened by the analogies used by the court.

The law against selling liquors to minors, it is said, contemplates all minors—those existing and those which may come into being afterwards. Very true, but the purpose of the law is that. The same with territories (to use another illustration of the opinion) being bound as States when they come into the Union. But these illustrations assume that the territory referred to was incorporated by the treaty into the United States, an ever-recurring and misleading fallacy, in our judgment.

Let us, however, look at the argument under the wrong assumption of incorporation. The provisions of the Constitution for the admission of new States contemplate the consequences of statehood—contemplate territories ceasing to be bound as such and becoming bound as States. In other words, those provisions regard the future, and have their purpose fulfilled, not defeated, by territories becoming States. But a tariff law does not contemplate additions to or subtractions from itself. It may be said to be occasional. It regards certain conditions, and may be dependent upon them, whether it be enacted for revenue only or for protection and revenue. Its entire plan may be impaired or be destroyed by change in any part. The revenues of the government may be lessened, even taken away by change ; the industrial policy of the country may be destroyed by change. We are repelled by the argument which leads to such consequences, whether regarding our own country or the foreign country made " domestic." If " domestic " as to what comes from it, it is " domestic " as to what goes to it, and its custom laws as well

as our custom laws may be cast into confusion, and its business and affairs deranged before there is possibility of action.

As we have already said, to set the word foreign in antithesis to the word domestic proves nothing. Their opposition does not express the controversy. The controversy is narrower. It is whether a particular. tariff law applies. That, indeed, may be the consequence of the principle that all laws apply. Or that customs laws apply by reason of the provision of the Constitution which requires duties, imposts and excises to be uniform throughout the United States, and the treaty-making power cannot prevent the application of that provision. That principle is asserted by counsel and is very simple, but applied, as counsel apply it, is fraught with grave consequences. It takes this great country out of the world and shuts it up within itself. It binds and cripples the power to make war and peace. It may take away the fruits of victory, and, if we may contemplate the possibility of disaster, it may take away the means of mitigating that. All those great and necessary powers, are, as a consequence of the argument, limited by the necessity to make some impost or excise " uniform throughout the United States."

The treaty-making power is as much a constitutional power as the legislative or judicial powers. It is a supreme attribute of sovereignty, but often less determined in its exercise than others—more dependent on contingency, and may be less optional. It may precede war or follow war—command or be commanded by war. The kind or direction of its exercise cannot always be predicted or marked. There can be no verbal limitations upon it, and, wisely, none were attempted. Whatever restraints should be put upon it might have to yield to the greater restraints of life or death—not only material prosperity, but national existence. These, of course, are extreme contingencies, but they are not impossible, and are necessary to be regarded when limitations are urged which take no account of them. We do not mean to say that there are no limitations. They are certainly not those which counsel urge. Besides, the contention of counsel is answered by the *Canter* case. The difference between military occupation of a territory and its cession at the treaty of peace was noted. "If ceded by the treaty,"

the court said, " the acquisition is confirmed, and the ceded territory becomes a part of the nation to which it is annexed, either on the terms stipulated in the treaty of cession or such as its new master may impose." What is the significance of this? It would seem like useless language; its purpose often defeated if the Constitution and laws of the conqueror, and, to drop from the abstract and supposing this country the conqueror, if our Constitution and laws immediately apply on cession of territory. The terms which may be granted or received would be, to a certain and important extent, predetermined. Neither we nor the conquered nation would have any choice in the new situation—could make no accommodation to exigency, would stand bound in a helpless fatality. Whatever might be the interests, temporary or permanent, whatever might be the condition or fitness of the ceded territory, the effect on it or on us, the territory would become a part of the United States with all that implies. It is only true to say that counsel shrink somewhat from the consequences of their contention, or if " shrink " be too strong an expression, deny that it can be carried to the nationalization of uncivilized tribes. Whether that limitation can be logically justified we are not called upon to say. There may be no ready test of the civilized and uncivilized, between those who are capable of self-government and those who are not, available to the judiciary, or could be applied or enforced by the judiciary. Upon what degree of civilization could civil and political rights under the Constitution be awarded by courts? The question suggests the difficulties, and how essentially the whole matter is legislative, not judicial. Nor can those difficulties be put out of contemplation, under the assumption that the principles which we may declare will have no other consequence than to affect duties upon a cargo of sugar. We need not, however, dwell on this part of the discussion. From our construction of the powers of the government and of the treaty with Spain the danger of the nationalization of savage tribes cannot arise.

These views answer, in our judgment, the chief arguments of the opinion, but to make a complete reply and to justify a different conclusion we should consider and interpret the treaty

with Spain. We will, however, not do so now. It has been done in the concurring opinion in *Downes* v. *Bidwell*, and it is not necessary to anticipate the statements and reasoning of that opinion.

We said at the outset that it could be demonstrated that Porto Rico occupied a relation to the United States between that of being a foreign country absolutely and of being domestic territory absolutely, and because of that relation its products were subject to the duties imposed by the Dingley act. And, concluding, we say, we believe that, in this opinion and the one referred to, we have made that demonstration; made it from the Constitution itself, the immediate and continued practice under the Constitution, judicial authority and the treaty with Spain. And that demonstration does more than declare the legality of the duties which were levied upon the sugars of the plaintiff in error. It vindicates the government from national and international weakness. It exhibits the Constitution as a charter of great and vital authorities, with limitations indeed, but with such limitations as serve and assist government, not destroy it; which, though fully enforced, yet enable the United States to have—what it was intended to have—"an equal station among the Powers of the earth," and to do all "Acts and Things which Independent States may of right do." And confidently do, able to secure the fullest fruits of their performance. All powers of government, placed in harmony under the Constitution; the rights and liberties of every citizen secured—put to no hazard of loss or impairment; the power of the nation also secured in its great station, enabled to move with strength and dignity and effect among the other nations of the earth to such purpose as it may undertake or to such destiny as it may be called.

The judgment of the Circuit Court should be affirmed.

MR. JUSTICE GRAY, dissenting.

I am compelled to dissent from the judgment in this case. It appears to me irreconcilable with the unanimous opinion of this court in *Fleming* v. *Page*, 9 How. 603, and with the opinions of the majority of the Justices in the case, this day decided, of *Downes* v. *Bidwell*.